## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | : Chapter 11 |
| | : |
| LESLIE CONTROLS, INC., | : Case No. 10-_____ (___) |
| | : |
| Debtor.[1] | : |
| | : |

## DECLARATION OF G. WAYNE DAY IN SUPPORT OF CHAPTER 11
## PETITION AND FIRST-DAY PLEADINGS

Pursuant to 28 U.S.C. § 1746, G. Wayne Day declares as follows, under penalty of perjury:

1.      I am the Chief Restructuring Officer of Leslie Controls, Inc. (the "Debtor," the "Company" or "Leslie"), a corporation organized under the laws of the State of Delaware.  In my capacity as the Chief Restructuring Officer, I have become familiar with the day-to-day operations, financial condition, books and records, and business affairs of the Debtor.  I submit this Declaration in support of the Company's Chapter 11 petition filed as of the date hereof (the "Petition Date") and first-day motions listed (collectively, the "First-Day Pleadings").

2.      Except as otherwise indicated, all facts set forth in this Declaration are offered to the best of my knowledge, information and belief and are based upon my personal knowledge, my review of relevant documents, information provided to me by the Company's management or professionals working with me or under my supervision, or my informed opinion based upon my experience and knowledge of the Company's industry, operations and financial condition.  I am authorized to submit this Declaration on behalf of the Company, and, if I were called upon to testify, I could and would testify competently to the facts set forth herein.

---

[1] The last four digits of the Debtor's federal tax identification number are 3780.

3.      To minimize any adverse effects on its business as a result of the commencement of the Company's Chapter 11 case, the Company has requested various types of relief in the First-Day Pleadings.  The First-Day Pleadings seek relief, among other things, to:  (a)  ensure the continuation of the Company's cash management system and other business operations without interruption, and authorize the Company to obtain debtor-in-possession financing and to use cash collateral; (b) preserve customer and vendor relationships; (c) maintain employee morale and confidence; and (d) establish certain other administrative procedures to promote a smooth transition into Chapter 11.  Gaining and maintaining the support of the Company's employees, customers, vendors and other key constituencies as well as maintaining the day-to-day operations of the Company's business with minimal disruption, will be critical to the Company's reorganization efforts and in maximizing the recovery prospects for all interested constituencies. Moreover, the relief requested in the First-Day Pleadings is in the best interest of the Company, its creditors and estate and is necessary to avoid immediate and irreparable harm.

4.      To familiarize the Court with the Company and the relief requested in the First-Day Pleadings, this Declaration is organized as follows:  Section I describes the nature of the debtor's business and circumstances leading to the Chapter 11 case; and Section II incorporates and affirms the facts that support the relief requested in the First-Day Pleadings.

I.      **NATURE OF THE DEBTOR'S BUSINESS AND CIRCUMSTANCES LEADING TO THE CHAPTER 11 CASE**

    A.      <u>**History of Debtor's Business and Products**</u>

5.      The Company is a legal entity incorporated under the laws of the State of Delaware, with its headquarters located in Tampa, Florida.

6.      In 1884, J. S. Leslie, the Company's founder, emigrated from Toronto, Canada to Paterson, New Jersey.  After emigrating to New Jersey, J. S. Leslie produced a  "rotary" snow

plow that was mounted on the front of locomotives. In 1899, J. S. Leslie purchased patent rights to a pressure regulator, which was used to supply constant air pressure to atomize locomotive fuel.

7.      The origins of the Company can be traced back to 1905, when J. S. Leslie established the "Leslie Company" and built a foundry, a machine shop, and a high pressure steam test plant in Lyndhurst, New Jersey. J. S. Leslie adapted the pressure regulator to other applications such as an application used to control steam heat in railroad cars. The pressure regulator application was used on the first U.S. Navy ship, the Battleship Georgia.

8.      In 1926, S. Inglis Leslie, the son of J.S. Leslie, along with other investors, purchased the business from his father and re-incorporated it under the name "Leslie Co." Under Inglis Leslie's leadership, a series of new products were developed and marketed, including pressure reducing valves, temperature regulators, controllers, self-cleaning strainers, and steam powered whistles for railroad and ship applications. The shipbuilding program, which preceded World War II, resulted in a considerable increase in production at Leslie Co.

9.      Through the shipbuilding program, the U.S. Navy used the Company's regulators for various kinds of services. Ultimately, the Company became a major supplier of steam control equipment for military and merchant ships during both World Wars and has continued as a supplier of military/commercial marine service products.

10.     In 1946, J. S. Leslie's grandson, John S. Leslie, became President and the third successive generation of Leslies to lead the Company. The Company's product line grew over the years to incorporate equipment for industrial and utility customers. In 1968, to account for its increase in growth and customer base, the Company moved into a larger plant in Parsippany, New Jersey. Until approximately 1970, the U.S. Navy was the Company's largest customer.

11.    In 1982, John S. Leslie sold the Leslie Company to the executive operating board of the Company.  Four years later, in 1986, the Company moved its operations to a newly-built 150,000 square foot facility in Tampa, Florida, and the Company was re-named "Leslie Controls, Inc," the Company's current legal name.

12.    After moving to the new facility in Florida, Leslie broadened the products it offered to include a comprehensive array of applications designed for total fluid management of steam and other fluids.  In 1989, the Company's stock was sold to Watts Industries, Inc. ("Watts"), a leading independent manufacturer of valves, and the Company became a wholly-owned subsidiary of Watts.  At the time of the stock purchase, the Company had approximately 250 employees in its Florida facility.  One benefit of the transaction was that Watts provided a broader scope of fluid control products distributed throughout the global marketplace.

13.    During the period in which it was a subsidiary of Watts, the Company's customer base and product lines further expanded, largely through internal product development and acquisitions.  In 1994, the "Aeroflow" severe service control valve product line was introduced. The following year, the Company acquired the Kieley Mueller Control Valve product line from International Valve Corp. of Des Moines, Iowa.

14.    In 1999, Watts separated its instrumentation and fluid regulation and petrochemical businesses from its existing plumbing and heating and water quality businesses, and created CIRCOR International, Inc. ("CIRCOR").  CIRCOR was formed as a separate, independent public holding company whose subsidiary companies operated the instrumentation and fluid regulation and petrochemical businesses.  As part of that separation, CIRCOR acquired the Company's stock from Watts, and Leslie became a wholly-owned subsidiary of CIRCOR.[2]

---

[2]    In connection with the transaction between Watts and CIRCOR, a Distribution Agreement between Watts and CIRCOR provided in part that "[o]n and after the Distribution Date, Circor shall indemnify . . . each member of the Watts Group . . . (the 'Watts Indemnitees') from and against

15.     As of July 12, 2010 (the "Petition Date"), the Company employs 178 employees, of whom 109 are hourly and 86 are salaried.  The Company's total net revenues in 2009 exceeded $35 million.

**B.     Liabilities**

       i.     **Asbestos-Related Personal Injury and Wrongful Death Claims against Leslie**

16.     Certain of the asbestos-related personal injury and wrongful death claims ("Asbestos PI Claims") asserted against the Company relate to two small component parts previously used inside the main body of a Leslie valve.  The first such component is a copper-jacketed or spiral-wound gasket that was used to seal the upper portion of the valve to the main body.  The second such component is braided rope or ring packing material.  Both of these components were purchased from outside suppliers and specified by the Navy for use.  Leslie never mined, manufactured or licensed any asbestos-containing products.

17.     In addition, from the 1940's through the 1960's, asbestos insulation was used to insulate steam piping and valves aboard Navy ships.  The Company had no involvement in specifying, manufacturing or installing any type of insulation.  In comparison to the large amount of asbestos that was used in a typical U.S. Navy ship, the amount of asbestos used in the Company's valves was nominal.  Indeed, a Leslie valve used approximately 90 ounces of asbestos.

18.     As the medical problems related to prolonged exposure to asbestos particles became known, lawsuits resulted in the bankruptcies of many major suppliers of the product.  As a result, litigants pursued recoveries against second- and third-tier suppliers of products that had any asbestos content, including the Company.

---

any and all damages, loss, liability and expense . . . incurred or suffered by any of the Watts Indemnities and arising out of . . . any of the Circor Liabilities, whether before or after the Distribution Date."

19.    At the time of Watts' acquisition of Leslie's stock in 1989, Leslie was involved as a defendant or third party defendant in six actions involving claims for damages arising from plaintiffs' exposure to asbestos.  Leslie settled one claim in 1989 for $500.

20.    From July 1990 through December 1995, Leslie was sued as a third-party defendant in some 215 maritime asbestos actions in the United States District Court for the Northern District of Ohio.  The underlying claims were filed by present or former employees of various shipping companies against certain ship-owners, who in turn filed third-party actions against some thirty different contractors, subcontractors, and suppliers, including Leslie.  The claims against Leslie asserted that the gaskets in metal valves supplied by Leslie contained asbestos that contributed to the asbestos exposure of the plaintiffs who worked on the defendants' ships.  In 1995, one claim involving a number of defendants, including Leslie was settled in 1995 for about $300,000, of which Leslie paid $2,000.

21.    From June 1996 through the Watts' spinoff of CIRCOR in October 1999, Leslie received two third-party claims brought in the Superior Court of California, San Francisco County, but those two third-party claims were later dismissed without payment.  No new ship-owner claims were filed against Leslie during this period, and the third-party claims that were previously filed against Leslie were effectively stayed by court-ordered moratoriums on answers and motion practice.  In addition, during the period from October 1999 through the third quarter of 2001, Leslie received no new asbestos claims and its third-party maritime asbestos cases remained nearly inactive.

22.    In the last quarter of 2001, however, Leslie was named in one case brought in Mississippi on behalf of 122 plaintiffs against over 250 defendants.  In 2002, that case was followed by 25 additional Mississippi cases brought on behalf of more than 1,500 claimants, as

well as some 10 claims in California Superior Court in San Francisco, two third-party claims in

Michigan, and a single claim in New York.  In subsequent years, increasing numbers of Asbestos

PI Claims, including mesothelioma claims, were filed against Leslie.  As a result, Leslie has

incurred increasingly large costs for the defense and, where appropriate, settlement of Asbestos

PI Claims.  During 2007, Leslie for the first time suffered adverse verdicts.  In November 2009,

the California Court of Appeals issued a ruling reversing one of the two judgments against

Leslie, but that appellate decision is pending further appeal.  On June 3, 2010, the California

Court of Appeal issued a ruling that conditionally affirmed the other verdict but awarded Leslie a

new trial as to non-economic damages unless the plaintiffs agree to a remittitur.

23.      As of the Petition Date, Leslie has approximately 1307 pending Asbestos PI

Claims.

          ii.      **Asbestos-Related Personal Injury and Wrongful Death Claims against
                   Entities other than Leslie**

24.      In addition to Asbestos PI Claims asserted against Leslie, certain plaintiffs also

have alleged derivative or successor Asbestos PI Claims arising out of the conduct or products of

Leslie against other parties related to Leslie, including CIRCOR and Watts.

25.      No judgment has ever been entered against CIRCOR or Watts in any of these

cases, nor has CIRCOR or Watts ever paid any money on behalf of itself to plaintiffs in

settlement of any of these cases.  Where CIRCOR has settled an asbestos-related personal injury

or wrongful death case in which CIRCOR was a party, settling plaintiffs have released all alleged

asbestos-related personal injury and wrongful death claims against CIRCOR (as well as Leslie)

that were alleged to be derivative of, based on, or related to, products containing asbestos

distributed by Leslie.

### iii.    Prepetition Capital Structure

26.    Leslie's principal capital structure consists of the Secured Note, an unsecured guaranty of the CIRCOR Unsecured Facility (each as defined below), and equity. As of the Petition Date, Leslie had approximately $14.6 million of secured debt.

### The Secured Note

27.    On or about July 29, 2009, Leslie entered into a Secured Promissory Note (the "Secured Note") with CIRCOR. The Secured Note provides for an aggregate commitment of $30,000,000 with an initial advance of $222,998.18. CIRCOR has a first priority lien on substantially all of the assets of Leslie. The proceeds of the Secured Note were used to cover payment of settlements, defense costs and other liabilities. As of the Petition Date, there was $14,326,338 in outstanding principal and $334,726 in outstanding interest under the Secured Note.

### Guaranty of the CIRCOR Unsecured Credit Facility

28.    On or about July 29, 2009, CIRCOR, as borrower, entered into a Credit Agreement (the "CIRCOR Unsecured Facility") with KeyBank National Association, Suntrust Bank, Sovereign Bank, Royal Bank of Canada and Bank of America, N.A. Pursuant to the CIRCOR Unsecured Facility, the lenders agreed to extend up to $190,000,000 of credit to CIRCOR to refinance certain of CIRCOR's then existing indebtedness and to provide working capital and funds for other general corporate purposes. Each of CIRCOR's U.S. subsidiaries, including Leslie, jointly and severally, irrevocably and unconditionally guaranteed CIRCOR's obligations under the CIRCOR Unsecured Facility.

29.     As of the Petition Date, CIRCOR owed approximately $532,000, consisting of

$500,000 in outstanding principal, plus $32,000 in accrued unpaid interest, under the CIRCOR

Unsecured Facility.

**Equity**

30.     Leslie is authorized to issue 100 shares of common stock, par value $0.01 per

share.  CIRCOR, a non-Debtor entity, owns 100% of the outstanding common stock of Leslie.

There is no public market for the equity securities of Leslie.

**C.     Insurance Coverage**

31.     Beginning at least as early as 1967, Leslie maintained primary comprehensive

general liability insurance coverage applicable to Asbestos PI Claims.  That primary coverage

was issued at least by Continental Casualty Co. ("Continental") from 1967 to 1974, New Jersey

Manufacturers Insurance Co. from 1974 to 1982, Zurich Insurance Co. from 1982 to 1983,

Integrity Insurance Co. from 1983 to 1984, The Central National Insurance Co. of Omaha

("Central National") from 1984 to 1985, and National Union Fire Insurance Co. of Pittsburgh,

Pa. ("National Union") from 1985 to 1986.  Leslie also maintained excess liability coverage

applicable to Asbestos PI Claims from various insurers from at least 1967 through 1985.

32.     The comprehensive general liability insurance policies purchased by Leslie at

least until August 25, 1986, are "occurrence-based" policies, which, subject to other policy

terms, generally insure against "occurrences" that result in bodily injury or property damage that

trigger the applicable policy period, even if the injury or damage does not manifest itself until

after the policy period.  Leslie's pre-1986 "occurrence" policies provide insurance coverage for

asbestos and other "long-tail" claims, which are commonly asserted years or decades after the

underlying injuries are alleged to have occurred.  Beginning in approximately November 1,

1985, Leslie's excess insurance policies may arguably contain policy exclusions generally

barring coverage for liabilities resulting from asbestos-related injuries or damage. Such alleged asbestos exclusions may be included in the primary policies Leslie purchased after August 25, 1986.

33.    In total, from 1967 to 1985, Leslie purchased primary, umbrella, and/or excess comprehensive general liability policies with undisputed combined limits of more than $136 million. Each policy appears to contain per-occurrence and annual aggregate limits of liability and may only cover claims to the extent any applicable lower level insurance for the covered period is or becomes exhausted. As a general matter, primary policies respond to claims first, then umbrella or first-layer excess policies, followed in particular years by second-layer excess policies.

34.    Leslie's primary comprehensive general liability policies include a duty on the part of the insurers to defend claims that are potentially covered under their policies and in addition a duty to indemnify Leslie with respect to claims up to properly specified applicable limits of liability. Some of the primary comprehensive general liability policies purchased by Leslie between 1967 and 1985 reportedly have been exhausted, and others may be significantly impaired, through the payment of asbestos-related liabilities. Additionally, Leslie and Continental, one of its primary insurers, executed an insurance settlement agreement to resolve certain disputed years of coverage. As a result of that settlement, Leslie has released its rights under insurance policies issued by Continental.

35.    Moreover, of the approximately $118 million in excess coverage purchased by Leslie, more than $74 million was issued by domestic and foreign carriers that appear to be insolvent. Accordingly, as of June 17, 2010, and excluding any insurance proceeds that are available pursuant to an Insurance Settlement Agreement, there appears to remain nearly $48

million of solvent primary and excess comprehensive general liability coverage available to pay

Asbestos PI Claims between at least 1967 and 1985, depending on how those policies are

interpreted.

**D.      Circumstances Leading to the Company's Chapter 11 Case**

36.      The cost of defending and resolving Asbestos PI Claims asserted against Leslie

has been and continues to be substantial.  In addition, the amount of insurance coverage

remaining to Leslie has continued to decline.  These events have placed significant pressure on

Leslie's ability to manage its liabilities.  Leslie's gross expenditures for the costs of defending

Asbestos PI Claims were some $2.2 million in 2005, $5.8 million in 2006, $8.9 million in 2007,

$10.2 million in 2008, and $12.3 million in 2009.  Leslie's gross indemnity (settlement)

payments for Asbestos PI Claims were some $1.1 million in 2005, $2.3 million in 2006, $4.3

million in 2007, $4.1 million in 2008, and $6.3 million in 2009.  As of the Petition Date, Leslie's

counsel is defending approximately 1307 pending Asbestos PI Claims.

37.      Leslie currently estimates that the remaining coverage available to it under the

insurance policies and various insurance settlement agreements will not be sufficient to satisfy in

full the pending and future Asbestos PI Claims asserted against it.

38.      In light of these circumstances, Leslie determined that it was necessary to

commence a case under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy

Code") to preserve its remaining assets and to confirm a plan of reorganization that would allow

Leslie to satisfy its asbestos-related liabilities in accordance with the requirements of section

524(g) of the Bankruptcy Code.  I believe that it is necessary for any such channeling injunction

to cover all Asbestos PI Claims based on the conduct or products of Leslie, against Leslie and

parties related to Leslie including, but not limited to, past and present affiliates of Leslie (such as

CIRCOR and Watts), past and present officers and directors of Leslie, predecessors in interest to

Leslie, and any entity that owned a financial interest in Leslie or its affiliates or predecessors.

39.      Accordingly, Leslie and CIRCOR commenced negotiations with the holders of

asbestos-related personal injury and wrongful death claims arising out of the conduct or products

of Leslie (or its representatives) in order to establish a consensus on the framework for a Chapter

11 plan of reorganization that would satisfy the requirements of section 524(g) of the Bankruptcy

Code and treat all present and future claimants fairly and equitably.

**E.      Prepetition Settlement Negotiations**

      **i.      The Ad Hoc Committee Representing Current Asbestos PI Claim Holders**

40.      In November 2009, counsel for Leslie and CIRCOR began discussions with

plaintiffs' counsel who represent numerous current holders of Asbestos PI Claims against both

Leslie and CIRCOR in order to explore the feasibility of and the potential for a prenegotiated

Chapter 11 plan of reorganization that would include an Asbestos PI Trust and a channeling

injunction pursuant to section 524(g) of the Bankruptcy Code.  Such counsel, without the

involvement of Leslie or CIRCOR, created an ad hoc committee (the "Ad Hoc Committee") for

the purpose of negotiating the terms of a possible plan of reorganization for Leslie.

41.      The members of the Ad Hoc Committee were:  Joseph Belluck (Belluck & Fox,

LLP); Alan R. Brayton (Brayton & Purcell LLP); Matthew Bergman (Bergman, Draper &

Frockt); John D. Cooney (Cooney & Conway); James F. Early (Early, Ludwick, Sweeney &

Strauss, LLC); Jordan Fox (Belluck & Fox, LLP); David C. Greenstone (Simon, Eddins &

Greenstone, LLP); Dean Hanley (Paul Hanley, LLP); Mark H. Iola (Stanley, Mandell & Iola,

LLP); Steven Kazan (Kazan, McCain, Lyons, Greenwood & Harley, PLC); Peter Kraus (Walters

& Kraus, LLP); William (Bill) Levin (Levin, Simes, Kaiser & Gornick, LLP); Jeffrey Simon

(Simon, Eddins & Greenstone, LLP); and Perry Weitz (Weitz & Luxeberg, P.C.).  The Ad Hoc

Committee, in turn, appointed a three-person steering committee (the "Steering Committee") to

handle the actual negotiations over the terms of such a plan.  The members of the Steering

Committee were:  Steven Kazan, Mark Iola and John Cooney.

42.    The Ad Hoc Committee selected the law firm of Montgomery, McCracken,

Walker & Rhoads, LLP as its counsel, the firm of Frank Gecker LLP as its insurance experts,

and the firm of Charter Oak Financial Consultants, LLC as its financial experts.

### ii.    The Pre-Petition Future Claimants' Representative

43.    In addition to satisfy the requirements of section 524(g) of the Bankruptcy Code

with regard to obtaining a channeling injunction, Leslie determined that it was necessary and

appropriate to engage an independent third-party representative (the "Pre-Petition Future

Claimants' Representative") for the purpose of protecting the rights of persons that might

subsequently assert asbestos-related personal injury or wrongful death claims against Leslie (or,

derivatively, against CIRCOR or Watts arising out of Leslie's conduct or products).

44.    Beginning in approximately November 2009, to further explore whether a

Chapter 11 case was likely to provide the best means of quantifying and satisfying Leslie's

asbestos-related liabilities, Leslie commenced a nationwide search for an individual to serve as

the representative for the holders of future demands alleging exposure to products containing

asbestos distributed by Leslie.  In conducting its search for possible candidates to serve as Future

Claimants' Representative, Leslie focused on persons with reputations of high integrity and with

recognized experience and expertise in dealing with mass torts, particularly asbestos, and who

would not have any actual or perceived conflict of interest.

45.    After that process, Leslie asked James L. Patton, Jr. whether he would be willing

to serve as the Pre-Petition Future Claimants' Representative and, if appointed by the Court, as

the Future Claimants' Representative, based on Mr. Patton's reputation for integrity, renown in

the field of complex mass tort proceedings, and extensive experience with asbestos-related

personal injury litigation. Specifically, since May 8, 2006, Mr. Patton has served as the Future

Claimants' Representative in the Celotex Corporation asbestos-related bankruptcy case. In

addition, Mr. Patton has represented the Future Claimants' Representatives in connection with

asbestos-related bankruptcy cases of Armstrong World Industries, Inc., Babcock & Wilcox

Company, The Celotex Corporation, Federal-Mogul Global Inc., Kaiser Aluminum Corporation,

Mid-Valley, Inc. (Halliburton), North American Refractories Company, Owens-Corning,

Pittsburgh Corning Corporation, and USG Corporation.

46.    Prior to assuming the role of Pre-Petition Future Claimants' Representative, Mr.

Patton had no association or relationship with, or other connection to, Leslie or any affiliate of

Leslie, and had never represented any plaintiff, defendant, or insurer in any asbestos-related

litigation against Leslie.

47.    Mr. Patton selected his law firm, Young, Conaway, Stargatt & Taylor LLP, as his

counsel. Mr. Patton also retained Analysis Research Planning Corporation to act as his expert

for the purpose of evaluating the Asbestos PI Claims against Leslie.

### iii.    Due Diligence and Plan Negotiations

48.    The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative,

personally and/or through their various representatives, have conducted extensive due diligence

concerning the background, nature, and scope of Leslie's liability for Asbestos PI Claims. This

investigation has included, among other things, careful review of the facts concerning Leslie's

historical involvement with asbestos; the nature and extent of past and pending asbestos

litigation against Leslie, including the types of claims asserted and the legal issues raised; the

projected value of present and future Asbestos PI Claims; and the extent to which insurance and

other Leslie assets may be available to satisfy these liabilities in whole or in part. The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative have also examined the potential for recovery by claimants asserting asbestos-related claims against CIRCOR and Watts, and their affiliates, based upon a variety of legal theories, including derivative liability theories such as alter ego, successor liability, and/or fraudulent conveyance.

49.     That due diligence process included the review of many thousands of pages of documents and electronic files relating to Leslie, CIRCOR, and Watts. In addition, Leslie and CIRCOR provided written responses to all of the numerous information requests prepared by the Ad Hoc Committee and the Pre-Petition Future Claimants' Representative. The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative have also reviewed the sworn declarations of a number of current and former Leslie and CIRCOR employees concerning the relationship between Leslie, CIRCOR, and Watts. Finally, Leslie and CIRCOR have provided detailed presentations to the Ad Hoc Committee and the Pre-Petition Future Claimants' Representative on relevant factual and legal issues.

50.     Following the extensive due diligence process described above, representatives of Leslie, representatives of CIRCOR, the Ad Hoc Committee, and the Pre-Petition Future Claimants' Representative spent considerable time negotiating over the terms of a possible plan of reorganization for Leslie. These negotiations addressed all of the material provisions of a plan, including without limitation the funding for a trust to be established by the plan, the contributions to be made by Leslie and CIRCOR, the terms of a channeling injunction, the issues relating to insurance coverage, and indemnification provisions. Ultimately, Leslie, CIRCOR, the Ad Hoc Committee, and the Pre-Petition Future Claimants' Representative reached an agreement on the terms for a proposed plan of reorganization for Leslie (the "Plan").

**F.**    **The Plan**[3]

51.    The Plan contemplates the establishment of a trust under section 524(g) of the Bankruptcy Code (the "Asbestos PI Trust") and an injunction (the "Asbestos PI Channeling Injunction") that will channel all current asbestos-related Claims and future asbestos-related Demands to the Asbestos PI Trust.  The Asbestos PI Channeling Injunction will cover all asbestos-related personal injury and wrongful death claims and demands based in whole or in part on the alleged conduct or products of Leslie.  The Asbestos PI Channeling Injunction will also channel all current asbestos-related Claims and future asbestos-related Demands based in whole or in part upon asbestos-related personal injury and wrongful death Claims and Demands against certain parties related to Leslie, including, but not limited to, past and present affiliates of Leslie, past and present officers and directors of Leslie, predecessors in interest to Leslie, and any entity that owned a financial interest in Leslie or its affiliates or predecessors.

52.    Specifically, the Asbestos PI Channeling Injunction will cover Asbestos PI Claims and Demands against Leslie and Reorganized Leslie, as well as Asbestos PI Claims and Demands against CIRCOR and its affiliated entities (the "CIRCOR Protected Parties"), and Leslie's former parent company, Watts, and its affiliated entities (the "Watts Protected Parties") (together, the "Protected Parties"), based on any purported liability arising from their ownership of or relation to Leslie, parties that have a right of indemnity against Leslie or CIRCOR, and parties that have actual or alleged liability with respect to Asbestos PI Claims or Demands in each case related to or arising from the conduct or products of Leslie that purportedly caused asbestos-related personal injury or wrongful death, including any claim based upon a theory of veil piercing, alter ego, successor liability, fraudulent conveyance or conspiracy.

---

[3] Capitalized terms used in this Section 1(F) that are not otherwise defined herein have the meaning ascribed to them in the Plan.

53.     I have been advised that the effect of "channeling" Asbestos PI Claims and Demands to the Asbestos PI Trust is that they may only be pursued through, and paid from, the Asbestos PI Trust; Asbestos PI Claims or Demands may not be asserted against Leslie, CIRCOR, Watts and their respective Protected Parties.

54.     The Asbestos PI Trust will be funded with (i) a Cash contributions from Leslie and CIRCOR, on behalf of themselves and certain other parties; (ii) the Leslie Promissory Note executed by Leslie and secured by a pledge by CIRCOR of 100% of the outstanding voting equity interests in Reorganized Leslie; and (iii) an assignment of the Asbestos Insurance Rights and Asbestos Insurance Actions.  The assets of the Asbestos PI Trust will be used to pay current and future asbestos-related personal injury and wrongful death claimants in accordance with the terms of the Asbestos PI Trust Distribution Procedures established under the Plan.

55.     The Asbestos PI Trust's assets, which are limited, must be managed by the Asbestos PI Trustees to ensure that funds are available to pay all current claimants as well as all expected future claimants.  Nevertheless, for all the reasons detailed in the Disclosure Statement, Leslie believes that there will be substantially more assets available to pay claimants under the Plan than would be the case if there were no Plan and Leslie were forced to pay Claims solely from its own assets.

56.     I believe that substantially more assets will be available under the Plan because, among other reasons, CIRCOR is contributing substantial assets to the Asbestos PI Trust as part of the Plan on behalf of itself and the CIRCOR Protected Parties and Watts and the Watts Protected Parties, in exchange for the protections provided to these parties under the Plan, which would not be contributed otherwise.  Moreover, without the settlements and distribution procedures in the Plan, there likely would be years of costly and time-consuming litigation

involving creditors and other parties that could be avoided through the Plan's orderly

administrative process.  Absent the Plan, distributions to creditors would be delayed and, due to

the costs of litigation, the funds actually available for creditors would be reduced substantially.

## II.     FIRST-DAY PLEADINGS

57.     Concurrently with the filing of this Chapter 11 case, the Debtor filed a number of

First-Day Pleadings.[4]  In addition, the Debtor filed contemporaneously herewith the Plan and the

Disclosure Statement in Support of the Plan (the "Disclosure Statement").  The Debtor also

commenced an adversary proceeding by filing a complaint (the "Complaint") against all known

and unknown, current and future claimants who have asserted and who may assert Leslie

Derivative Liability Claims (as defined in the Complaint) against the Protected Parties (as

defined in the Complaint), including CIRCOR.  In addition, the Debtor filed an Emergency

Motion for an Order Pursuant to Section 105(a) and 363(a) of the Bankruptcy Code and

Bankruptcy Rule 7065 Confirming Application of the Automatic Stay and Granting a

Preliminary Injunction and a Temporary Restraining Order (the "Emergency Motion").  As

described in detail in section I(F) above, the Plan reflects the terms of a settlement entered into

prior to the commencement of this case among Leslie, CIRCOR, Watts, the Ad Hoc Committee,

and the Pre-Petition Future Claimants' Representative.

58.     The Debtor anticipates that the Court will conduct a hearing soon after the

commencement of this case (the "First-Day Hearing"), at which the Court will hear the First-Day

Motions as well as the Emergency Motion.

59.     An important and critical element of the success of this Chapter 11 case will be

the entry of orders granting the relief requested in each of the First-Day Motions and the

---

[4] Capitalized terms not defined in the sections below have the meanings ascribed to them in the applicable First-Day Pleading.

Emergency Motion.  Generally the First-Day Motions are designed to facilitate:  (a) the

continuation of the Debtor's existing cash management systems and other business operations

without interruption, (b) approval on an interim basis of the postpetition financing agreement

negotiated between the Debtor and CIRCOR and authorization for the Debtor's use of cash

collateral, (b) preservation of customer and vendor relationships, (c) maintenance of employee

morale and confidence, and (d) establishment of certain other administrative procedures to

promote a smooth transition into Chapter 11.  The factual background in support of each First-

Day Motion is provided below:

    **A.**    **Motion for Entry of an Order Authorizing the Retention and Employment of EPIQ Bankruptcy solutions, LLC as Claims, Noticing, and Balloting Agent**

    60.    The Debtor requests the issuance and entry of an order appointing Epiq

Bankruptcy Solutions, LLC ("Epiq") to act as the official Claims Agent of the Clerk of the

Bankruptcy Court in order to assume full responsibility for the distribution of notices and proofs

of claim, and maintenance, processing and docketing of proofs of claim filed in the Debtor's

Chapter 11 case, and to provide such additional services as are described in more detail in the

motion.

    61.    Based on Epiq's substantial experience in providing similar services in other large

Chapter 11 cases, including noticing, claims processing and reconciliation, and plan voting and

distribution services, I believe that Epiq is qualified to serve as Claims, Noticing and Balloting

Agent in this Chapter 11 case.  In addition, I believe that the Debtor's estate, creditors, parties-in-

interest, and this Court will benefit as a result of Epiq's experience and cost-effective methods.

> **B.**  **Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and (II) Authorizing Banks to Honor Related Checks and Electronic Transfers**

62.     The Debtor seeks the entry of interim and final orders authorizing the Debtor to pay, in the ordinary course of business, in its discretion, various taxes and related obligations that accrued or that arose before the Petition Date that will become due during the pendency of this case.  On an interim basis, the Debtor only seeks authorization to pay certain taxes that will become due within 30 days of the Petition Date.  The Debtor further requests that the Court schedule a final hearing within approximately 25 days of the Petition Date to consider approval of the motion on a final basis.

**63.**     The Debtor seeks the relief requested in the event and to the extent that: (a) the various taxes and related obligations that accrued prior to the Petition Date (i) were not paid prepetition, (ii) were not processed prepetition or (iii) were paid in an amount that was less than is actually owed, including amounts subsequently determined upon any audit or otherwise to be owed for periods prior to the Petition Date; (b) any payments made prepetition were rejected, lost or otherwise not received in full by any taxing authority, or (c) any taxes and related obligations accrued or were incurred prepetition that will become due during the pendency of these cases in the ordinary course of business.  The Debtor estimates that as of the Petition Date, its accrued and unpaid prepetition taxes were approximately $147,000, $13,000 of which consist of sales taxes and $134,000 of which consist of personal and real property taxes  The Debtor further estimates that during the pendency of this case the amount of such prepetition taxes to be paid to the various Taxing Authorities will not exceed $160,000.

64.     The Debtor further requests that the order approving this motion authorize banks and financial institutions to honor and process electronic transfers or checks issued by the Debtor on account of any prepetition taxes that have not cleared as of the Petition Date, and to rely on

the Debtor's representations as to which checks are issued and authorized to be paid in accordance with this motion, without any duty of further inquiry and without liability for following the Debtor's instructions.

65.    I believe that there are several justifications to grant the relief requested in this motion.  First, I have been advised that a portion of the taxes may be entitled to priority status under section 507(a)(8) of the Bankruptcy Code and therefore must be paid in full under any plan of reorganization.  Thus, payment of the taxes at this time only affects the timing of the payment and does not prejudice the rights of other creditors.

66.    Second, in some or all of the states in which the Debtor does business, I have been advised that liens can attach to property on which the Debtor has unpaid taxes, thus potentially entitling the relevant Taxing Authorities to a secured claim against property of the Debtor's estate and the payment of post-petition interest and penalties.  I have been advised that secured claims must be paid in full under any plan of reorganization.  Accordingly, I believe that payment of the Taxes will therefore affect only the timing of the payments, and not the amounts that would ultimately be payable to the applicable Taxing Authorities, and may, in some instances, allow the Debtor to avoid the payment of unnecessary interest and penalties.

67.    Third, I have been advised that some of the Taxes may constitute "trust fund" taxes that the Debtor is required to collect from third parties and hold in trust for the benefit of such Taxing Authorities, and may not constitute property of the estate.  Accordingly, it is my belief that, because the Debtor may have no equitable interest in any such trust fund Taxes, payment of such Taxes would not prejudice the rights of any of the Debtor's other creditors, and the Debtor should be permitted to pay them to the relevant Taxing Authorities as they become due.

68.     Fourth, I have been advised that failure to pay taxes could impose personal liability on the Debtor's directors and officers and may also cause some states to challenge the Debtor's right to operate within the states' jurisdictions. Addressing any action taken by these states would be costly and burdensome, and would be an unnecessary distraction during this Chapter 11 case. Therefore, I believe that it is in the best interests of the Debtor's estate to eliminate the possibility of the foregoing distractions.

69.     Fifth, the Debtor has a strong business purpose for paying the taxes. Indeed, failure to pay the taxes jeopardizes the Debtor's ability to continue to operate in various jurisdictions and may subject the Debtor's directors and officers to personal liability. Furthermore, taxing authorities may audit the Debtor if taxes are not timely paid. I believe that such audits would needlessly divert the Debtor's attention from its reorganization efforts. In addition, some taxing authorities may also seek to impose liens on the Debtor's assets on account of unpaid "trust fund" taxes, which liens would require time, effort and expense for the Debtor to challenge and remove.

70.     Accordingly, I believe that the relief requested in the motion should be approved.

**C.     Motion for Entry of an Interim and Final Order (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining the Adequate Assurance of Payment**

71.     The Debtor seeks entry of interim and final orders, (i) prohibiting utility providers from altering, refusing or discontinuing service to the Debtor on account of prepetition invoices, including the making of demands for security deposits or accelerated payment terms; (ii) providing that the utility providers have "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code, based, *inter alia*, on the Debtor's establishment of a segregated account containing an amount equal to fifty percent (50%) of the Debtor's estimated

average monthly cost of utility service of approximately $45,000 (or $22,500), which may be

adjusted by the Debtor for reasons specified herein following the final hearing on this Motion;

and (iii) establishing procedures for resolving requests for additional adequate assurance and

authorizing the Debtor to provide adequate assurance of future payment to the utility providers.

72.     Uninterrupted utility services are essential to the Debtor's ongoing operations and

the success of the Debtor's reorganization efforts.  A disruption of the utility services at any of

the Debtor's facilities would likely be costly to the Debtor and harmful to its business, as the

Debtor would be forced from the outset of this Chapter 11 case to focus on finding replacement

utility providers and services, rather than focusing on the operation and restructuring of its

business.  Moreover, the business disruption that would likely result from interruption of the

utility services would damage the Debtor's customer relationships, revenues, and profits and

would adversely affect the Debtor's restructuring efforts, to the detriment of its estates, creditors,

and employees.  It is my belief, therefore, that it is critical that the relief requested in the motion

be granted and that the Debtor's utility services continue uninterrupted.

**D.   Motion for an Order (I) Authorizing: (A) Payment of Prepetition Employee Wages, Salaries, Commissions and Other Compensation; (B) Payment of Prepetition Compensation Owed to Independent Contractors and Temporary Workers; (C) Reimbursement of Prepetition Employee Business Expenses; (D) Payments for Which Prepetition Payroll and Tax Deductions Were Made; (E) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (F) Payment of Workers' Compensation Obligations; and (G) Payment to Third Parties of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (II) Authorizing and Directing Applicable Banks and Other Financial Institutions to Honor and Pay All Checks and Transfers Drawn on the Debtor's Payroll Accounts to Make the Foregoing Payments**

73.     To minimize the personal hardship that these individuals would suffer if

prepetition employee-related obligations are not paid when due or as expected, as well as to

maintain morale and an essential workforce during this critical time, the Debtor seeks entry of an

order (i) authorizing, but not directing, the Debtor, in accordance with its stated policies, to: (a) pay all prepetition wages, salaries, and other compensation owed to the Employees; (b) pay all prepetition compensation owed to individuals who work for the Debtor as Independent Contractors and Temporary Workers; (c) reimburse all prepetition business expenses to Employees; (d) make all payments for which prepetition payroll and tax deductions were made; (e) honor prepetition obligations under certain employee benefit programs and continue such programs in the ordinary course; (f) honor workers' compensation obligations; and (g) make all payments to third parties relating to the foregoing payments and contributions (collectively, and as more fully in the motion, the "Employee Wages and Benefits"); and (ii) authorizing and directing applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtor's payroll accounts to make the foregoing payments.

74.    As of the Petition Date: (i) the Independent Contractors and Temporary Workers are owed approximately $56,000; (ii) the aggregate amount of Unpaid Wages is approximately $300,000; (iii) approximately $500 in Reimbursable Expenses have been incurred but remain unpaid; (iv) the amount of accrued and outstanding prepetition obligations with respect to the Payroll Taxes is approximately $39,000; (v) the Debtor does not believe that all amounts previously deducted from Employees' earnings have been forwarded to the appropriate third party recipients; (vi) the total amount owed or accrued prepetition in connection with the Employee Benefits is approximately $240,000; (vii) the amount of accrued and outstanding prepetition obligations to CIRCOR with respect to the Health Care Programs is $110,000; (viii) the estimated costs of accrued but unpaid Leave Pay is approximately $93,000; (ix) the Debtor owes approximately $20,000 to CIRCOR on account of 401(k) Plan contributions made for the benefit of the Debtor's employees; (x) the Debtor owes approximately $2,100 to CIRCOR on

account of the Short-Term Disability Benefits provided to the Debtor's Employees and

approximately $2,000 to CIRCOR in connection with Long-Term Disability Benefits provided to

the Debtor's Employees; (xi) the Debtor estimates that approximately $7,000 is owed to

CIRCOR in connection with life insurance coverage and accidental death and dismemberment

insurance for full-time Employees; (xii) the Debtor owes less than $3,000 in connection with the

Tuition Program; and (xiii) the outstanding Continued Severance Payments owed by the Debtor

totaled approximately $49,728, which will be fully paid to two (2) former employees on July 25,

2010 and one (1) former employee on December 17, 2010.

75.    The Debtor seeks this relief because any delay in paying the Employee Wages

and Benefits (including, without limitation, the wages owed to Independent Contractors and

Temporary Workers) could severely disrupt the Debtor's relationship with its Employees and

dedicated non-employee personnel and irreparably impair the Employees' morale at the very

time that their dedication, confidence and cooperation are most critical. The Debtor faces the

risk that its operations may be severely impaired if the Debtor is not immediately granted

authority to pay the Employee Wages and Benefits. At this critical stage, it is my belief that the

Debtor simply cannot risk the substantial disruption of its business operations that would attend

any decline in workforce morale attributable to the Debtor's failure to pay the Employee Wages

and Benefits in the ordinary course of its business.

76.    If the relief requested herein is not granted, I believe that the Employees,

Independent Contractors and Temporary Workers would suffer hardship and, in many instances,

financial difficulties, since these monies are needed to enable them to meet their personal

obligations. In addition, without the requested relief, I believe that the Debtor's stability would

be undermined by the potential threat that otherwise loyal employees at all levels would seek

other employment.

> E.    **Motion for an Order Authorizing the Debtor to Honor Certain Prepetition Obligations to Customers and to Otherwise Continue Prepetition Customer Programs and Practices in the Ordinary Course of Business**

77.    The Debtor requests the entry of an order granting the Debtor authority to (i)

perform its prepetition obligations related to its customer programs as it determines advisable,

and (ii) continue, renew, replace, modify and/or terminate any of its customer programs, as the

Debtor determines advisable, in the ordinary course of business and without further application

to this Court.

78.    Prior to the Petition Date, and in the ordinary course of its business operations, the

Debtor engaged in certain practices to develop and sustain a positive reputation with its

customers and in the marketplace for its products (collectively, the "Customer Programs").  The

Customer Programs, include, among others, customer lines of credit, prepayments and

adjustments, and the assistance of manufacturer's.  The goals of the Customer Programs are to

meet competitive pressures, ensure customer satisfaction and generate goodwill for the Debtor,

thereby retaining current customers, attracting new ones, and ultimately enhancing the Debtor's

revenue and profitability.

79.    As of the Petition Date: the Debtor owes approximately $300,000 in outstanding

and accrued commission payments to manufacturer's representatives.  Moreover: (i) the Debtor

issues approximately $50,000 to $75,000 in credits per month to customers for returns; (ii)

approximately a dozen prepayments from customers ranging from $3,000 to $29,000 for orders

that have not been fulfilled.  In addition, the Debtor has received $2,797,738 in advanced

funding from Northrop Grumman for the purchase of raw material for a U.S. Navy program.

This amount has been spent by the Debtor, but shipments of the hardware will not begin until the

third quarter of 2010. When shipments begin, the advanced funding amounts will be applied

against the customer invoices pertinent to the shipments; (iii) the Debtor issues approximately

$50,000 to $75,000 in credits per month to customers for returns; and (iv) in 2009, the Debtor

incurred warranty expenses of approximately $1,000 per month.

80.     The Debtor desires to continue during the postpetition period those Customer

Programs that are beneficial to its business. I believe that such relief is necessary to preserve

critical customer relationships. Indeed, I also believe that the total operational and

administrative cost to the Debtor to continue the Customer Programs is relatively insignificant

when compared to the revenue that the Debtor generates from its customers. Accordingly, it is

my belief that it is necessary and appropriate for the Debtor to obtain the authority to continue

the Customer Programs on a postpetition basis in the ordinary course of business.

81.     In addition, in light of the fact that some of the Customer Programs, as they relate

to prepetition arrangements between the Debtor and its customers, may represent unperformed

prepetition obligations, the Debtor seeks this Court's authorization to perform all prepetition

obligations under the Customer Programs.

82.     Accordingly, I believe that it is in the best interests of the Debtor and its estate to

maintain and continue the Customer Programs in the ordinary course of business.

**F.      Motion for an Order (A) Authorizing Continued Use of Existing Cash Management System, (II) Authorizing Continued Use of Existing Bank Accounts and Business Forms, (III) Authorizing the Continuation of Certain Intercompany Transactions, (IV) Waiving the Requirements of 11 U.S.C. § 345(b) on an Interim Basis, and (V) Granting Administrative Expense Status to Postpetition Intercompany Transactions**

83.     The Debtor seeks entry of an order (i) authorizing the Debtor's continued use of

its existing cash management system, (ii) authorizing the Debtor to continue using its existing

bank accounts and business forms, (iii) authorizing the Debtor to continue intercompany

transactions, by and between the Debtor and its parent company, CIRCOR, or its non-debtor

subsidiaries (the "Non-Debtor Subsidiaries") or CIRCOR Flow Technologies India Private Ltd.

("CIRCOR Flow") or Regeltechnik Kornwesteim GmbH ("RTK GmbH") on a postpetition basis,

(iv) waiving the requirements of 11 U.S.C. § 345(b) on an interim basis with respect to the

Debtor's deposit and investment practices, and (v) granting administrative expense status to

postpetition intercompany transactions by and between the Debtor and CIRCOR or the Non-

Debtor Subsidiaries or CIRCOR Flow or RTK GmbH.

84.     In connection with this relief, the Debtor seeks a waiver of certain of the

operating guidelines established by the Office of the United States Trustee for the District of

Delaware that generally require a debtor to close all prepetition bank accounts, open new

accounts designated as debtor in possession accounts, and obtain new business forms and

stationery reflecting a debtor's status as debtor in possession.

<u>Centralized Cash Management System</u>

85.     The Debtor is part of a cash management system maintained by CIRCOR for the

benefit of the Debtor and the Non-Debtor Subsidiaries, designed to collect funds from operations

and to pay operating and administrative expenses of the Debtor and Non-Debtor Subsidiaries

(the "Centralized Cash Management System"). The Centralized Cash Management System is

similar to centralized cash management systems used by other companies to collect, transfer, and

disburse funds in a cost effective and efficient manner.

86.     The Centralized Cash Management System utilizes the certain bank accounts (the

"Bank Accounts") to collect, transfer, and disburse funds as needed in the Debtor's general

business operations. The Centralized Cash Management System provides significant benefits to

the Debtor, including the ability to: (a) closely track, and thus control, all corporate funds

through the provision of near-continuous status reports on the location and amount of all such

funds, (b) ensure cash availability, and (c) reduce administrative expenses by facilitating the
movement of funds and the development of timely and accurate account balance and
presentment information. Indeed, it is my belief that that any disruption in the Centralized Cash
Management System would likely cause delays in the collection and disbursement of funds, thus
impeding the Debtor's ability to carry out its normal business operations to the detriment of the
Debtor's employees, customers and suppliers.

87.    The Centralized Cash Management System allows the Debtor to manage centrally
all of its cash flow needs and includes the necessary accounting controls to enable the Debtor, as
well as its creditors and this Court, to trace funds through the system and to ensure that all
transactions are adequately documented and readily ascertainable. The Debtor will continue to
maintain detailed records reflecting all postpetition transfers of funds. Any changes to the
Debtor's bank accounts or its Centralized Cash Management Systems would be disruptive to the
Debtor's business operations and could undermine the effectiveness of such systems.

88.    Moreover, requiring a modification of the Debtor's Centralized Cash
Management System also would be largely inefficient, given the current cash management
systems in place between CIRCOR and the Non-Debtor Subsidiaries. These systems are
centralized to provide an efficient means for CIRCOR to manage the cash of the Debtor and
Non-Debtor Subsidiaries, with minimal cost and disruption.

89.    It is therefore both essential and in the best interests of the Debtor's estate and
creditors that the Centralized Cash Management System be maintained. Furthermore, the
Debtor's reorganization efforts will be facilitated by preserving the "business as usual"
atmosphere and avoiding the distractions that would be associated with disruptions in the
Centralized Cash Management System.

**Maintenance of Existing Bank Accounts and Business Forms**

90.    As described in detail above, the Bank Accounts comprise an established

Centralized Cash Management System that the Debtor needs to maintain to ensure smooth

collections and disbursements in the ordinary course of its business.  To avoid delays in paying

debts incurred postpetition, and to ensure as smooth a transition into Chapter 11 as possible, it is

my belief that the Debtor should be permitted to continue to maintain its existing bank accounts

and, if necessary, to open new accounts and close existing accounts in the normal course of its

business operations.  Otherwise, transferring the bank accounts will be disruptive, time

consuming, and expensive.

91.    I believe that if the Debtor were required to change its correspondence, business

forms and checks, the Debtor may be forced to choose standard forms rather than the current

forms with which the Debtor's employees, customers and vendors are familiar.  Such a change in

operations could potentially create a sense of disruption and confusion within the Debtor's

organization and could result in confusion for the Debtor's customers and vendors.  It is my

belief that it would be costly and disruptive to cease using all existing forms and to purchase and

begin using new stationery, business forms and checks.  To do so would be unnecessary and that

the Debtor can take appropriate care to ensure the proper use of the existing business forms.

**Interim Waiver of Requirement of 11 U.S.C. § 345(b)**

92.    Prior to the Petition Date, all of the Debtor's funds flow through the Bank

Accounts as part of the Centralized Cash Management System.  The Debtor does not invest or

deposit funds in any other accounts.  Accordingly, to the extent applicable, the Debtor requests

that the Court waive the requirements of section 345(b) on an interim basis and permit the

Debtor to continue deposit customer payments into the Lockbox Account, and to allow such

funds to be transferred to the CIRCOR Operating Account, as described in detail above.

93.    All of the Bank Accounts the Debtor seeks to continue to use are federally insured, but the balances on a given day may exceed the federally insured limit.  Given that the Bank Accounts are business accounts and considering the relative stability of the Debtor's Bank Accounts, the Debtor does not believe that such funds are at risk.

**Intercompany Transactions**

94.    The Debtor's intercompany transactions with CIRCOR consist of the following: (i) ledger entries recorded to track the Debtor's cash receipts and CIRCOR's funding of the Debtor's Disbursement Accounts and Funding Accounts; (ii) direct costs that consist of payments CIRCOR makes directly on behalf of the Debtor; and (iii) allocated charges that consist of costs that CIROR incurs directly for items such as (a) retirement plan contributions for the Debtor's employees, (b) health benefits for the Debtor's employees and (c) worker's compensation insurance for the Debtor's employees.

95.    In addition to intercompany transactions between the Debtor and CIRCOR, the Debtor also engages in intercompany transactions with the Non-Debtor Subsidiaries.  Such transactions generally consist of the purchase and sale of materials or reimbursement of payments made by a Non-Debtor Subsidiary on behalf of the Debtor or the allocation of services provided by a Non-Debtor Subsidiary for the Debtor.

96.    More specifically, the Debtor purchases production hardware from certain Non-Debtor Subsidiaries at cost and uses the services of certain Non-Debtor Subsidiaries to complete customer orders.  Like transactions between the Debtor and CIRCOR, transactions between the Debtor and Non-Debtor Subsidiaries are recorded on the books of the Debtor and the applicable Non-Debtor Subsidiary and reconciled on a monthly basis.

97.    As a result, on any given date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payments made in the

ordinary course by and between the Debtor and CIRCOR or the Debtor and another Non-Debtor Subsidiary (the "Intercompany Transactions"). The Debtor maintains records of all Intercompany Transactions and can ascertain, trace and account for all Intercompany Transactions.

98.    In addition to the Intercompany Transactions with the Non-Debtor Subsidiaries (consisting of U.S. companies), as of the Petition Date, the Debtor had an intercompany balance owed to RTK GmbH of approximately $1,527 (the "RTK GmbH Intercompany Claim"). Unlike Intercompany Transactions with the Non-Debtor Subsidiaries, intercompany balances with non-U.S. affiliated are reconciled by check. For efficiency, CIRCOR writes a single check each month to the international affiliates based on all collective amounts owed to the affiliate by CIRCOR and the Non-Debtor Subsidiaries; provided, however, that the Debtor writes a check directly to RTK GmbH each month. The amount of the check allocable to each respective U.S. subsidiary is then reconciled between CIRCOR and the U.S. subsidiaries as book entries, in the same manner as other transactions between CIRCOR and the Non-Debtor Subsidiaries are reconciled. Pursuant to this motion, the Debtor seeks authority to pay the prepetition RTK GmbH Intercompany Claim.

99.    To ensure that the Non-Debtor Subsidiaries, CIRCOR Flow and RTK GmbH continue their transactions with the Debtor in the ordinary course of business, the Debtor requests that, all Intercompany Claims that a Non-Debtor Subsidiary or CIRCOR Flow or RTK GmbH may have against the Debtor arising after the Petition Date as a result of an Intercompany Transaction be accorded administrative priority expense status. To the extent that CIRCOR makes any Net Revolver Advances to the Debtor (as defined in the Postpetition Credit Agreement), I understand that CIRCOR will be authorized to do so in accordance with the terms

of the Motion of the Debtor for Entry of Interim and Final Orders, Pursuant to Bankruptcy Code

Sections 105(a), 361, 362 and 364, (I) Approving a Postpetition Credit Agreement, (II)

Authorizing Use of Cash Collateral, (III) Granting Superpriority Claims and Liens to

Postpetition Lender, (IV) Granting Adequate Protection to Prepetition Lender, and (V)

Scheduling a Final Order (the "DIP Motion").  In the event that at the end of each business day,

CIRCOR received funds from the Leslie Lockbox Account that are greater than what CIRCOR

has disbursed to the Debtor under the Postpetition Credit Agreement or allocated to the Debtor

on account of the expenses CIRCOR pays for the Debtor's benefit (the "Excess Funds"), then

CIRCOR will pay the Debtor interest at a rate of 1% per annum on the amount of the Excess

Funds which will be recorded as a book entry.  If all Intercompany Claims by and between the

Debtor and the Non-Debtor Subsidiaries or CIRCOR Flow or RTK GmbH are accorded

administrative priority expense status, the Debtor will continue to bear ultimate repayment

responsibility for such ordinary course transactions advanced by a Non-Debtor Subsidiary,

CIRCOR Flow or RTK GmbH on the Debtor's behalf.

     100.    Accordingly, I believe the relief requested in the motion is necessary and

appropriate.

### G.    Motion for an Order Authorizing the Payment of Prepetition Claims of Shippers, Customs Brokers and Other Lien Claimants

     101.    The Debtor seeks entry of an order authorizing the Debtor, in its discretion, to pay

certain prepetition claims of shippers ("Shippers"), customs brokers ("Customs Brokers"), and

other lien claimants (the "Lien Claimants") in the ordinary course of business.

     102.    As of the Petition Date: (i) the Debtor estimates that Shippers are owed

approximately $30,000 on account of prepetition invoices; (ii) Traffic Audit & Bureau Services,

Inc. ("TABS"), the entity that processes the Debtor's invoices from Shippers and pays Shippers

directly, is owed no more than $350 as a fee for its services; (iii) the Customs Brokers have outstanding claims for their fees in the approximate amount of $1,000; and (iv) the Lien Claimants have outstanding claims of approximately $12,000.

103.    Without authority to make these payments, I believe it is probable that several, if not all, of the Shippers will cease doing business with the Debtor, thereby affecting the Debtor's ability to deliver its products to customers.  At this critical time in the Debtor's Chapter 11 case, it is important that the delivery of raw materials and finished product remain uninterrupted. Without this required consistency, the Debtor is likely to lose customers which will severely hamper the Debtor's reorganization prospects and significantly decrease the value of the Debtor's estate.

104.    I believe that the payment of the Customs Claims is necessary to prevent any disruption in the Debtor's current arrangement with the Customs Brokers and to maintain uninterrupted access to the essential services that the Customs Brokers provide.  The Debtor further believes that the Customs Brokers may refuse to perform the services in a timely fashion if the outstanding Customs Claims remain unpaid.

105.    I believe that certain Lien Claimants may refuse to perform their ongoing obligations to the Debtor (i.e., providing equipment, raw materials and performing other services for the Debtor), unless their claims are paid in full.

106.    Accordingly, I believe that the relief requested in the motion is necessary and appropriate.

### H.    Motion of the Debtor for an Order Authorizing the Payment of Prepetition Claims of Certain (I) Critical Vendors and (II) Administrative Claimholders

107.    The Debtor seeks entry of an order authorizing the Debtor to pay, in its discretion, (a) the prepetition claims of certain vendors (the "Critical Vendors") that have claims for

providing essential goods and/or essential services to the Debtor that were received by the Debtor before the Petition Date (the "Critical Vendor Claims") and (b) the prepetition claims of certain vendors (the "Priority Vendors") that have claims for the value of goods received by the Debtor in the ordinary course of business during the 20-day period prior to the Petition Date (the "Priority Vendor Claims").

108.    I believe that payment of the Critical Vendor Claims is vital to the Debtor's reorganization efforts because, in several instances, the Critical Vendors are the only source from which the Debtor can procure certain goods and services within a timeframe and at a price that will permit the Debtor to continue operating its business.  A failure to pay the Critical Vendor Claims would likely result in many of the Critical Vendors refusing to provide goods and services to the Debtor postpetition, and may force the Debtor to obtain such goods and services elsewhere at a higher price or in a quantity or quality that is insufficient to satisfaction the Debtor's requirements.

109.    The Debtor seeks entry of an order authorizing the Debtor, in its discretion, to pay the Critical Vendor Claims in an aggregate amount not to exceed $455,000 (the "Critical Vendor Cap").  Given the paramount importance of the goods and services provided by the Critical Vendors, and in order to ensure that the Debtor continues to receive such goods and services, I believe it is imperative that the Debtor is permitted to pay the Critical Vendor Claims.

110.    I also believe it is essential for the Debtor to maintain good standing with the Priority Vendors in order to ensure its continued access to production manufacturing supplies, as well as general factory supplies, in order to maintain production.  The Debtor estimates that approximately $410,000 in Priority Vendor Claims are owed on account of goods that the Debtor received during the 20-day period prior to the Petition Date.

111.    The Debtor proposes to condition the payment of Critical Vendor Claims and the
Priority Vendor Claims on the agreement of the individual Critical Vendor or Priority Vendors,
as applicable, to continue supplying goods and services to the Debtor on terms that are as or
more favorable to the Debtor as the most favorable trade terms, practices, and programs in effect
between the Critical Vendor or Priority Vendor, as applicable, and the Debtor in the twelve
months prior to the Petition Date, or such other trade terms as are agreed to by the Debtor and the
Critical Vendor or the Priority Vendor.

112.    Accordingly, I believe that the relief requested in the motion is necessary and
appropriate.

I.    **Motion of the Debtor for Entry of Order Authorizing (I) The Debtor to File a
    List of the Fifty-Six Largest Asbestos Plaintiff Firms; (II) The Debtor to List
    Addresses of Counsel for Asbestos Claimants in Creditor Matrix, in Lieu
    of Claimants' Addresses and (III) Certain Notice Procedures
    for Asbestos Claimants**

113.    The Debtor seeks entry of an order authorizing it (i) to file a list of the fifty-six
asbestos plaintiff firms with the largest number of asbestos cases against the Debtor, (ii) to list
addresses of counsel for asbestos claimants in the creditor matrix in lieu of the actual addresses
of the asbestos claimants themselves and (iii) to implement a procedure by which the Debtor will
send required notices, mailings and other communication related to this Chapter 11 case to the
asbestos claimants in care of their counsel of record at such counsel's address.

114.    The Debtor believes that providing the U.S. Trustee with a list of the fifty-six
asbestos plaintiff firms with the largest number of asbestos cases against the Debtor, instead of
listing the individual asbestos claimants with the largest unsecured claims, would better assist the
U.S. Trustee in forming an asbestos creditors' committee.

115.    Furthermore, while preparing for filing, the Debtor ascertained that it could not
reasonably obtain the actual names and addresses of many of the asbestos claimants.  The

Debtor's address information is limited to counsel of record for the asbestos claimants, since all communications regarding the asbestos claims and the various pending lawsuits has been through and with such counsel.  Thus, the Debtor seeks approval to serve all notices, mailings and other communications related to this Chapter 11 case on asbestos-related personal injury claimants care of their counsel of record at such counsel's address.  In order to implement these notice procedures, the Debtor will seek approval to list the names and addresses of the asbestos plaintiffs firms in the Debtor's creditor matrix in lieu of listing the individual asbestos creditors' addresses.

116.    Without the above notice procedures, the Debtor would be required to undertake a massive manual review of the actual hard-copy files (both on site and at numerous storage facilities) maintained by various past and current counsel representing the Debtor across the nation with respect to the asbestos litigation.  Furthermore, I have been advised that the mailing of notices to personal injury claimants, rather than to their known attorneys, does not satisfy due process requirements of adequate notice.  Accordingly, I believe that the relief requested in the motion is necessary and appropriate.

**J.    Motion Of The Debtor For Entry Of Interim And Final Orders, Pursuant To Bankruptcy Code Sections 105(A), 361, 362, 363 And 364, (I) Approving A Postpetition Credit Agreement, (II) Authorizing Use Of Cash Collateral, (III) Granting Superpriority Claims And Liens To Postpetition Lender, (IV) Granting Adequate Protection To Prepetition Lender, And (V) Scheduling A Final Hearing (the "DIP Motion")**

117.    By the DIP Motion, the Debtor seeks entry of an interim order and a final order: (i) authorizing the Debtor to obtain postpetition financing on a senior secured and superpriority basis, in the form of a revolving credit line in an aggregate principal amount at any time outstanding not to exceed U.S. $10 million, including an initial draw of not more than $2 million upon or after interim approval of the relief sought herein, pursuant to the terms and conditions of

a certain Postpetition Credit and Security Agreement, by and between Leslie Controls, Inc., as

borrower, and CIRCOR, as lender (the "Postpetition Credit Agreement"), (ii) granting senior

secured liens and superpriority claims to CIRCOR, as postpetition lender, (iii) granting adequate

protection to CIRCOR, as prepetition lender and (iv) scheduling a final hearing on the relief

sought herein to consider the relief requested herein on a final basis (the "Final Hearing").

118.    Prior to the Petition Date, the Debtor prepared a budget and determined that its

available cash and projected revenues from operations may not be sufficient to fund its

operational and restructuring activities during the course of the Chapter 11 case. In light of this

determination and to assure the marketplace of the Debtor's continued viability as a going

concern, the Debtor sought to secure sources of additional funding that could provide the

liquidity, flexibility, and low capital costs required to allow the Debtor to successfully implement

its operational and restructuring plan, and to successfully emerge from Chapter 11 protection.

119.    As such, the Debtor's management, counsel and other professionals evaluated

alternative sources of credit on a superpriority and senior secured basis. Prior to the Petition

Date, the Debtor contacted nine potential sources for postpetition financing, including, its banks

that provide financing to CIRCOR. Although a few of these sources would not provide funds to

the Debtor due to the paucity of the funds sought, the Debtor received term sheets from two

potential lenders. No other potential lender, however, offered terms to the Debtor that are equal,

much less superior, to those offered by its parent corporation, CIRCOR. In fact, the two

potential lenders asked for numerous fees, including commitment fees and collateral monitoring

fees. Having reviewed possible borrowing sources conceivable in the current credit market, the

Debtor determined that its best opportunity to obtain the credit it needs to successfully reorganize

on terms favorable to the Debtor is through the Postpetition Credit Facility to be provided by
CIRCOR.

120.    Based on the Debtor's experience in the credit markets, I believe that the Debtor
reasonably concluded that it cannot obtain financing sufficient to support its operations and
restructuring initiatives on an unsecured or administrative expense priority basis with terms that
are equal to or better than the financing to be provided by CIRCOR.  The revenues produced by
the Debtor's operations, and the assets available to be pledged as security, compared with its
exposure to potentially enormous asbestos-related liabilities, effectively make postpetition credit
unavailable to the Debtor, except through loans with superpriority status and secured by senior
liens on the Debtor's assets as provided for in section 364(c) of the Bankruptcy Code.  Moreover,
the recent tightening of the global credit markets and the corresponding difficulties companies of
all types have found in obtaining extensions of credit have further limited the Debtor's ability to
obtain credit.

121.    I believe that the terms of the Postpetition Credit Agreement are extremely
favorable to the Debtor.  The financing offered by CIRCOR contemplates an extremely low
interest rate of LIBOR+350 bps.  The Postpetition Credit Agreement with CIRCOR reflects good
faith, arm's length negotiations that spanned several weeks when the Debtor was actively
represented by outside counsel.  No other lender has offered terms for postpetition financing that
are equal to or superior to the terms offered by CIRCOR.

122.    I believe that the Debtor has a need to obtain post petition financing to ensure the
Debtor's ability to operate through the pendency of this Chapter 11 case and to successfully
reorganize.  Without obtaining a line of postpetition financing, including an initial draw of not
more than $2 million, the Debtor anticipates that cash on hand and anticipated operating

revenues may not provide sufficient liquidity to satisfy its operating and administrative expenses during the pendency of this Chapter 11 case.  Accordingly, I believe that the Debtor needs access to the line of postpetition financing provided by the Postpetition Credit Agreement to conduct this Chapter 11 case in a manner that will maximize the value of the Debtor's estate for the benefit of its creditors.

123.    Accordingly, on behalf of the Debtors, I respectfully submit that the DIP Motion should be approved.

## CONCLUSION

123.    Approval of the First-Day Pleadings filed by the Company is a critical step for the

Company to achieve a successful Chapter 11 case as such approval would (a) facilitate the

continuation of the Company's existing cash management systems and other business operations

without interruption, (b) preserve customer and vendor relationships, (c) maintain employee

morale and confidence, and (d) establish certain other administrative procedures to promote a

smooth transition into Chapter 11.


Dated: July 12, 2010

_____
G. Wayne Day
Chief Restructuring Officer