# EXHIBIT C

## ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

ALL PROVISIONS IN THESE ASBESTOS PI TRUST DISTRIBUTION PROCEDURES, INCLUDING THE VALUES ESTABLISHED FOR ASBESTOS PI CLAIMS IN EACH DISEASE LEVEL, WERE AGREED TO FOR SETTLEMENT PURPOSES ONLY.  TO THE EXTENT THE PLAN IS NOT CONFIRMED, OR IS CONFIRMED AND SUBSEQUENTLY REVERSED, THE PARTIES RESERVE ALL RIGHTS WITH RESPECT TO CLAIM VALUES AND OTHER MATTERS DEALT WITH IN THESE ASBESTOS PI TRUST DISTRIBUTION PROCEDURES.

## LESLIE CONTROLS, INC.

### FORM OF ASBESTOS PERSONAL INJURY
### TRUST DISTRIBUTION PROCEDURES

# LESLIE CONTROLS, INC.
## ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

### TABLE OF CONTENTS

Page

**SECTION I     INTRODUCTION** ................................................................ 1
   1.1   Purpose ................................................................................ 1
   1.2   Interpretation ....................................................................... 2

**SECTION II     OVERVIEW** ...................................................................... 2
   2.1   Asbestos PI Trust Goal ......................................................... 2
   2.2   Claims Liquidation Procedures ............................................. 3
   2.3   Application of the Payment Percentage ................................ 5
   2.4   Determination of the Maximum Annual Payment ................ 7
   2.5   Claims Payment Ratio ......................................................... 8
   2.6   Indirect Asbestos PI Claims .............................................. 11

**SECTION III     ASBESTOS PI TRUST DISTRIBUTION PROCEDURES**
                  **ADMINISTRATION** ..................................................... 11
   3.1   Asbestos PI Trust Advisory Committee and Future Claimants'
       Representative ................................................................... 11
   3.2   Consent and Consultation Procedures ................................ 12

**SECTION IV     PAYMENT PERCENTAGE; PERIODIC ESTIMATES** ......................... 12
   4.1   Uncertainty of Leslie Controls' Personal Injury Asbestos Liabilities ................ 12
   4.2   Computation of Payment Percentage .................................. 13
   4.3   Applicability of the Payment Percentage ............................ 15

**SECTION V     RESOLUTION OF ASBESTOS PI CLAIMS** ....................................... 16
   5.1   Ordering, Processing and Payment of Claims ..................... 16
        (a)   Ordering of Claims ...................................................... 16
            (1)   Establishment of FIFO Processing Queues .............. 16
            (2)   Effect of Statutes of Limitations and Repose ......... 18
        (b)   Notice of Impending Processing of Claims .................. 19
        (c)   Payment of Claims ..................................................... 19
   5.2   Resolution of Unliquidated Asbestos PI Claims .................. 20
        (a)   Expedited Review Process ............................................ 22
            (1)   In General ............................................................... 22
            (2)   Claims Processing Under Expedited Review ............ 23
            (3)   Disease Levels: Scheduled Values and
                 Medical/Exposure Criteria ...................................... 23
        (b)   Individual Review Process ........................................... 27
            (1)   In General ............................................................... 27
                (A)   Review of Medical/Exposure Criteria ............... 29
                (B)   Review of Liquidated Value ............................. 29

| | | (2) | Valuation Factors to Be Considered in Individual Review ........................................................... 30 |

| | | (3) | Scheduled, Average and Maximum Values.................... 33 |
| | | (4) | Claims Processing under Individual Review ................. 34 |
| 5.3 | Categorizing Claims as Extraordinary and/or Exigent ....................................... 34 |
| | (a) | Extraordinary Claims ..................................................... 34 |
| | (b) | Exigent Claims............................................................... 35 |
| | | (1) | Exigent Health Claims ................................................ 35 |
| | | (2) | Exigent Hardship Claims ............................................. 36 |
| 5.4 | Secondary Exposure Claims ......................................................................... 36 |
| 5.5 | Indirect Asbestos PI Claims ......................................................................... 37 |
| 5.6 | Evidentiary Requirements............................................................................ 39 |
| | (a) | Medical Evidence............................................................ 39 |
| | | (1) | In General................................................................... 39 |
| | | | (A) | Disease Levels I - III............................................ 40 |
| | | | (B) | Disease Levels IV - VII ....................................... 41 |
| | | | (C) | Exception to the Exception for Certain Pre-Petition Asbestos PI Claims................................ 41 |
| | | (2) | Credibility of Medical Evidence ...................................... 42 |
| | (b) | Exposure Evidence........................................................... 43 |
| | | (1) | In General................................................................... 43 |
| | | (2) | Significant Occupational Exposure................................. 44 |
| | | (3) | Leslie Controls Exposure ............................................. 44 |
| 5.7 | Claims Audit Program ................................................................................. 45 |
| 5.8 | Second Disease (Malignancy) Claims ........................................................... 46 |
| 5.9 | Arbitration.................................................................................................. 46 |
| | (a) | Establishment of ADR Procedures ................................... 46 |
| | (b) | Claims Eligible for Arbitration ........................................ 48 |
| | (c) | Limitations on and Payment of Arbitration Awards.................... 48 |
| 5.10 | Litigation.................................................................................................... 49 |

| **SECTION VI** | **CLAIMS MATERIALS** ...................................................................... **49** |
| 6.1 | Claims Materials ......................................................................................... 49 |
| 6.2 | Content of Claims Materials ........................................................................ 50 |
| 6.3 | Withdrawal or Deferral of Claims ................................................................ 50 |
| 6.4 | Filing Requirements and Fees...................................................................... 51 |
| 6.5 | English Language........................................................................................ 51 |
| 6.6 | Confidentiality of Claimants' Submissions ................................................... 51 |

| **SECTION VII** | **GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS**............................................................................... **52** |
| 7.1 | Showing Required....................................................................................... 52 |
| 7.2 | Costs Considered ....................................................................................... 53 |
| 7.3 | Discretion to Vary the Order and Amounts of Payments in the Event of Limited Liquidity ......................................................................................... 53 |
| 7.4 | Punitive Damages ....................................................................................... 54 |

46392/0001-6934601v1

7.5     Sequencing Adjustments.................................................................. 56
            (a)     In General....................................................................... 56
            (b)     Unliquidated Asbestos PI Claims ................................ 56
7.6     Suits in the Tort System.................................................................. 57
7.7     Payment of Judgments for Money Damages ................................... 57
7.8     Releases........................................................................................... 58
7.9     Third-Party Services ....................................................................... 58
7.10    Asbestos PI Trust Disclosure of Information.................................... 59

**SECTION VIII   MISCELLANEOUS ............................................................ 59**
8.1     Amendments .................................................................................... 59
8.2     Severability ..................................................................................... 60
8.3     Governing Law ................................................................................ 60
8.4     Administration of Asbestos PI Trust Assets with Other Comparable Trusts ...... 60

46392/0001-6934601v1

# LESLIE CONTROLS, INC.

## ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

Capitalized terms not otherwise defined herein shall have the meaning ascribed to such terms in the Plan of Reorganization of Leslie Controls, Inc. under Chapter 11 of the Bankruptcy Code dated _____, 2010 (the "Plan"), or the Asbestos PI Trust Agreement executed pursuant to the Plan and referred to below, as applicable.

The Leslie Controls, Inc. Asbestos Personal Injury Trust Distribution Procedures ("Asbestos PI Trust Distribution Procedures") contained herein provide the means for resolving all Asbestos PI Claims under the Plan for which the Asbestos Protected Parties have or are alleged to have legal responsibility for or on account of Leslie Controls, Inc. ("Leslie Controls"), as provided in and required by the Plan and the Leslie Controls, Inc. Asbestos Personal Injury Trust Agreement (the "Asbestos PI Trust Agreement").

The Plan and the Asbestos PI Trust Agreement establish the Leslie Controls, Inc. Asbestos Personal Injury Trust (the "Asbestos PI Trust"). The Asbestos PI Trustee shall implement and administer these Asbestos PI Trust Distribution Procedures in accordance with the Asbestos PI Trust Agreement. For purposes of the Asbestos PI Trust Distribution Procedures, Asbestos PI Claims shall not include Asbestos PI Trust Expenses

## SECTION I
## Introduction

1.1    Purpose. These Asbestos PI Trust Distribution Procedures have been adopted pursuant to the Asbestos PI Trust Agreement. They are intended and designed to provide fair, equitable, and substantially similar treatment for all Asbestos PI Claims that may presently exist or may arise in the future in substantially the same manner.

1.2    <u>Interpretation</u>.  These Asbestos PI Trust Distribution Procedures are not intended to, nor shall they be deemed to, create additional substantive rights for any claimant.  The rights and benefits provided herein to holders of Asbestos PI Claims shall vest in such holders as of the Effective Date.

## SECTION II
## Overview

2.1    <u>Asbestos PI Trust Goal</u>.  The goal of the Asbestos PI Trust is to treat all holders of Asbestos PI Claims similarly and equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy Code.  These Asbestos PI Trust Distribution Procedures are intended to further that goal by setting forth procedures for processing, resolving and paying Leslie Controls' several share of the unpaid portion of the liquidated value of Asbestos PI Claims from the Asbestos PI Trust on an impartial, first-in-first-out ("<u>FIFO</u>") basis, with the objective of paying all holders of such claims over time as equal a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[1,2]  To this end, these Asbestos PI Trust Distribution Procedures establish matrices relating to seven asbestos-related diseases ("<u>Disease Levels</u>"), six of which have medical and exposure requirements that create a presumption that the claimant is entitled to compensation hereunder ("<u>Medical/Exposure Criteria</u>"), and specific liquidated values attributable to claims of such type ("<u>Scheduled Values</u>"), five of which have expected average values ("<u>Average Values</u>"), and all of which have upper limits (caps) on their liquidated values ("<u>Maximum Values</u>").  The Disease Levels,

---

[1] As used in these Asbestos PI Trust Distribution Procedures, the phrase "in the tort system" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to Section 524(g) of the Bankruptcy Code or any other applicable law.

[2] Asbestos PI Claims have been classified, for purposes of these Asbestos PI Trust Distribution Procedures, as either Leslie Powerhouse or Below-Deck Naval Station Claims or Leslie Construction and Maintenance Claims (as such terms are defined in Section 5.2 below, because the liquidated value of such claims varies on such basis.

-2-

Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are set forth in Sections 5.2 and 5.3 below, have all been established with the intention of achieving a fair allocation of the Asbestos PI Trust funds among claimants suffering from different diseases in light of the best available information considering the settlement history of Leslie Controls and the rights claimants would have in the tort system absent Leslie Controls' bankruptcy proceeding.

      2.2    <u>Claims Liquidation Procedures</u>.

      (a)    A claimant may assert an Asbestos PI Claim against the Asbestos PI Trust as herein contemplated. All Asbestos PI Claims shall be processed, liquidated, resolved and/or paid pursuant to these Asbestos PI Trust Distribution Procedures.

      (b)    All claimants holding an Asbestos PI Claim must file a claim with the Asbestos PI Trust using the proof of claim form provided by the Asbestos PI Trust. Asbestos PI Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below. The Asbestos PI Trust shall take all reasonable steps to resolve Asbestos PI Claims as efficiently and expeditiously as possible at each stage of claims processing, including mediation and arbitration, which steps may include, in the Asbestos PI Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained, and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.2(b)(2) below. The Asbestos PI Trust shall also make every effort to resolve each year at least that number of Asbestos PI Claims required to exhaust the Maximum Annual Payment, as such term is defined below.

-3-

The Asbestos PI Trust shall, except as otherwise provided below, liquidate all Asbestos PI Claims except Foreign Claims (as defined in Section 5.2 (b)(1) below) that meet the Medical/Exposure Criteria of Disease Levels I - IV, VI and VII under the Expedited Review Process described in Section 5.2 (a) below. Asbestos PI Claims involving Disease Levels III, IV, VI and VII that do not meet the Medical/Exposure Criteria for the relevant Disease Level may undergo the Asbestos PI Trust's Individual Review Process described in Section 5.2(b) below. In such a case, notwithstanding that the claim does not meet the Medical/Exposure Criteria for the relevant Disease Level, the Asbestos PI Trust may offer the claimant an amount up to the Scheduled Value of that Disease Level if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

In lieu of liquidating Asbestos PI Claims involving Disease Levels III, IV, VI and VII under the Expedited Review Process, a claimant holding an Asbestos PI Claim involving Disease Level III, IV, VI or VII may, in the alternative, seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the Asbestos PI Trust's Individual Review Process pursuant to Section 5.2(b) below. However, the liquidated value of an Asbestos PI Claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than the Scheduled Value for the applicable Disease Level, and, in any event, shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.2(b)(3) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.3(a) below, in which case its liquidated value shall not exceed the maximum extraordinary value specified in Section 5.3(a) for such claims. Claims involving Disease Level V (Lung Cancer 2) and all Foreign Claims may be liquidated only pursuant to the Asbestos PI Trust's Individual Review Process.

46392/0001-6934601v1

The Scheduled Values and Maximum Values for claims involving Disease Levels III, IV, V and VII and the Average Value and Maximum Value for claims involving Disease Level V set forth in Section 5.2(b)(3) which claims are eligible for Individual Review of their liquidated values (or, in the case of Level V, required to be so liquidated), have been established. The Trustee shall use his or her reasonable best efforts to insure that the Asbestos PI Trust processes claims such that over time the combination of settlements at the Scheduled Values and those resulting from the Individual Review Process should generally result in the Average Values set forth in Section 5.2(b)(3) for such Disease Levels.

All unresolved disputes regarding a claimant's medical condition, exposure history and/or the liquidated value of the claim shall be subject to mediation and then, at the election of the claimant, to binding or non-binding arbitration as set forth in Section 5.9 below under the alternative dispute resolution procedures (the "ADR Procedures") to be adopted by the Asbestos PI Trust as provided in Section 5.9 below. Asbestos PI Claims that are the subject of a dispute with the Asbestos PI Trust that are not resolved by arbitration may enter the tort system as provided in Sections 5.10 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable (subject to the Payment Percentage, Maximum Annual Payment, and Claims Payment Ratio provisions set forth below) as provided in Section 7.7 below.

2.3     Application of the Payment Percentage. After the liquidated value of an Asbestos PI Claim is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, mediation, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro-rata portion of the applicable liquidated value based on the Payment Percentage described in Section 4.2 below.

The initial Payment Percentage (the "Initial Payment Percentage") has been set at forty percent (40%) and shall apply to all Asbestos PI Claims accepted as valid for payment by the Asbestos PI Trust, unless and until adjusted by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative pursuant to Section 4.2 below, and except as provided in Section 4.3 below with respect to supplemental payments in the event the Initial Payment Percentage is changed.  The term "Asbestos PI Trust Voting Claims" means (i) Qualified Asbestos PI Claims; (ii) claims filed against Leslie Controls in the tort system or actually submitted to Leslie Controls; and (iii) all asbestos claims filed against another defendant in the tort system prior to the date the Plan was filed with the Bankruptcy Court (July 12, 2010 (the "Plan Filing Date")), provided, however, that (1) the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures approved by the Bankruptcy Court, unless such holder certifies to the satisfaction of the Asbestos PI Trustee that he or she was prevented from voting in this proceeding as a result of circumstances resulting in a state of emergency affecting, as the case may be, the holder's residence, principal place of business or legal representative's place of business at which the holder or his or her legal representative receives notice and/or maintains material records relating to the claim; and provided further that (2) the claim was subsequently filed with the Asbestos PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date defined in Section 5.1(a) below.

The Initial Payment Percentage has been established based upon (i) the Scheduled Values set forth in Section 5.2(b)(3) below with respect to existing and projected future claims involving Disease Levels I and II, and (ii) the assumption that generally the Average Values set forth in

Section 5.2(b)(3) below will be achieved with respect to existing and projected future claims involving Disease Levels III - VII.

The Payment Percentage may be adjusted upwards, but not in excess of 100%, or downwards from time to time by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative to reflect then-current estimates of the Asbestos PI Trust's assets and liabilities, as well as the then-estimated value of then-pending and projected future claims. Any adjustment to the Payment Percentage (including the Initial Payment Percentage) shall be made only pursuant to Section 4.2 below. If at any time the Payment Percentage is increased, claimants whose claims were liquidated and paid prior to the increase under these Asbestos PI Trust Distribution Procedures at a lower Payment Percentage shall receive additional payments only as provided in Section 4.3 below. Because there is uncertainty in the prediction of both the number and severity of future Asbestos PI Claims and the amount of the Asbestos PI Trust's assets, no guarantee or representation can be made regarding the Payment Percentage that will be applied to an Asbestos PI Claim's liquidated value.

2.4    <u>Determination of the Maximum Annual Payment</u>. The Asbestos PI Trust shall estimate or model the amount of cash flow anticipated to be necessary over its entire life to ensure that funds shall be available to treat all present and future holders of Asbestos PI Claims as similarly as possible. In each year, the Asbestos PI Trust shall be empowered to pay out all of the income earned during such year (net of taxes payable with respect thereto), together with a portion of its principal calculated so that the application of the Asbestos PI Trust's funds over the life of the trust shall correspond with the needs created by the estimated initial backlog of claims and the estimated anticipated future flow of claims (the "<u>Maximum Annual Payment</u>"), taking

-7-

into account the Payment Percentage provisions set forth in Section 2.3 above and Sections 4.2

and 4.3 below. The Maximum Annual Payment shall be determined annually by the Asbestos PI

Trustee with the consent of the Asbestos PI Trust Advisory Committee and the Future

Claimants' Representative. The Asbestos PI Trust's distributions to all claimants for a year shall

not exceed the Maximum Annual Payment so determined for that year.

2.5    Claims Payment Ratio. Based upon Leslie Controls' claims settlement history

and the analysis of present and future claims, a ratio (the "Claims Payment Ratio") as of the

Effective Date, of Category A claims (which consist of Asbestos PI Claims involving

malignancies and Severe Asbestosis (Disease Levels III - VII) that were unliquidated as of the

Commencement Date), to Category B claims (which are Asbestos PI Claims involving non-

malignant Asbestosis or Pleural Disease (Disease Levels I and II) that were unliquidated as of

the Commencement Date) has been determined to be 80% Category A to 20% Category B.

In each year, after the determination of the Maximum Annual Payment described in

Section 2.4 above and subject thereto, 80% of that amount will be available to pay liquidated

Category A claims and 20% will be available to pay liquidated Category B claims, each in the

order such claims come up for payment in the FIFO Payment Queue described in Section 5.1(c)

below following the liquidation thereof. In the event there are insufficient funds in any year to

pay the liquidated claims in a Category, the available funds allocated to that Category shall be

paid to the claimants in that Category based on their place in the FIFO Payment Queue.

Liquidated claims remaining unpaid in such year on account of an insufficiency of funds

allocated to the Category in which such unpaid claims fall shall be carried over to the next

succeeding year and shall be placed at the head of such succeeding year's FIFO Payment Queue.

-8-

In the event that there are insufficient liquidated claims in Category A to exhaust the Maximum Annual Payment amount allocated to Category A by the Claims Payment Ratio, then the excess amount for such Category A shall be rolled forward to the next succeeding year and shall remain available to pay liquidated claims in Category A.  With respect to Category B, in the event there are insufficient liquidated claims in Category B to exhaust the Maximum Annual Payment amount allocated to Category B by the Claims Payment Ratio, then the excess amount for such Category B shall be rolled forward and shall remain available to pay liquidated claims in Category B, subject to the following: (a) at the end of the second year and thereafter at the end of each year the Asbestos PI Trustee shall make a determination of whether, in respect of the two years or year (as applicable) then ended, funds made available in Category B to pay Category B claims exceeded amounts payable in respect of liquidated Category B claims in accordance with these Asbestos PI Trust Distribution Procedures (any such excess amount being a "Category B Excess Amount"); and (b) any such Category B Excess Amount shall be (i) used to pay liquidated Category A claims entitled to payment in respect of which there are insufficient funds to pay such liquidated Category A claims or (ii) in the absence of such unpaid liquidated Category A claims at such time, such Category B Excess Amount shall be added back to and become part of the principal portion of the Asbestos PI Trust *res* and, accordingly, shall again be available in ensuing years (including the immediately next succeeding year) for application to liquidated Category A and Category B claims in proportion to the Claims Payment Ratio applicable in such ensuing years.

In addition, in the event that the available funds in either Category A or Category B exceed the amounts payable to liquidated claims in such Category for two consecutive years, then the Asbestos PI Trustee shall re-evaluate the Claims Payment Ratio in light of claims

-9-

liquidation and payment experience of the Asbestos PI Trust and propose (i) maintenance of the then-existing Claims Payment Ratio, or (ii) establishment of a different Claims Payment Ratio that more accurately reflects past and likely future claims liquidation and payment needs. Any change in the Claims Payment Ratio shall take effect only with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative as contemplated below.

The Claims Payment Ratio established as of the Effective Date shall apply to all Asbestos PI Trust Claims and shall not be changed or modified sooner than the second anniversary of the date on which the Asbestos PI Trust first accepts proofs of claim for processing. Thereafter, the Claims Payment Ratio shall be continued or recalibrated (on a prospective basis only and subject to the approval and consent requirements below) in order to approximately reflect the actual number of Asbestos PI Claims in each Category that have been liquidated and paid and are anticipated in subsequent years to be liquidated and paid pursuant to these Asbestos PI Trust Distribution Procedures.

In considering whether to make any changes or modifications to the Claims Payment Ratio, the Asbestos PI Trustee shall consider the reasons for which the Claims Payment Ratio was adopted, the settlement history that gave rise thereto (including the fact that, historically, 99% of Leslie Controls' settlement and judgment payment amounts were paid on account of claims that would qualify as Category A claims hereunder), and whether the reasons asserted to necessitate the change or modification were or were not foreseeable when the Claims Payment Ratio then in effect was established. In such regard, the Asbestos PI Trustee should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as they affect the net cash actually paid to claimants.

-10-

Anything in these Asbestos PI Trust Distribution Procedures to the contrary notwithstanding, no change or modification to the Claims Payment Ratio (i) to reduce the percentage allocated to Category A claims shall be made except with the unanimous consent of the Asbestos PI Trust Advisory Committee members and the consent of the Future Claimants' Representative, or (ii) to increase the percentage allocated to Category A claims shall be made except with the consent of the Asbestos PI Trust Advisory Committee and the consent of the Future Claimants' Representative. In the case of any proposed change or modification to the Claims Payment Ratio, the consent process set forth in Sections 6.7(b) and 7.7(b) of the Asbestos PI Trust Agreement shall apply. The Asbestos PI Trustee, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for more prompt payment (the "Reduced Payment Option").

2.6 Indirect Asbestos PI Claims. As set forth in Section 5.5 below, Indirect Asbestos PI Claims, if any, shall be subject to all the same limitations and other provisions (including, without limitation, all provisions relating to categorization, evaluation and payment) of these Asbestos PI Trust Distribution Procedures as all other Asbestos PI Claims.

## SECTION III
### Asbestos PI Trust Distribution Procedures Administration

3.1 Asbestos PI Trust Advisory Committee and Future Claimants' Representative. Pursuant to the Plan and the Asbestos PI Trust Agreement, the Asbestos PI Trust and these Asbestos PI Trust Distribution Procedures shall be administered by the Asbestos PI Trustee in consultation with the Asbestos PI Trust Advisory Committee, which committee represents the interests of holders of present Asbestos PI Claims, and the Future Claimants' Representative, who represents the interests of holders of Asbestos PI Claims that will be asserted in the future.

-11-

The Asbestos PI Trustee shall obtain the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative with respect to any amendment, change or modification to these Asbestos PI Trust Distribution Procedures pursuant to Section 8.1 below, and regarding such other matters requiring such consent or approval hereunder or under Section 2.2(e) of the Asbestos PI Trust Agreement.  The Asbestos PI Trustee shall also consult with the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative on such matters requiring such consultation hereunder or under Section 2.2(d) of the Asbestos PI Trust Agreement.  The initial Asbestos PI Trustee, the initial members of the Asbestos PI Trust Advisory Committee and the initial Future Claimants' Representative are identified in the Asbestos PI Trust Agreement.

      3.2    <u>Consent and Consultation Procedures</u>.  In those circumstances in which consultation or consent is required, the Asbestos PI Trustee shall provide written notice to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative of the specific amendment, change or modification or other action that is proposed.  The Asbestos PI Trustee shall not implement any amendment, change or modification nor take such proposed action unless and until the parties have engaged in the Consultation Process described in Sections 6.7(a) and 7.7(a) or the Consent Process described in Sections 6.7(b) and 7.7(b), respectively, of the Asbestos PI Trust Agreement.

**SECTION IV**

**Payment Percentage; Periodic Estimates**

      4.1    <u>Uncertainty of Leslie Controls' Personal Injury Asbestos Liabilities</u>.  As noted herein, there is inherent uncertainty regarding Leslie Controls' total asbestos-related tort liabilities, as well as the total value of the assets available to the Asbestos PI Trust to pay Asbestos PI Claims.  Consequently, there is inherent uncertainty regarding the amounts that

-12-

holders of Asbestos PI Claims will receive.  To seek to ensure substantially equivalent treatment of all present and future Asbestos PI Claims, the Asbestos PI Trustee must determine from time to time the pro rata portion or percentage of the liquidated value of claims that holders of present and future Asbestos PI Claims will likely receive pursuant to the Plan (including the provisions of the Asbestos PI Trust Agreement and these Asbestos PI Trust Distribution Procedures); i.e., the "Payment Percentage" referred to in Section 2.3 above and Section 4.2 below.

     4.2   <u>Computation of Payment Percentage</u>.  As provided in Section 2.3 above, the Initial Payment Percentage shall be 40% and shall be applied to all Asbestos PI Claims approved for payment by the Asbestos PI Trust, unless the Asbestos PI Trustee, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, determine that the Initial Payment Percentage should be changed to assure that the Asbestos PI Trust shall be in a financial position to pay present and future holders of Asbestos PI Claims in substantially the same manner.

     In making any such change to the Initial Payment Percentage, the Asbestos PI Trustee, the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative shall take into account the fact that the holders of Asbestos PI Trust Claims who voted on the Plan relied on the findings of experts that the Initial Payment Percentage represented a reasonably reliable estimate of the Asbestos PI Trust's total assets and liabilities over the trust's life based on the best information available at the time, and shall therefore give due consideration to the expectations of such claim holders that the Initial Payment Percentage would be applied to their Asbestos PI Trust Claims.

     The Payment Percentage shall be subject to change from time to time pursuant to the terms of these Asbestos PI Trust Distribution Procedures and the Asbestos PI Trust Agreement if

the Asbestos PI Trustee, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, determine that an adjustment is required. No less frequently than once every three (3) years, commencing January 2 of the year next succeeding the year in which the Effective Date occurs, the Asbestos PI Trustee shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, if deemed necessary to assure that the Asbestos PI Trust remains in a financial position to pay present and future holders of Asbestos PI Claims in substantially the same manner. The Asbestos PI Trustee may also reconsider the then-applicable Payment Percentage at shorter intervals if the Asbestos PI Trustee deems such reconsideration to be appropriate or if requested to do so by the Asbestos PI Trust Advisory Committee or the Future Claimants' Representative.

The Asbestos PI Trustee shall base the determination of the Payment Percentage on current estimates of the number, types, and values of present and future Asbestos PI Claims, the value of the assets then available to the Asbestos PI Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of liquidated value to all present and future holders of Asbestos PI Claims. When making these determinations, the Asbestos PI Trustee shall exercise common sense and flexibly evaluate all relevant factors. The Payment Percentage applicable to Category A or Category B claims may not be reduced to alleviate delays in payments of claims in the other Category; both Category A and Category B claims shall receive the same Payment Percentage, but the payment may be deferred as needed pursuant

to Section 7.3 below, and a Reduced Payment Option may be instituted as described in Section 2.5 above.

     4.3    <u>Applicability of the Payment Percentage</u>.  Except as otherwise provided in Section 5.1(c) below for Asbestos PI Claims involving deceased or incompetent claimants for which approval of the Asbestos PI Trust's offer by a court or through a probate process is required, no holder of any Asbestos PI Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment.

     If a redetermination of the Payment Percentage has been proposed in writing by the Asbestos PI Trustee to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, but has not yet been approved and implemented, a claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage.  However, if the proposed Payment Percentage was the lower of the two but is not so approved and implemented, the claimant shall thereafter receive an amount equal to the difference between the amounts determined with reference to the lower proposed percentage and the higher current percentage. If the proposed Payment Percentage was the higher of the two and is subsequently approved and implemented, the claimant shall thereafter receive an amount equal to the difference between the amounts determined with reference to the lower current percentage and the higher adopted percentage.

     There is uncertainty surrounding the amount of the Asbestos PI Trust's future assets. There is also uncertainty surrounding the totality of the Asbestos PI Claims to be paid over time, as well as the extent to which changes in existing federal and state law could affect the Asbestos PI Trust's liabilities under these Asbestos PI Trust Distribution Procedures.  If the value of the Asbestos PI Trust's future assets increases significantly and/or if the value or volume of

46392/0001-6934601v1

Asbestos PI Trust claims actually filed with the Asbestos PI Trust is significantly lower than originally estimated, the Asbestos PI Trust shall use the increase in assets and/or claims' savings, as the case may be, first to maintain the Payment Percentage then in effect.

If the Asbestos PI Trustee, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, increases the Payment Percentage, the Asbestos PI Trustee shall also make supplemental payments to all claimants who previously liquidated their claims and received payments from the Asbestos PI Trust based on a lower Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (but excluding any such amounts attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Asbestos PI Trustee's obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100. However, the Asbestos PI Trustee's obligation shall resume and the Asbestos PI Trustee shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $100.

## SECTION V
### Resolution Of Asbestos PI Claims

5.1     Ordering, Processing and Payment of Claims.

       (a)     Ordering of Claims.

             (1)     Establishment of FIFO Processing Queues. The Asbestos PI Trust shall order all claims that are sufficiently complete to be reviewed for processing purposes on a

-16-

FIFO basis except as otherwise provided herein (the "FIFO Processing Queue"). For all claims filed on or before the date six (6) months after the date that the Asbestos PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos PI Trust (the "Initial Claims Filing Date"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Commencement Date that the specific claim was filed against Leslie Controls in the tort system; (ii) the date prior to the Commencement Date that the asbestos claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with Leslie Controls; (iii) the date subsequent to the Commencement Date but prior to the date that the Asbestos PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos PI Trust that the asbestos claim was filed against another defendant in the tort system; (iv) the date subsequent to the Commencement Date but prior to the Effective Date that a proof of claim was filed by the claimant against Leslie Controls in Leslie Controls' Chapter 11 case; or (v) the date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to voting procedures approved by the Bankruptcy Court.

For all claims filed subsequent to the Initial Claims Filing Date, a claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Asbestos PI Trust, provided such claim is sufficiently complete, as defined in the Asbestos PI Trust's claim filing instructions or, if not so sufficiently complete, the later date on which it becomes so sufficiently complete. If any claims are filed on the same date, a claimant's position in the FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the date of the diagnosis of the asbestos-related disease with the earlier diagnosis having priority over the later diagnosis. If any claims are filed and diagnosed on the same date, a claimant's position in the

FIFO Processing Queue vis-à-vis such other same-day claims shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

(2)   <u>Effect of Statutes of Limitations and Repose</u>.  All unliquidated Asbestos PI Claims must meet either: (i) in the case of claims first filed in the tort system against Leslie Controls prior to the Commencement Date, the applicable federal, state or foreign statute of limitations and repose that was in effect at the time of the filing of the claim in the tort system; or (ii) in the case of claims not filed against Leslie Controls in the tort system prior to the Commencement Date, the applicable federal, state or foreign statute of limitations that was in effect at the time of the filing with the Asbestos PI Trust.  However, the running of the applicable statute of limitations shall be tolled as of the earliest of: (A) the actual filing of a claim against Leslie Controls prior to the Commencement Date in the tort system; (B) the date specified by agreement or otherwise between Leslie and/or the Asbestos PI Trust, on the one hand, and the applicable claimant, on the other hand, (or, if none, the date of the agreement) in the case of the tolling prior to the Commencement Date by an agreement or otherwise, provided such tolling was still in effect on the Commencement Date; or (C) the Commencement Date.

If an Asbestos PI Claim meets any of the tolling provisions described in the preceding paragraph and the claim was not barred by the applicable federal, state or foreign statute of limitations at the time of the relevant tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos PI Trust within three (3) years after the Initial Claims Filing Date.  In addition, any Asbestos PI Claim that is first diagnosed after the Commencement Date, irrespective of the application of any relevant federal, state or foreign statute of limitations or repose, may be filed with the Asbestos PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever is later.  However, the

processing of any Asbestos PI Claim by the Asbestos PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

(b)    <u>Notice of Impending Processing of Claims</u>.  The Asbestos PI Trust shall review its claims files on a regular basis and shall notify any claimant whose claim is likely to come up in the FIFO Processing Queue in the near future and, in any event.

(c)    <u>Payment of Claims</u>.  Asbestos PI Claims that have been liquidated by the Expedited Review Process as provided in Section 5.2(a) below, by the Individual Review Process as provided in Section 5.2(b) below, by mediation or arbitration as provided in Section 5.9 below, or by litigation in the tort system as provided in Section 5.10 below, shall be paid in FIFO order based on the date their liquidation became final (the "<u>FIFO Payment Queue</u>"), all such payments being subject to the applicable Payment Percentage at the time payment is made, the Maximum Annual Payment, the Claims Payment Ratio and any sequencing adjustment provided for in Section 7.5 below, except as otherwise provided herein.

Where a claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer of settlement or liquidation of the claim made by the Asbestos PI Trust shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or in that probate process for approval.  If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease with the earlier diagnosis having priority over the later diagnosis. If any claims are liquidated on the same date and the respective claimants' asbestos-related diseases were diagnosed on the same date, the position of those claimants' in the FIFO Payment Queue shall be determined by the Asbestos PI Trust based on the dates of the claimants' births, with older claimants given priority over younger claimants.

5.2    Resolution of Unliquidated Asbestos PI Claims. Within six (6) months after the establishment of the Asbestos PI Trust, the Asbestos PI Trustee, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, shall adopt procedures for reviewing and liquidating all unliquidated Asbestos PI Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking resolution of unliquidated Asbestos PI Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below. It is anticipated that the Asbestos PI Trust shall provide an initial response to a claimant within six (6) months of receiving the proof of claim form.

The proof of claim form shall require a claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Without regard to the Disease Level alleged on the proof of claim form, a claim shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify, whether at the time of filing or in the future, shall be treated as subsumed by and merged into the higher Disease Level for both processing and payment purposes. The proof of claim form also shall require a claimant to elect the Expedited Review

Process, as described in Section 5.2(a) below, or the Individual Review Process, as described in Section 5.2(b) below, if such election is available under these Asbestos PI Trust Distribution Procedures for the Disease Level alleged (or deemed applicable) by the claimant.

A claimant shall specify on his or her proof of claim (and the claim form shall require that a claimant so designate) whether the claim is asserted to be a "Leslie Powerhouse and Below-Deck Naval Station Claim" or a "Leslie Construction and Maintenance Claim." The Asbestos PI Trustee shall have the right (in addition to all other rights) to challenge any such assertion or designation. As used in these Asbestos PI Trust Distribution Procedures, the following terms shall have the following meanings:

(i)     "Leslie Powerhouse and Below-Deck Naval Station Claims"[3] means Asbestos PI Claims alleging exposure to asbestos during installation, removal or maintenance of Leslie valves and other control equipment or exposure to asbestos in the immediate vicinity of a worker who is performing such hands-on installation, removal or maintenance of Leslie valves and other control equipment while regularly employed in a Leslie Powerhouse, in a United States shipyard while working on naval vessels, or while serving at an assigned Below-Deck Naval Station, respectively. Most such claims allege that Leslie manufactured, sold, and/or distributed valves and other control equipment that contained asbestos-containing materials used at powerhouse facilities and on Naval vessels. To the extent that any Asbestos PI Claim filed or otherwise asserted against the Asbestos PI Trust does not specifically allege asbestos exposure arising from such circumstances, such claim shall be presumed to be a Leslie Construction and

---

[3] Leslie Powerhouse and Below-Deck Naval Station Claims include claims arising at United States and Canadian Naval Shipyards, private shipyards in the United States and Canada, shipyards operated outside of the United States by the United States Navy, United States Coast Guard vessels, and commercial vessels for which there is independent corroborating documentary evidence of Leslie asbestos-containing products.

Maintenance Claim unless designed as a Leslie Powerhouse and Below-Deck Naval Station Claim in the applicable proof of claim form (subject to challenge by the Trustee).

(ii)    "Leslie Construction and Maintenance Claims" means Asbestos PI Claims alleging asbestos exposure arising from the installation, maintenance, or removal of valves and/or other control equipment manufactured by Leslie installed other than described in (i) of this Section.  To the extent that any Asbestos PI Claim filed or otherwise asserted against the Asbestos PI Trust does not specify the circumstances of alleged asbestos exposure, such claim shall be presumed to be a Leslie Construction and Maintenance Claim.

Upon filing of a valid proof of claim form with the required supporting documentation and designation, a claim shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.

(a)    Expedited Review Process.

(1)    In General.  The Asbestos PI Trust's Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos PI Claims (except those involving Disease Level V and except Foreign Claims (as defined below), which shall only be liquidated pursuant to the Asbestos PI Trust's Individual Review Process) where the claim can easily be verified by the Asbestos PI Trust as meeting the Medical/Exposure Criteria for the relevant Disease Level.  Expedited Review thus provides claimants with a substantially less burdensome process for pursuing Asbestos PI Claims than does the Individual Review Process described in Section 5.2(b) below.  Expedited Review is also intended to provide qualifying claimants a fixed and certain claim value.

Thus, claims that undergo Expedited Review and meet the Medical/Exposure Criteria for the relevant Disease Level shall be paid on the basis of the Scheduled Value for such Disease

Level set forth in Section 5.2(a)(3) below. However, all claims liquidated by Expedited Review shall be subject to the applicable Payment Percentage at the time payment is made, the Maximum Annual Payment, and the Claims Payment Ratio limitations set forth herein.

Subject to the provisions of Section 5.7, a claimant's eligibility to receive the Scheduled Value for his or her Asbestos PI Claim pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

(2)    Claims Processing Under Expedited Review. All claimants seeking liquidation of an Asbestos PI Claim pursuant to Expedited Review shall file the Asbestos PI Trust's proof of claim form. As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the six Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination. If the Asbestos PI Trust determines that a claim meets the Medical/Exposure Criteria for a Disease Level, the Asbestos PI Trust shall tender to the claimant an offer of payment equal to payment of the Scheduled Value subject to the Payment Percentage in effect at the time of payment for the relevant Disease Level, together with a form of release approved by the Asbestos PI Trust. If the claimant accepts such offer, including the Scheduled Value, and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos PI Trust shall make payment on the claim subject to the limitations, if any, of the Maximum Annual Payment and Claims Payment Ratio.

(3)    Disease Levels: Scheduled Values and Medical/Exposure Criteria. The seven Disease Levels covered by these Asbestos PI Trust Distribution Procedures, together

with the Medical/Exposure Criteria for each, and the Scheduled Values for the six Disease

Levels eligible for Expedited Review, are set forth below.  These Disease Levels, Scheduled

Values, and Medical/Exposure Criteria shall apply to all Asbestos PI Trust Claims filed with the

Asbestos PI Trust on or before the Initial Claims Filing Date for which the claimant elects the

Expedited Review Process.  Thereafter, for purposes of administering the Expedited Review

Process and, with the consent of the Asbestos PI Trust Advisory Committee and the Future

Claimants' Representative, the Asbestos PI Trustee may: add to, change or eliminate Disease

Levels, Scheduled Values, and/or Medical/Exposure Criteria; develop subcategories of Disease

Levels, Scheduled Values and/or Medical/Exposure Criteria; or determine that a novel or

exceptional Asbestos PI Claim is compensable even though it does not meet the

Medical/Exposure Criteria for any of the then current Disease Levels.  Because claimants who

fall within Disease Level V seeking to recover from the Asbestos PI Trust may not undergo

Expedited Review and must undergo Individual Review, no Scheduled Value is provided.

| Disease Level | Scheduled Value | | Medical/Exposure Criteria |
|---|---|---|---|
| | Powerhouse and Below-Deck Naval Station Claims | Construction and Maintenance Claims | |
| Mesothelioma (Level VII) | $100,000 | $25,000 | (1) Diagnosis[4] of mesothelioma; and (2) Leslie Controls Exposure as defined in Section 5.6(b)(3) below |
| Lung Cancer 1 (Level VI) | $25,000 | $7,500 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos Related Nonmalignant Disease,[5] (2) six months Leslie Controls |

---

[4] The requirements for a diagnosis of an asbestos-related disease are set forth in Section 5.6 below.

[5] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease" for purposes of meeting the criteria for establishing Disease Levels I, II, IV, and VI, means either (i) a chest X-ray read by a qualified B reader of 1/0 or

Continued…

| Disease Level | Scheduled Value | | Medical/Exposure Criteria |
|---|---|---|---|
| | Powerhouse and Below-Deck Naval Station Claims | Construction and Maintenance Claims | |
| | | | Exposure prior to December 31, 1986, (3) Significant Occupational Exposure[6] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |
| Lung Cancer 2 (Level V) | None | None | (1) Diagnosis of a primary lung cancer; (2) Leslie Controls Exposure prior to December 31, 1986, and (3) supporting medical documentation establishing asbestos exposure as a substantial contributing factor in causing the lung cancer in question. Lung Cancer 2 (Level V) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VI) claims. All claims in Disease |

....Continued

higher on the ILO scale or (ii)(x) a chest x-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification, or (z) pathology. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (e.g., an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against Leslie Controls or another defendant in the tort system prior to the Commencement Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the medical requirements of Disease Levels I, II, IV and VI, or (z) pathology. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). For all purposes of these Asbestos PI Trust Distribution Procedures, a "Qualified Physician" is a physician who is board certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, that, subject to the provisions of Section 5.7, the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose x-rays and/or CT scan readings are submitted for deceased holders of Asbestos PI Claims.

[6] "Significant Occupational Exposure" is defined in Section 5.6(b)(2) below.

46392/0001-6934601v1

| Disease Level | Scheduled Value | | Medical/Exposure Criteria |
|---|---|---|---|
| | **Powerhouse and Below-Deck Naval Station Claims** | **Construction and Maintenance Claims** | |
| | | | Level V shall be individually evaluated. The estimated likely average of the individual evaluation awards for this category is $18,000 for Leslie Powerhouse and Below-Deck Naval Station Claims and $5,000 for Leslie Construction and Maintenance Claims, with such awards capped at $22,000 for Leslie Powerhouse and Below-Deck Naval Station Claims and $10,000 for Leslie Construction and Maintenance Claims, unless the claim qualifies for Extraordinary Claim treatment (discussed in Section 5.3 below). Level V claims that show no evidence of either an underlying Bilateral Asbestos-Related Nonmalignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker.[7] In any event, no presumption of validity shall be available for claims in this category. |

---

....Continued

[7] There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VI) or Lung Cancer 2 (Level V), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VI) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Asbestos PI Trust. In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the Scheduled Value for Lung Cancer 1 (Level VI), shown above. "Non-Smoker" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.

| Disease Level | Scheduled Value | | Medical/Exposure Criteria |
|---|---|---|---|
| | Powerhouse and Below-Deck Naval Station Claims | Construction and Maintenance Claims | |
| Other Cancer (Level IV) | $15,000 | $5,000 | (1) Diagnosis of a primary colorectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Leslie Controls Exposure prior to December 31, 1986, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level III) | $17,500 | $6,000 | (1) Diagnosis of asbestosis with ILO[8] of 2/1 or greater, or asbestosis determined by pathological evidence of asbestosis, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Leslie Controls Exposure prior to December 31, 1986, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary impairment in question. |

---

[8] If the diagnostic images being interpreted in such regard are digital images, then a written report by a Qualified Physician confirming that the images reviewed are with reasonable medical certainly equivalent to those that would qualify for the required ILO grade shall be provided as well.

| Disease Level | Scheduled Value | | Medical/Exposure Criteria |
| --- | --- | --- | --- |
| | Powerhouse and Below-Deck Naval Station Claims | Construction and Maintenance Claims | |
| Asbestosis/Pleural Disease (Level II) | $4,500 | $1,250 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months Leslie Controls Exposure prior to December 31, 1986, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary impairment in question. |
| Asbestosis/Pleural Disease (Level I) | $1,500 | $500 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, and (2) six months Leslie Controls Exposure prior to December 31, 1986, and (3) five years cumulative occupational exposure to asbestos. |

(b)    Individual Review Process.

(1)    In General.  Subject to the provisions set forth below, a claimant may elect to have his or her Asbestos PI Claim reviewed for purposes of determining whether the claim would be compensable in the tort system even though it does not meet the Medical/Exposure Criteria for any of the Disease Levels III, IV, VI or VII set forth in Section 5.2(a)(3) above or because it is a Disease Level V claim.  In addition or alternatively, a claimant holding an Asbestos PI Claim meeting the Medical/Exposure Criteria for Disease Levels III, IV, VI or VII may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of the claim exceeds the Scheduled Value for the

-28-

relevant Disease Level. However, until such time as the Asbestos PI Trust has made an offer on a claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the Asbestos PI Trust's Expedited Review Process. In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims asserted or payable under these Asbestos PI Trust Distribution Procedures shall be established only under the Asbestos PI Trust's Individual Review Process. Asbestos PI Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("Canadian Claims") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process. Accordingly, a "Foreign Claim" is an Asbestos PI Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which Leslie Controls has legal responsibility occurred outside of the United States and its Territories and Possessions and outside of the Provinces and Territories of Canada.

In reviewing Foreign Claims, the Asbestos PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.2(b)(2) below. The Asbestos PI Trust shall determine the liquidated value of a Foreign Claim based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.2(b)(2) below.

For purposes of the Individual Review Process for Foreign Claims, the Asbestos PI Trustee, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, may develop separate Medical/Exposure Criteria and standards, as

well as separate requirements for physician and other professional qualifications, which shall be applicable to Foreign Claims channeled to the Asbestos PI Trust; provided, however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under these Asbestos PI Trust Distribution Procedures, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the Asbestos PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Asbestos PI Trustee, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, may also establish a separate valuation matrix for any such Foreign Claims based on that data.

(A)    Review of Medical/Exposure Criteria. The Asbestos PI Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of an Asbestos PI Claim that fails to meet the Medical/Exposure Criteria for Disease Levels III, IV, VI or VII. In such a case, the Asbestos PI Trust shall either deny the claim, or, if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the Asbestos PI Trust may offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.

(B)    Review of Liquidated Value. Claimants holding claims in Disease Levels III - VII shall also be eligible to seek Individual Review of the liquidated value of their Asbestos PI Claims, as well as of their medical/exposure evidence. The Individual Review Process is intended to result in payments equal to the full liquidated

value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Asbestos PI Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review. Moreover, the liquidated value for a claim involving Disease Levels III - VII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.2(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.3(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value set forth in Section 5.3(a) for such claims.  Because the detailed examination and valuation process pursuant to Individual Review requires substantial time and effort, claimants electing to undergo the Individual Review Process may be paid on the basis of the liquidated value of their Asbestos PI Claims later than would have been the case had the claimant elected the Expedited Review Process.  Subject to the provisions of Section 5.7, the Asbestos PI Trust shall devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all Categories of claims.

(2)    <u>Valuation Factors to Be Considered in Individual Review</u>.  The Asbestos PI Trust shall liquidate the value of each Asbestos PI Claim that undergoes Individual Review based on the historic liquidated values of other similarly-situated claims in the tort system for the same Disease Level.  Accordingly, the Asbestos PI Trust shall take into consideration all of the factors that affect the amount of damages and values in the tort system, including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or

-31-

recreational activities, dependencies, special damages, and pain and suffering; (iii) whether the claimant's damages were (or were not) caused by asbestos exposure, including exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which Leslie Controls has legal responsibility, prior to December 31, 1986 (for example, possible alternative causes and the strength of documentation of injuries); (iv) the industry of exposure; (v) settlement and verdict histories in the Claimant's Jurisdiction for similarly-situated claims; (vi) the extent of the claimant's exposure to asbestos working below-deck on Navy vessels; and (vii) the greater of (a) settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction for similarly-situated claims, and (b) settlement and verdict histories for the claimant's law firm, including all cases where the claimant's law firm satisfies the Asbestos PI Trust on the basis of clear and convincing evidence provided to the Asbestos PI Trust that the claimant's law firm played a substantial role in the prosecution and resolution of the cases, such as actively participating in court appearances, discovery and/or trial of the cases, irrespective of whether a second law firm was also involved and would also be entitled to include the cases in its "settlement and verdict histories." For the avoidance of doubt, mere referral of a case, without further direct involvement, will not be viewed as having played a substantial role in the prosecution and resolution of a case. In liquidating the value of an Asbestos PI Claim that undergoes Individual Review, the Asbestos PI Trust shall treat a claimant as living if the claimant was alive at the time the initial pre-petition complaint was filed or the proof of claim form was filed with the Asbestos PI Trust even if the claimant has subsequently died.

For these purposes, the "Claimant's Jurisdiction" is the jurisdiction in which the claim was filed (if at all) against Leslie Controls in the tort system prior to the Commencement Date.

If the claim was not filed against Leslie Controls in the tort system prior to the Commencement Date, the claimant may elect as the Claimant's Jurisdiction (i) the jurisdiction in which the claimant resides or resided at the time of diagnosis or when the claim is filed with the Asbestos PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which Leslie Controls has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under these Asbestos PI Trust Distribution Procedures for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles.  The choice of law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.2(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the Asbestos PI Trust and the claimant, and, to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance coverage to Leslie Controls, the Alabama Wrongful Death Statute shall govern.

With respect to the "Claimant's Jurisdiction" in the event a claim is made under these Asbestos PI Trust Distribution Procedures for compensatory damages that would otherwise satisfy the criteria for payment under these Asbestos PI Trust Distribution Procedures, but the claimant is foreclosed from payment because the governing law of the Claimant's Jurisdiction (a "Foreclosed Jurisdiction") describes the claim as a claim for "exemplary" or "punitive" damages

-33-

and the claimant would have no other remedy for compensation under the law of the Foreclosed Jurisdiction, the claimant may elect the Commonwealth of Pennsylvania as the Claimant's Jurisdiction, and such claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.2(b)(2) is determined to be the law of a Foreclosed Jurisdiction, shall govern only the rights between the Asbestos PI Trust and the claimant, and, to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance coverage to Leslie Controls, the law of the Foreclosed Jurisdiction shall govern.

(3)    <u>Scheduled, Average and Maximum Values</u>.  The Scheduled, Average and Maximum Values for claims involving Disease Levels I-VII shall be as follows:

| Leslie Powerhouse and Below-Deck Naval Station Claims: | | | |
|---|---|---|---|
| **Scheduled Disease** | **Scheduled Value** | **Average Value** | **Maximum Value** |
| Mesothelioma (Level VII) | 100,000 | 140,000 | 350,000 |
| Lung Cancer 1 (Level VI) | 25,000 | 35,000 | 125,000 |
| Lung Cancer 2 (Level V) | N/A | 18,000 | 22,000 |
| Other Cancer (Level IV) | 15,000 | 17,500 | 25,500 |
| Severe Asbestosis (Level III) | 17,500 | 20,000 | 30,000 |
| Asbestosis/Pleural Disease (Level II) | 4,500 | 4,500 | 4,500 |
| Asbestosis/Pleural Disease (Level I) | 1,500 | 1,500 | 1,500 |

| Leslie Construction and Maintenance Claims: | | | |
|---|---|---|---|
| **Scheduled Disease** | **Scheduled Value** | **Average Value** | **Maximum Value** |
| Mesothelioma (Level VII) | 25,000 | 30,000 | 125,000 |
| Lung Cancer 1 (Level VI) | 7,500 | 10,000 | 37,500 |
| Lung Cancer 2 (Level V) | N/A | 5,000 | 10,000 |

| Other Cancer (Level IV) | 5,000 | 7,500 | 15,000 |
| Severe Asbestosis (Level III) | 6,000 | 8,000 | 17,500 |
| Asbestosis/Pleural Disease (Level II) | 1,250 | 1,250 | 1,250 |
| Asbestosis/Pleural Disease (Level I) | 500 | 500 | 500 |

The foregoing Scheduled Values, Average Values and Maximum Values shall apply to all Asbestos PI Claims filed with the Asbestos PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above. With respect to Asbestos PI Claims filed after such date, the Asbestos PI Trust, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative pursuant to Sections 6.7(b) and 7.7(b) of the Asbestos PI Trust Agreement may change these value amounts for good cause and consistent with any other restrictions on the power to amend or modify these Asbestos PI Trust Distribution Procedures.

(4) Claims Processing under Individual Review. At the conclusion of the Individual Review Process, the Asbestos PI Trust shall: (i) determine the liquidated value, if any, of the claim, and (ii) advise the claimant of its determination. If the Asbestos PI Trust establishes a liquidated value, it shall tender to the claimant an offer of payment of the determined value multiplied by the applicable Payment Percentage, together with a form of release approved by the Asbestos PI Trust. If the claimant accepts such offer, including such liquidated value, and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos PI Trust shall make payment on the claim subject to the limitations, if any, of the Maximum Annual Payment and Claims Payment Ratio.

5.3 Categorizing Claims as Extraordinary and/or Exigent.

(a) Extraordinary Claims. "Extraordinary Claim" means an Asbestos PI Claim that otherwise satisfies the Medical Criteria for Disease Levels III - VII, and that is held by a claimant whose exposure to asbestos was at least 75% the result of exposure to asbestos-

-35-

containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which Leslie Controls has legal responsibility, and there is little likelihood of a substantial recovery elsewhere. All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to a liquidation value of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.2(b)(3) for claims qualifying for Disease Levels III - IV, VI and VII, and five (5) times the Average Value set forth in Section 5.2(b)(3) for claims in Disease Level V, multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special panel established by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative (the "Extraordinary Claims Panel"). All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review. An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other Asbestos PI Claims, except Exigent Claims (as defined in Section 5.3(b) below), based on its date of liquidation and shall be subject to the Maximum Annual Payment and Claims Payment Ratio described above.

(b)    Exigent Claims. At any time the Asbestos PI Trust may liquidate and pay Asbestos PI Claims that qualify as Exigent Health Claims or Exigent Hardship Claims (together, "Exigent Claims") as defined below. Exigent Claims may be considered separately under the Individual Review Process no matter what the order of processing otherwise would have been under these Asbestos PI Trust Distribution Procedures. An Exigent Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other Asbestos PI Claims and shall be subject to the Maximum Annual Payment and Claims Payment Ratio described above.

46392/0001-6934601v1

(1)    <u>Exigent Health Claims</u>.  An Asbestos PI Claim qualifies for payment as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma (Disease Level VII) and the claimant is living when the claim is filed.  A claim in Disease Levels III-VI qualifies as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for the Disease Level, and the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states (a) that there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the relevant asbestos-related disease.

(2)    <u>Exigent Hardship Claims</u>.  An Asbestos PI Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level III) or an asbestos-related malignancy (Disease Levels IV - VII), and the Asbestos PI Trust, in its sole discretion, determines (i) that the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

5.4    <u>Secondary Exposure Claims</u>.  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must seek Individual Review of his or her claim pursuant to Section 5.2(b) above. In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under these Asbestos PI Trust Distribution Procedures that would have been applicable had that person filed a direct claim against the Asbestos PI Trust.  In

-37-

addition, the claimant with secondary exposure must establish that he or she is suffering from

one of the seven Disease Levels described in Section 5.2(a)(3) above or an asbestos-related

disease otherwise compensable under these Asbestos PI Trust Distribution Procedures, that his or

her own exposure to the occupationally exposed person occurred within the same time frame as

the occupationally exposed person was exposed to asbestos-containing products or conduct for

which Leslie Controls has legal responsibility, and that such secondary exposure was a cause of

the claimed disease. All other liquidation and payment rights and limitations under these

Asbestos PI Trust Distribution Procedures shall be applicable to such claims, including the right

to elect Scheduled Value.

     5.5    Indirect Asbestos PI Claims. Indirect Asbestos PI Claims asserted against the

Asbestos PI Trust shall be treated as valid and paid by the Asbestos PI Trust subject to the

applicable Payment Percentage (and all other limitations applicable to direct claims hereunder) if

(a) such claim satisfied the requirements of the Bar Date for such claims established by the

Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code

or subordinated under Section 509(c) of the Code, and (b) the holder of such claim (the "Indirect

Claimant") establishes to the satisfaction of the Asbestos PI Trustee that (i) the Indirect Claimant

has paid in full the liability and obligation of the Asbestos PI Trust to the individual claimant to

whom the Asbestos PI Trust would otherwise have had a liability or obligation under these

Asbestos PI Trust Distribution Procedures (the "Direct Claimant") (and which has not been paid

by the Asbestos PI Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and

fully released the Asbestos PI Trust and the Asbestos Protected Parties from all liability to the

Direct Claimant and the Indirect Claimant, and (iii) the claim is not otherwise barred by a statute

of limitations or repose or by other applicable law. In no event shall any Indirect Claimant have

-38-

any rights against the Asbestos PI Trust superior to the rights of the related Direct Claimant

against the Asbestos PI Trust, including any rights with respect to the timing, amount or manner

of payment. In addition, no Indirect Asbestos PI Claim may be liquidated and paid in an amount

that exceeds what the Indirect Claimant has actually paid the related Direct Claimant in respect

of such Direct Claimant's claim for which the Asbestos PI Trust would have liability.

In addition, to establish a presumptively valid Indirect Asbestos PI Claim, the Indirect

Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed,

liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release

in favor of the Asbestos PI Trust and the Asbestos Protected Parties) or a Final Order, provided

that such claim is valid under the applicable state law. In any case where the Indirect Claimant

has satisfied the claim of a Direct Claimant against the Asbestos PI Trust under applicable law

by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Asbestos PI Trust

and the Asbestos Protected Parties a release in form and substance satisfactory to the Asbestos PI

Trustee.

If an Indirect Claimant cannot meet the presumptive requirements set forth above,

including the requirement that the Indirect Claimant provide the Asbestos PI Trust and the

Asbestos Protected Parties with a full release of the Direct Claimant's claim, the Indirect

Claimant may request that the Asbestos PI Trust review the Indirect Asbestos PI Claim

individually to determine whether the Indirect Claimant can establish under applicable state law

that the Indirect Claimant has paid all or a portion of a liability or obligation that the Asbestos PI

Trust had to the Direct Claimant as of the date the indirect claim was filed with the Asbestos PI

Trust. If the Indirect Claimant can show that it has paid all or a portion of such a liability or

obligation, the Asbestos PI Trust shall reimburse the Indirect Claimant the amount of the liability

or obligation so paid, times the then applicable Payment Percentage.  However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under these Asbestos PI Trust Distribution Procedures.  Further, the liquidated value of any Indirect Asbestos PI Claim paid by the Asbestos PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos PI Claim that might be subsequently asserted by the Direct Claimant against the Asbestos PI Trust.

Any dispute between the Asbestos PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures.  If such dispute is not resolved under the ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.10 and 7.6 below.

Indirect Asbestos PI Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Asbestos PI Trustee consistent with the provisions of this Section 5.5, which procedures (a) shall determine the validity, allowability and enforceability of such claims, and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos PI Trust would have afforded the holders of the underlying valid Asbestos PI Claims.  Nothing in these Asbestos PI Trust Distribution Procedures is intended to preclude a trust to which asbestos-related liabilities are channeled from asserting an Indirect Asbestos PI Claim against the Asbestos PI Trust subject to the requirements set forth herein.

-40-

5.6    Evidentiary Requirements.

(a)    Medical Evidence.

(1)    In General.  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least 10 years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.[9]

(A)    Disease Levels I - III.  Except for asbestos claims filed against Leslie Controls or any other defendant in the tort system prior to the Commencement Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I - III) shall be based in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.  All living claimants must also provide:  (i) for Disease Levels I - II, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 4 above), (ii) for Disease Level III, an ILO[10] reading of 2/1 or greater or pathological evidence of asbestosis, and (iii) for Disease Levels II and III, pulmonary function testing.[11]  A finding by a physician after the Effective Date that a claimant's

---

[9] All diagnoses of Asbestosis/Pleural Disease (Disease Levels I, II and III) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VII) shall be presumed to be based on findings that the disease involves a malignancy. However, the Asbestos PI Trust may rebut such presumptions.

[10] See note 7 above.

[11] "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("ATS") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by the JCAHO (as defined in Section 5.6(a)(1)(B) below), or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in a JCAHO-accredited hospital, or

Continued...

46392/0001-6934601v1

disease is "consistent with" or "compatible with" asbestosis will not alone be treated by the Asbestos PI Trust as a diagnosis.

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I - III) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) pathological evidence of the non-malignant asbestos-related disease, or (iii) in the case of Disease Levels I and II, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 4 above), and for Disease Level III, either an ILO[12] reading of 2/1 or greater or pathological evidence of asbestosis, or (iv) for either Disease Level II or III, pulmonary function testing.

(B)    Disease Levels IV - VII.  All diagnoses of an asbestos-related malignancy (Disease Levels IV - VII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

(C)    Exception to the Exception for Certain Pre-Petition Asbestos PI Claims.  If the holder of an Asbestos PI Claim that was filed against Leslie

---

....Continued

performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other party who is qualified to make a certification regarding the PFT, in the form provided by the Asbestos PI Trust, certifying that the PFT was conducted in material compliance with ATS standards.

[12] See note 6 above.

46392/0001-6934601v1

Controls or any other defendant in the tort system prior to the Commencement Date has

available a report of a diagnosing physician engaged by the holder or his or her law firm

who conducted a physical examination of the holder as described in Section 5.6(a)(1)(A),

or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related

disease by a physician not engaged by the holder or his or her law firm who conducted a

physical examination of the holder with another asbestos-related personal injury

settlement trust that requires such evidence, without regard to whether the claimant or the

law firm engaged the diagnosing physician, the holder shall provide such medical

evidence to the Asbestos PI Trust notwithstanding the exception in Section 5.6(a)(1)(A).

(2)     Credibility of Medical Evidence.  Before making any payment to a

claimant, the Asbestos PI Trust must have reasonable confidence that the medical evidence

provided in support of the claim is credible and consistent with recognized medical standards.

The Asbestos PI Trust may require the submission of X-rays, CT scans, detailed results of

pulmonary function tests, laboratory tests, tissue samples, results of medical examination or

reviews of other medical evidence, and may require that medical evidence submitted comply

with recognized medical standards regarding equipment, testing methods and procedures to

assure that such evidence is reliable.  Medical evidence (i) that is of a kind shown to have been

received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence

submitted to Leslie Controls for settlement purposes for payment of similar disease cases prior to

Leslie Controls' bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously

qualified as a medical expert with respect to the asbestos-related disease in question before a

state or federal judge using the same methodology and standard, is presumptively reliable,

although the Asbestos PI Trust may seek to rebut the presumption.  Notwithstanding the

-43-

foregoing or any other provision of these Asbestos PI Trust Distribution Procedures, any medical evidence submitted by a physician or entity that the Asbestos PI Trust has determined, after consulting with the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, to be unreliable shall not be acceptable as medical evidence in support of any Asbestos PI Claim.

In addition, claimants who otherwise meet the requirements of these Asbestos PI Trust Distribution Procedures for payment of an Asbestos PI Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment, involving another defendant may be introduced by either the claimant or the Asbestos PI Trust in any Individual Review proceeding conducted pursuant to 5.2 (b) or any Extraordinary Claim proceeding conducted pursuant to 5.3(a).

(b)    Exposure Evidence.

(1)    In General.  As set forth above in Section 5.2(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to asbestos-containing products, or to conduct that exposed the claimant to an asbestos-containing product, for which Leslie Controls has legal responsibility.  Claims based on conspiracy theories that involve no exposure to an asbestos-containing product sold, distributed, marketed, handled, processed or manufactured by Leslie Controls are not compensable under these Asbestos PI Trust Distribution Procedures.  To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.2 (a)(3) above, the claimant must show (i) for all Disease Levels, Leslie Controls Exposure as defined in Section 5.6(b)(3) below prior to December 31, 1986, (ii) for Asbestos/Pleural Disease Level I, six (6) months Leslie Controls Exposure prior to December 31,

1986 plus five (5) years cumulative occupational asbestos exposure, and (iii) for Asbestosis/Pleural Disease (Disease Level II), Severe Asbestosis (Disease Level III), Other Cancer (Disease Level IV) or Lung Cancer 1 (Disease Level VI), the claimant must show six (6) months of Leslie Controls Exposure prior to December 31, 1986, plus Significant Occupational Exposure to asbestos as defined below.  If a claimant asserting a claim in Disease Level III, IV, V, VI or VII cannot meet the relevant presumptive exposure requirements for a Disease Level eligible for Expedited Review, such claimant may seek Individual Review of his or her claim based on exposure to asbestos-containing products, or to conduct that exposed the claimant to an asbestos-containing product, for which Leslie Controls has legal responsibility.

(2)      Significant Occupational Exposure.  "Significant Occupational Exposure" means employment for a cumulative period of at least five (5) years, with a minimum of two (2) years prior to December 31, 1986, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis, (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers, (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers, or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

(3)      Leslie Controls Exposure.  The claimant must demonstrate meaningful and credible exposure, which occurred prior to December 31, 1986, (a) to an asbestos-containing product sold, distributed, marketed, handled, processed or manufactured by Leslie Controls or for which Leslie Controls otherwise has legal responsibility, or (b) to conduct for which Leslie Controls has legal responsibility that exposed the claimant to an asbestos-

-45-

containing product ("Leslie Controls Exposure"). That meaningful and credible exposure evidence may be established by an affidavit or sworn statement on personal knowledge of the claimant, by an affidavit or sworn statement on personal knowledge of a co-worker or the affidavit or sworn statement on personal knowledge of a family member in the case of a deceased claimant (provided that the Asbestos PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the Asbestos PI Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof of claim form to be used by the Asbestos PI Trust. The Asbestos PI Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

Evidence submitted to establish proof of Leslie Controls Exposure is for the sole benefit of the Asbestos PI Trust, not third parties or defendants in the tort system. The Asbestos PI Trust has no need for, and therefore claimants are not required to furnish the Asbestos PI Trust with, evidence of exposure to specific asbestos products other than those for which Leslie Controls has legal responsibility, except to the extent such evidence is required elsewhere in these Asbestos PI Trust Distribution Procedures. Similarly, failure to identify Leslie Controls Exposure in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Asbestos PI Trust, provided that the claimant satisfies the medical and exposure requirements of these Asbestos PI Trust Distribution Procedures.

5.7    Claims Audit Program. The Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative may develop methods for auditing the reliability of medical evidence, including additional readings of X-rays and CT scans and verification of pulmonary function tests, as well as the reliability of evidence of

exposure to asbestos, including Leslie Controls Exposure, prior to December 31, 1986. In the event that the Asbestos PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical evidence, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos PI Trust, the Asbestos PI Trust may penalize any claimant or claimant's attorney by disallowing the Asbestos PI Claim and/or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos PI Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. §152, and/or seeking sanctions from the Bankruptcy Court.

5.8    <u>Second Disease (Malignancy) Claims</u>. The holder of an Asbestos PI Claim involving a non-malignant asbestos-related disease (Disease Levels I through III) may assert a new Asbestos PI Claim against the Asbestos PI Trust for a malignant disease (Disease Levels IV -VII) that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to such malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed at the time the claimant was paid with respect to his or her original claim involving the non-malignant disease.

46392/0001-6934601v1

5.9     Arbitration.

(a)     Establishment of ADR Procedures.  The Asbestos PI Trust, with the

consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative,

shall develop and adopt ADR Procedures, which shall provide for pro-bono evaluation,

mediation and binding or non-binding arbitration to resolve disputes concerning whether the

Asbestos PI Trust's outright rejection or denial of a claim was proper, or whether the claimant's

medical condition or exposure history meets the requirements of these Asbestos PI Trust

Distribution Procedures for purposes of categorizing a claim involving Disease Levels I - VII.

Proceedings under the ADR Procedures shall also be available for resolving disputes over the

liquidated value of a claim involving Disease Levels III - VII, as well as disputes over the

validity of an Indirect Asbestos PI Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary

requirements that are set forth in Section 5.6 above.  In the case of an arbitration involving the

liquidated value of a claim involving Disease Levels III - VII, the arbitrator shall consider the

same valuation factors that are set forth in Section 5.2(b)(2) above.  To facilitate the Individual

Review Process with respect to claims involving Disease Level III, IV, VI or VII, the Asbestos

PI Trust may develop a valuation model that enables it to efficiently make initial settlement

offers on such claims.  In an arbitration involving any such claim, the Asbestos PI Trust shall not

offer into evidence or describe any model or assert that any information generated by the model

has any evidentiary relevance or should be used by the arbitrator in determining the presumed

correct liquidated value in the arbitration.  The underlying data that was used to create the model

may be relevant and may be made available to the arbitrator but only if provide do the claimant

or his or her counsel ten days prior to the arbitration proceeding.  The claimant and his or her

-48-

counsel may use the data that is provided by the Asbestos PI Trust in the arbitration and shall

agree to otherwise maintain the confidentiality of such information.  Any disputes regarding

confidentiality shall be resolved by the arbitrator.

With respect to all claims eligible for arbitration, the claimant, but not the Asbestos PI

Trust, may elect either non-binding or binding arbitration.  The ADR Procedures may be

modified by the Asbestos PI Trust with the consent of the Asbestos PI Trust Advisory

Committee and the Future Claimants' Representative.

(b)    Claims Eligible for Arbitration.  In order to be eligible for arbitration on

the question of the appropriate liquidated value to be assigned a claim, the Claimant must first

complete the Individual Review Process set forth in Section 5.2(b) above, as well as the pro bono

evaluation or mediation process set forth in the ADR Procedures, with respect to the disputed

issue.  Individual Review shall be treated as completed for these purposes when the claim has

been individually reviewed, where applicable, by the Asbestos PI Trust, the Asbestos PI Trust

has made an offer on the claim, the claimant has rejected the liquidated value resulting from the

Individual Review, and the claimant has notified the Asbestos PI Trust of claimant's rejection in

writing.  Individual Review will also be treated as completed if the Asbestos PI Trust has

rejected the claim.

(c)    Limitations on and Payment of Arbitration Awards.  In the case of a non-

Extraordinary Claim involving Disease Levels III - VII, the arbitrator shall not return an award in

excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.2(b)(4)

above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall

not return an award greater than the maximum extraordinary value for such a claim as set forth in

Section 5.3(a) above.  A claimant who submits to binding arbitration will receive payments in

-49-

the same manner as one who accepts the Asbestos PI Trust's original valuation of the claim.  If a claimant elects non-binding arbitration and both the claimant and the Asbestos PI Trustee agree to be bound by the award therein, then the claimant will receive payments in the same manner as one who accepts the Asbestos PI Trust's original valuation of the claim.

5.10    _Litigation_.  Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos PI Trust pursuant to Section 7.6 below.  However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Asbestos PI Trust's available cash only as provided in Section 7.7 below.

## SECTION VI
## Claims Materials

6.1    _Claims Materials_.  The Asbestos PI Trust shall prepare suitable and efficient claims materials ("_Claims Materials_") for all Asbestos PI Claims, and shall provide such Claims Materials upon a written request for such materials to the Asbestos PI Trust.  In addition, a separate claim form for Indirect Asbestos PI Claims shall be developed.  The proof of claim form to be submitted to the PI Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing.  The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure.  In developing its claim filing procedures, the Asbestos PI Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology in their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD-rom.  The proof of claim form to be used by the Asbestos PI Trust shall be developed by the Asbestos PI Trust and submitted to the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative for

-50-

approval; it may be changed by the Asbestos PI Trust with the consent of the Asbestos PI Trust

Advisory Committee and the Future Claimants' Representative.

      6.2    <u>Content of Claims Materials</u>.  The Claims Materials shall include a copy of these

Asbestos PI Trust Distribution Procedures, such instructions as the Asbestos PI Trustee shall

approve, and a detailed proof of claim form.  If feasible, the forms used by the Asbestos PI Trust

to obtain claims information shall be the same or substantially similar to those used by other

asbestos claims resolution organizations.  If requested by the claimant, the Asbestos PI Trust

shall accept information provided electronically.  The claimant may, but shall not be required to,

provide the Asbestos PI Trust with evidence of recovery from other asbestos defendants and

claims resolution organizations.

      6.3    <u>Withdrawal or Deferral of Claims</u>.  A claimant may withdraw an Asbestos PI

Claim at any time upon written notice to the Asbestos PI Trust and file another claim

subsequently without affecting the status of the claim for statute of limitations purposes, but any

such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on

the date of such subsequent filing.  Also, a claimant may request that the processing of his or her

Asbestos PI Claim by the Asbestos PI Trust be deferred for a period not to exceed three (3) years

without affecting the status of the claim for statute of limitations purposes, in which case the

claimant shall also retain his or her original place in the FIFO Processing Queue.  During the

period of such deferral, a sequencing adjustment on such claimant's Asbestos PI Claim as

provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived

by the claimant.  Except for Asbestos PI Claims held by representatives of deceased or

incompetent claimants for which court or probate approval of the Asbestos PI Trust's offer is

required, or an Asbestos PI Claim for which deferral status has been granted, a claim shall be

deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the Asbestos PI Trust's written offer of payment or of rejection of the claim. Upon written request, for good cause, the Asbestos PI Trust may extend the withdrawal or deferral period for an additional six (6) months.

6.4     Filing Requirements and Fees. The Asbestos PI Trustee shall have the discretion to determine, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, whether a filing fee should be required for any Asbestos PI Claims. Any such requirement shall be applied, within any Category, on a non-discriminatory basis.

6.5     English Language. All claims, claims forms, submissions and evidence submitted to the Asbestos PI Trust or in connection with any claim or its liquidation shall be in the English language.

6.6     Confidentiality of Claimants' Submissions. All submissions to the Asbestos PI Trust by a holder of an Asbestos PI Claim, including the proof of claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Asbestos PI Trust and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including, but not limited to, those directly applicable to settlement discussions. The Asbestos PI Trust shall preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only with the permission of the holder to another trust established for the benefit of asbestos personal injury claimants pursuant to Section 524(g) and/or Section 105 of the Bankruptcy Code or other applicable law, or to such other persons as authorized by the holder, or in response to a valid subpoena. Furthermore, the Asbestos PI Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served. The Asbestos PI Trust shall on its own initiative

-52-

or upon request of the claimant in question take all necessary and appropriate steps to preserve any and all privileges. Notwithstanding anything in the foregoing to the contrary, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, the Asbestos PI Trust may, in specific limited instances, disclose information, documents, or other materials reasonably necessary in the Asbestos PI Trust's judgment to preserve, litigate, resolve or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement within the Asbestos Insurance Rights; provided, however, that the Asbestos PI Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Asbestos PI Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Asbestos PI Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party.

## SECTION VII
### General Guidelines For Liquidating And Paying Claims

7.1    <u>Showing Required</u>. To establish a valid Asbestos PI Claim, a claimant must meet the requirements set forth in these Asbestos PI Trust Distribution Procedures. The Asbestos PI Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other medical evidence, or any other evidence to support or verify an Asbestos PI Claim, and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable.

7.2     <u>Costs Considered</u>.  Notwithstanding any provisions of these Asbestos PI Trust Distribution Procedures to the contrary, the Asbestos PI Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos PI Claims so that the payment of valid Asbestos PI Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting an Asbestos PI Claim.  The Asbestos PI Trustee shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Asbestos PI Trust so that valid Asbestos PI Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Asbestos PI Trustee, in appropriate circumstances, from contesting the validity of any claim against the Asbestos PI Trust whatever the costs, or declining to accept medical evidence from sources that the Asbestos PI Trustee has determined to be unreliable pursuant to the Claims Audit Program described in Section 5.7 above.

7.3     <u>Discretion to Vary the Order and Amounts of Payments in the Event of Limited Liquidity</u>.  Consistent with the provisions hereof and subject to the FIFO Processing Queue and the FIFO Payment Queue, the Maximum Annual Payment, and the Claims Payment Ratio requirements set forth above, the Asbestos PI Trustee shall proceed as quickly as possible to liquidate valid Asbestos PI Claims, and shall make payments to holders of such claims in accordance with these Asbestos PI Trust Distribution Procedures promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Asbestos PI Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment

-54-

to claimants. However, the Asbestos PI Trustee shall use his or her best efforts to treat similar claims in substantially the same manner, consistent with his or her duties as Asbestos PI Trustee, the purposes of the Asbestos PI Trust, the established allocation of funds to claims in Categories A and B, and the practical limitations imposed by the inability to predict the future with precision. In the event that the Asbestos PI Trust faces temporary periods of limited liquidity, the Asbestos PI Trustee may, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, suspend the normal order of payment and may temporarily limit or suspend payments altogether, and may offer a Reduced Payment Option as described in Section 2.5 above.

7.4    Punitive Damages. Except as provided below for claims asserted under the Alabama Wrongful Death Statute and for claims asserted by a claimant for compensatory damages that would otherwise satisfy the criteria for payment under these Asbestos PI Trust Distribution Procedures but in respect of which the claimant is foreclosed from payment because the governing law of a Foreclosed Jurisdiction (as defined in Section 5.2(b)(2) above) considers the claim to be a claim for "exemplary" or "punitive" damages and in respect of which the claimant would have no other remedy for compensation under the law of the Foreclosed Jurisdiction, in determining the value of any liquidated or unliquidated Asbestos PI Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or allowed, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Asbestos PI Trust in the tort system pursuant to Sections 5.10 above and 7.6 below. The only damages that may be awarded pursuant to these Asbestos PI Trust Distribution Procedures to Alabama Claimants who are deceased and whose personal representatives pursue their claims

only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles. The choice of law provision in this Section 7.4 applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.2(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the Asbestos PI Trust and the claimant including, but not limited to, suits in the tort system pursuant to Section 7.6, and to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance to Leslie Controls, the Alabama Wrongful Death Statute shall govern.

The only damages that may be awarded pursuant to these Asbestos PI Trust Distribution Procedures for claims asserted by a claimant for compensatory damages that would otherwise satisfy the criteria for payment under these Asbestos PI Trust Distribution Procedures, but in respect of which the claimant is foreclosed from payment because the governing law of a Foreclosed Jurisdiction describes the claim as a claim for "exemplary" or "punitive" damages and the claimant would have no other remedy for compensation under the law of the Foreclosed Jurisdiction, shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles. The choice of law provision in this Section 7.4 applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.2(b)(2) is determined to be the law of the Foreclosed Jurisdiction, shall govern only the rights between the Asbestos PI Trust and the claimant including, but not limited to, suits in the tort system pursuant to Section 7.6, and to the extent the Asbestos PI Trust seeks recovery from any

-56-

entity that provided insurance to Leslie Controls, the law of the Foreclosed Jurisdiction shall govern.

7.5    Sequencing Adjustments.

(a)    In General. Subject to the limitations set forth below, a sequencing adjustment shall be paid on all Asbestos PI Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years on an unliquidated Asbestos PI Claim. The sequencing adjustment factor shall be 4.5% per annum for each of the first five (5) years after the Effective Date; thereafter, the Asbestos PI Trust shall have the discretion to change the annual sequencing adjustment factor with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative.

(b)    Unliquidated Asbestos PI Claims. A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Asbestos PI Claim that meets the requirements of Disease Levels I - IV, VI and VII, whether the claim is liquidated under Expedited Review, Individual Review, or by arbitration. No sequencing adjustment shall be available to or paid on any claim liquidated in the tort system pursuant to Section 5.10 above and Section 7.6 below. The sequencing adjustment on an unliquidated Asbestos PI Claim that meets the requirements of Disease Level V shall be based on the liquidated value of such claim. Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the date that is one (1) year after the date on which the claim was placed in the FIFO Payment Queue, subject to the limitation that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years.

46392/0001-6934601v1

7.6     Suits in the Tort System.  If the holder of a disputed claim disagrees with the

Asbestos PI Trust's determination regarding the Disease Level of the claim, the claimant's

exposure history or the liquidated value of the claim, and if the holder has first submitted the

claim to non-binding arbitration as provided in Section 5.9 above, the holder may file a lawsuit

in the Claimant's Jurisdiction as defined in Section 5.2 (b)(2) above.  Any such lawsuit must be

filed by the claimant in his or her own right and name and not as a member or representative of a

class, and no such lawsuit may be consolidated with any other lawsuit.  All defenses (including,

with respect to the Asbestos PI Trust, all defenses which could have been asserted by Leslie

Controls) shall be available to both sides at trial; however, the Asbestos PI Trust may waive any

defense and/or concede any issue of fact or law.  If the claimant was alive at the time the initial

pre-petition complaint was filed or the proof of claim form was filed with the Asbestos PI Trust,

the case shall be treated as a personal injury case with all personal injury damages to be

considered even if the claimant has died during the pendency of the claim.

7.7     Payment of Judgments for Money Damages.  If and when a claimant obtains a

judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the

date on which the judgment became final.  Thereafter, the claimant shall receive from the

Asbestos PI Trust an initial payment (subject to the applicable Payment Percentage, the

Maximum Annual Payment, and the Claims Payment Ratio provisions set forth above) of an

amount equal to the greater of (i) the Asbestos PI Trust's last offer to the claimant, or (ii) the

award that the claimant declined in non-binding arbitration; provided, however, that in no event

shall such payment amount exceed the amount of the judgment obtained in the tort system.  The

claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years

six (6) through ten (10) following the year of the initial payment (also subject to the applicable

Payment Percentage, the Maximum Annual Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

In the case of non-Extraordinary claims involving Disease Levels III - VII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.2(b)(3). In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum extraordinary values for such claims set forth in Section 5.3 above. Under no circumstances shall (a) sequencing adjustments be paid pursuant to Section 7.5, or (b) interest be paid under any statute on any judgments obtained in the tort system.

7.8    Releases. The Asbestos PI Trustee shall have the discretion to determine the form and substance of the releases to be provided to the Asbestos PI Trust and the Asbestos Protected Parties in order to maximize recovery for claimants against other tortfeasors without increasing the risk or amount of claims for indemnification or contribution from the Asbestos PI Trust or the Asbestos Protected Parties with respect to the Asbestos PI Claim. As a condition to making any payment to a claimant, the Asbestos PI Trust shall obtain, for the benefit of the Asbestos PI Trust and the Asbestos Protected Parties, a general, partial, or limited release as appropriate in accordance with the applicable state or other law. If allowed by state law, the endorsing of a check or draft for payment by or on behalf of a claimant may, in the discretion of the Asbestos PI Trust, constitute such a release.

7.9    Third-Party Services. Nothing in these Asbestos PI Trust Distribution Procedures shall preclude the Asbestos PI Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos PI Trust so long as decisions about the categorization and liquidated value of Asbestos PI Claims are based on the relevant provisions of

46392/0001-6934601v1

these Asbestos PI Trust Distribution Procedures, including the Disease Levels, Scheduled

Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

7.10   <u>Asbestos PI Trust Disclosure of Information</u>.  Periodically, but not less often than

once a year, the Asbestos PI Trust shall make available to claimants and other interested parties,

the number of claims by Disease Levels that have been resolved both by the Individual Review

Process and by arbitration as well as by litigation in the tort system indicating the amounts of the

awards and the averages of the awards by jurisdiction.

**SECTION VIII**
**<u>Miscellaneous</u>**

8.1   <u>Amendments</u>.  Except as otherwise provided herein, the Asbestos PI Trustee may

amend, modify, delete, or add to any provisions of these Asbestos PI Trust Distribution

Procedures (including, without limitation, amendments to conform these Asbestos PI Trust

Distribution Procedures to advances in scientific or medical knowledge or other changes in

circumstances), provided he or she first obtains the consent of the Asbestos PI Trust Advisory

Committee and the Future Claimants' Representative pursuant to the Consent Process set forth in

Sections 6.7(b) and 7.7(b) of the Asbestos PI Trust Agreement, except that the right to amend the

Claims Payment Ratio is also governed by the restrictions in Section 2.5 above, and the right to

adjust the Payment Percentage is also governed by Section 4.2 above.  Nothing herein is

intended to preclude the Asbestos PI Trust Advisory Committee or the Future Claimants'

Representative from proposing to the Asbestos PI Trustee, in writing, amendments to these

Asbestos PI Trust Distribution Procedures.  Any amendment proposed by the Asbestos PI Trust

Advisory Committee or the Future Claimants' Representative shall remain subject to Section 8.3

of the Asbestos PI Trust Agreement.

46392/0001-6934601v1

8.2    Severability.  Should any provision contained in these Asbestos PI Trust Distribution Procedures be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of these Asbestos PI Trust Distribution Procedures.  Should any provision contained in these Asbestos PI Trust Distribution Procedures be determined to be inconsistent with or contrary to Leslie Controls' obligations to any insurance company providing insurance coverage to Leslie Controls in respect of claims for personal injury based on exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which Leslie Controls has legal responsibility or products containing asbestos for which Leslie Controls has legal responsibility, the Asbestos PI Trust, with the consent of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative, may amend these Asbestos PI Trust Distribution Procedures and/or the Asbestos PI Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of Leslie Controls to said insurance company.

8.3    Governing Law.  Except for purposes of determining the liquidated value of any Asbestos PI Claim, administration of these Asbestos PI Trust Distribution Procedures shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the liquidation of Asbestos PI Claims in the case of Individual Review, mediation, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.2 (b)(2) above.

8.4    Administration of Asbestos PI Trust Assets with Other Comparable Trusts.  In order to efficiently administer the Asbestos PI Trust Assets, the Asbestos PI Trustee may determine, with the consent of the Asbestos PI Trust Advisory Committee and the Future

Claimants' Representative, to provide for the administration of the Asbestos PI Trust Assets and/or these Asbestos PI Trust Distribution Procedures by or in conjunction with another trust or trusts established under Section 524(g) of the Bankruptcy Code, provided, however, that appropriate accounting, trust and other procedures shall be adopted and followed to ensure that the Asbestos PI Trust's *res* is maintained separate and segregated from any other trust's assets or *res* and the Asbestos PI Trust's value can be separately ascertained at all appropriate times.

-62-

# EXHIBIT D

# LESLIE PROMISSORY NOTE

**UNTIL ONE YEAR AFTER THE PLAN EFFECTIVE DATE (AS DEFINED HEREIN), NEITHER THIS NOTE (AS DEFINED HEREIN) NOR ANY INTEREST HEREIN MAY BE SOLD, DISTRIBUTED, ASSIGNED, OFFERED, PLEDGED OR OTHERWISE TRANSFERRED WITHOUT THE PRIOR WRITTEN CONSENT OF THE OBLIGOR (AS DEFINED HEREIN), WHICH CONSENT MAY BE WITHHELD IN THE SOLE DISCRETION OF THE OBLIGOR.**

**THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. WITHOUT IN ANY WAY LIMITING THE TERMS OF THE FOREGOING PARAGRAPH, NO INTEREST IN THIS NOTE MAY BE SOLD, DISTRIBUTED, ASSIGNED, OFFERED, PLEDGED OR OTHERWISE TRANSFERRED WITHOUT AN APPLICABLE EXEMPTION FROM REGISTRATION.**

**LESLIE CONTROLS, INC.**
**SECURED PROMISSORY NOTE**

_____, 2010                                                      $1,000,000

     FOR VALUE RECEIVED, the undersigned, Leslie Controls, Inc., a Delaware corporation (the "Obligor"), hereby promises to pay to the order of Leslie Controls, Inc. Asbestos Personal Injury Trust, a Delaware statutory trust (together with its successors or permitted assigns, the "Holder"), the principal amount of $1,000,000.00, with simple interest thereon at the rate of 5% per annum, subject to the terms and conditions hereof.

     Capitalized terms used but not otherwise defined in Section 12 of this Secured Promissory Note (this "Note") have the meanings specified in the *Plan of Reorganization of Leslie Controls, Inc. Under Chapter 11 of the Bankruptcy Code*, dated _____, 2010 (as modified and/or amended from time to time, the "Plan"), as confirmed by the United States Bankruptcy Court for the District of Delaware, or, as the case may be, the United States District Court for the District of Delaware in a confirmation order entered on _____, 2010, together with the exhibits and schedules thereto. This Note is the "Leslie Promissory Note" referred to in such Plan.

## 1.     PAYMENT OBLIGATIONS; SECURITY

     1.1     *Scheduled Payments and Prepayment*. The amount outstanding hereunder shall be due and payable in equal quarterly installments of $10,000.00 (each, an "Installment Payment" and collectively, the "Installment Payments"), commencing on the first anniversary of the Effective Date of the Plan, with each such subsequent Installment Payment due on the fifteenth (15th) day after the last date of each subsequent calendar quarter, until _____, 2020 (the "Final Maturity Date"); provided, however, that the Final Maturity Date may be extended at the option of the Holder for any period deemed acceptable by the Holder. Interest on the then-outstanding principal amount of the Note shall accrue at a rate per annum of 5% and shall be paid quarterly (each, an "Interest Payment" and collectively, the "Interest Payments") commencing on the first anniversary of the Effective Date of the Plan, with each such subsequent Interest Payment due on the fifteenth (15th) day after the last date of each subsequent calendar

quarter, until the Final Maturity Date. All Installment Payments shall be applied to reducing the principal amount of this Note and all Interest Payments shall be applied to interest accrued on this Note. Notwithstanding anything herein to the contrary, the Obligor may, at any time after payment of the first installment, prepay the principal amount of the Note in whole or in part, without premium or penalty, and any such prepayment of principal shall be accompanied by a payment of the accrued and unpaid interest on such principal amount.

1.2     *Maturity, Surrender*. In the case of each payment pursuant to this Section 1, the principal amount to be paid shall mature and become due and payable on the date fixed for such payment. If this Note is paid in full, it shall be surrendered to the Obligor and cancelled and shall not be reissued.

1.3     *Method of Payment*. All payments made hereunder to the Holder shall be made not later than 12:00 noon (Eastern Time) on the day when due by wire transfer of immediately available funds for credit to such account or accounts as the Holder shall have designated by thirty (30) days' prior written notice to the Obligor. Anything in this Note to the contrary notwithstanding, any payment hereunder that is due on a date other than a Business Day shall be made on the next succeeding Business Day.

1.4     *Security*. On the date hereof, the Pledgor, as sole owner of 100% of the authorized, issued and outstanding equity interests in the Obligor, is entering into the Pledge Agreement, pursuant to which it agrees to secure all of the Obligor's obligations hereunder. The Pledge Agreement provides for the grant to the Holder of a security interest in 100% of the outstanding equity interests in the Obligor directly owned by the Pledgor (such pledged assets, the "Collateral").

## 2.     REPRESENTATIONS OF HOLDER

Each Holder, whether the initial Holder or any subsequent Holder, represents, and it is specifically understood and agreed, that the Holder is not acquiring the Note with a view for sale, or to sell, in connection with any distribution thereof within the meaning of the Securities Act, provided that the disposition of the Holder's property shall at all times be and remain within the Holder's control. The Holder hereby acknowledges that none of this Note, the Pledge Agreement or the Collateral have been registered, and in no event shall the Obligor be required to register any of the foregoing, under the Securities Act or any state securities laws.

## 3.     REPRESENTATIONS OF THE OBLIGOR

(a)     The Obligor is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its formation and has full corporate power to execute, deliver, and perform this Note.

(b)     The execution, delivery, and performance of this Note has been and remains duly authorized by all necessary corporate action on the part of the Obligor and does not result in a contravention by the Obligor of any material provision of applicable law or of the Obligor's organizational documents or any material contractual restriction binding on the Obligor or its assets.

2

(c)    All material consents, authorizations, and approvals of, and registrations and declarations with, any governmental authority necessary for the due execution, delivery, and performance of this Note by the Obligor have been obtained or will, substantially concurrently with the Plan Effective Date, be obtained and will remain in full force and effect and all conditions hereof have been duly complied with, and no other action by, and no notice to or filing with, any government authority is required to be made or obtained by the Obligor in connection with the execution, delivery, or performance of this Note by the Obligor.

(d)    This Note constitutes the legal, valid, and binding obligation of the Obligor enforceable against the Obligor in accordance with its terms, subject, as to enforcement, to bankruptcy, insolvency, reorganization, and other laws of general applicability relating to or affecting creditors' rights and to general equity principles.

## 4.    EVENTS OF DEFAULT

An "Event of Default" shall exist if any of the following conditions or events shall occur:

(a)    except as otherwise provided herein, the Obligor defaults in the payment of any principal and/or interest when the same becomes due and payable hereunder and, in either case, such default remains unremedied for a period of fifteen (15) business days after written notice of such default is delivered to the Obligor and the Pledgor (any such written notice to labeled "NOTICE OF DEFAULT" and to refer specifically to this paragraph (a) of Section 4), whether at maturity or at a date fixed for payment or by declaration or otherwise;

(b)    the Obligor defaults in any material respect in the performance of or compliance with any material term contained herein (other than those referred to in paragraph (a) of this Section 4) or the Pledgor defaults in any material respect in the performance or compliance with any material term contained in the Pledge Agreement, and in each case such default is not remedied within fifteen (15) business days after written notice of such default is delivered to the Obligor and Pledgor (any such written notice to be labeled as "NOTICE OF DEFAULT" and to refer specifically to this paragraph (b) of Section 4);

(c)    any representation or warranty by the Obligor in this Note or the Pledgor in the Pledge Agreement proves to have been false or incorrect in any material respect on the date hereof, and any defect in such representation or warranty is not corrected within fifteen (15) business days after written notice of such defect is delivered to the Obligor and Pledgor (any such written notice to be identified as a "NOTICE OF DEFAULT" and to refer specifically to this paragraph (c) of Section 4);

(d)    the Obligor or the Pledgor (i) files, or consents by answer or otherwise to the filing against it of, a petition for relief or reorganization or arrangement or any other petition in bankruptcy, for liquidation, or to take advantage of any bankruptcy, insolvency, reorganization, moratorium, or other similar law of any jurisdiction, (ii) makes a general assignment of substantially all of its assets for the benefit of its creditors, (iii) consents to the appointment of a custodian, receiver, trustee, or other officer with similar powers with respect to it or with respect to substantially all of its property, (iv) is adjudicated as insolvent or to be liquidated, or (v) authorizes any of the foregoing;

3

(e)     a court or governmental authority of competent jurisdiction enters an order appointing a custodian, receiver, trustee, or other officer with similar powers with respect to it or with respect to substantially all of the Obligor's or Pledgor's property, or constituting an order for relief or approving a petition for relief or reorganization or any other petition in bankruptcy or for liquidation or to take advantage of any bankruptcy or insolvency law of any jurisdiction, or ordering the dissolution, winding-up, or liquidation of the Obligor or the Pledgor, or any such petition shall be filed against the Obligor or the Pledgor, if, in each case, such order or petition remains unstayed and in effect for more than sixty (60) consecutive days;

(f)     Obligor sells or disposes of all or substantially all of its assets, without prior written consent of Holder; or

(g)     the liquidation or winding up of the Obligor.

## 5.   REMEDIES UPON DEFAULT.

5.1   *Acceleration.*

(a)     Upon the occurrence of an Event of Default described in paragraph (d), (e), (f), or (g) of Section 4 above, this Note shall automatically become immediately due and payable;

(b)     If any other Event of Default has occurred and is continuing at the time the Holder seeks to exercise its rights hereunder, the Holder may, at its option, by notice or notices to the Obligor and the Pledgor, declare this Note to be immediately due and payable.

5.2   *Notice of Acceleration and Payment of Amount Due.*

(a)     Upon this Note becoming immediately due and payable under Section 5.1, whether automatically or by declaration, the Holder shall given written notice of such Acceleration to the Obligor and the Pledgor (such notice to be labeled "NOTICE OF ACCELERATION").

(b)     Within fifteen (15) business days following the delivery of such notice of acceleration, the Obligor shall pay to the Holder the amount then due following such acceleration.

5.3   *Subsequent Remedies.*  If any Event of Default has occurred under Section 5.1, Notice of Acceleration has been delivered under Section 5.2(a), and payment of the amount due has not been made within the time provided under Section 5.2 (b), the Holder may, at its option, exercise forthwith (to the extent and in such order as the Holder may elect, in its sole and absolute discretion) any or all rights and remedies provided for herein, or otherwise at law or in equity, by an action at law, suit in equity, or other appropriate proceeding or act, in each and every case without presentment, demand, protest, or further notice, all of which are hereby expressly waived by the Obligor.

4

## 6.    COLLATERAL EVENTS; REMEDY

6.1    *Collateral Event*.  A "Collateral Event" shall exist if (i) this Note becomes immediately due and payable under Section 5.1 hereof, (ii) Notice of Acceleration has been delivered to the Obligor and Pledgor under Section 5.2(a) hereof, and (iii) the amount then due has not been paid within the time provided in Section 5.2(b) hereof.

6.2    *Enforcement Against Collateral*.  Notwithstanding anything to the contrary in this Note, specifically including (but not limited to) Section 5.3 hereof, only if a Collateral Event has occurred and is continuing at the time the Holder seeks to exercise and enforce its rights against the Collateral hereunder, the Holder may, with the consent of the Future Claimants' Representative, proceed to protect and enforce its rights against the Collateral as provided in the Pledge Agreement and exercise all rights and remedies of a secured party under the UCC.

## 7.    EXPENSES.

7.1    *Expenses*.  The Obligor agrees, whether or not the transactions contemplated hereby shall be consummated, to pay, and save the Holder harmless against liability for the payment of, (i) all document production and duplication charges and the fees and expenses of any special counsel engaged by the Holder in connection with this Note or the Pledge Agreement, the execution, delivery, and performance hereby and thereby and any subsequent proposed modification of, or proposed consent under, this Note or the Pledge Agreement, whether or not such proposed modification shall be effected or proposed consent granted, and (ii) the costs and expenses, including reasonable attorneys' fees, incurred by the Holder in enforcing any rights under this Note or the Pledge Agreement (whether in the context of a civil action, adversarial proceedings, workout or otherwise) or in responding to any subpoena or other legal process issued in connection with the enforcement of this Note or the Pledge Agreement or by reason of the Holder's having acquired this Note.  All such expenses shall be paid by the Obligor within 15 Business Days after receipt by the Obligor and Pledgor of a written request for payment accompanied by documentation supporting such expenses.

7.2    *Survival*.  The obligations of the Obligor under this Section 7 will survive the payment or transfer of this Note, the enforcement, amendment, or waiver of any provision of this Note, and the termination of this Note.

## 8.    SURVIVAL OF REPRESENTATIONS AND WARRANTIES; ENTIRE AGREEMENT

All representations and warranties contained herein shall survive the execution and delivery of this Note, the transfer of this Note and the payment of this Note, and may be relied upon by the Obligor, the Holder, and any subsequent Holder of this Note, regardless of any investigation made at any time by or on behalf of such person.  This Note embodies the entire agreement and understanding between the Holder and the Obligor and supersedes all prior agreements and understandings relating to the subject matter hereof.

## 9.    AMENDMENT AND WAIVER

(a)    The Obligor agrees that the Holder may extend the time for repayment or performance or accept partial payment or performance an unlimited number of times without discharging or releasing the Obligor from its obligations under this Note.

(b)    No course of dealing, delay, or omission on the part of the Holder in exercising any right, power, or remedy in connection with this Note or the Pledge Agreement shall operate as a waiver thereof or otherwise prejudice such Holder's rights, powers, or remedies, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such a right or power preclude any other or further exercise thereof or the exercise of any other right or power.  No right, power, or remedy conferred by this Note upon the Holder shall be exclusive of any other right, power, or remedy referred to herein or now or hereafter available at law, in equity, by statute, or otherwise.

(c)    This Note may be amended, and the observance of any term hereof may be waived (either retroactively or prospectively), but only with the written consent of the party against whom enforcement thereof is to be sought (or such party's attorney-in-fact), and then such waiver shall be effective only in the specific instance and for the specific purpose for which given.

## 10.    NOTICES

All notices and communications provided for hereunder, including without limitation those provided for in Sections 4, 5, and 7 above, shall be in writing and sent (a) by facsimile if the sender on the same day sends a confirming copy of such notice by a recognized overnight-delivery service (charges prepaid), or (b) by registered or certified mail with return receipt requested (postage prepaid), or (c) by a recognized overnight delivery service (with charges prepaid), as follows (or as otherwise directed in writing):

(i)    if to the Holder:

Leslie Controls, Inc. Asbestos Personal Injury Trust
Name(s)
Address
Address
Attention:_____
Facsimile:_____

With a copy (which alone will not constitute notice) to:

Name
Address
Address
Attention:_____
Facsimile:_____

(ii)    if to the Obligor:

Leslie Controls, Inc.
c/o President
12501 Telecom Drive
Tampa, FL 33637-0906

with a copy (which alone will not constitute notice) to:

Norman L. Pernick, Esq.
Marion M. Quirk, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
500 Delaware Avenue, 1410
Wilmington, DE 19801

(iii)    if to the Pledgor:

CIRCOR International, Inc.
c/o General Counsel
25 Corporate Drive, Suite 130
Burlington, MA 01803

with a copy to (which alone will not constitute notice) to:

William R. Hanlon, Esq.
Richard M. Wyner, Esq.
Goodwin Procter LLP
901 New York Avenue, N.W.
Washington, DC 20001

## 11.    MISCELLANEOUS

11.1    *Computation of Time Periods*.  In this Note in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and until" each means "to but excluding."

11.2    *Accounting Terms*.  All accounting terms not specifically defined herein shall be construed in accordance with GAAP.

11.3    *Severability*.  Any provision of this Note that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction.

11.4    *No Recourse Against Others*.  No director, officer, employee, member, manager, or equity interest holder, partner or representative of the Obligor shall have any personal liability in respect of any obligations of the Obligor under this Note, or for any claim based on, with

7

respect to, or by reason of such obligations or their creation, by reason of his/her or its status as such. By accepting this Note, the Holder waives and releases all such liability, which waiver and release is part of the consideration for the issuance of this Note by the Obligor.

11.5    *Construction*. Each covenant contained herein shall be construed (absent express provision to the contrary) as being independent of each other covenant contained herein, so that compliance with any one covenant shall not (absent such an express contrary provision) be deemed to excuse compliance with any other covenant. Where any provision herein refers to action to be taken by any person, or which such person is prohibited from taking, such provision shall be applicable whether such action is taken directly or indirectly by such person.

11.6    *Acceptance by Holder*. Upon Holder's acceptance of this Note, this Note shall become a binding agreement between the Obligor and the Holder. Without limitation of the foregoing, the Holder will be deemed, by its acceptance hereof, (i) to have agreed to the provisions set forth in Sections 1 and 4 through (and including) 11 hereof, and (ii) to have made the representations set forth in Section 2 hereof.

11.7    *Governing Law, Jurisdiction*.

(a)    This Note shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York excluding choice-of-law principles of the law of such State that would require the application of the laws of a jurisdiction other than such State.

(b)    The Obligor and the Holder each hereby irrevocably and unconditionally submits, for itself and its properties, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Note, or for recognition or enforcement of any judgment, and the Obligor and the Holder each hereby irrevocably and unconditionally agree that all claims in respect of any such action or proceeding may be heard and determined in such New York state court or, to the extent permitted by law, in such federal court. The Obligor and the Holder each agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Note shall affect any right that the Obligor or the Holder may otherwise have to bring any action or proceeding relating to this Note against the other or its properties in the courts of any jurisdiction.

(c)    The Obligor and the Holder each hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action, or proceeding arising out of or relating to this Note in any court referred to in Section 11.7(b) above. The Obligor and the Holder each hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    The Obligor and the Holder each irrevocably consents to service of process in the manner provided for notices in Section 10 hereof.  Nothing in this Note shall affect the right of the Obligor or the Holder to serve process in any other manner permitted by law.

## 12.    DEFINITIONS

"Business Day" means any day other than a Saturday, a Sunday, or a day on which commercial banks in New York City are required or authorized to be closed.

"Default" means an event or condition the occurrence or existence of which would, with the lapse of time or the giving of notice or both, become an Event of Default.

"Event of Default" is defined in Section 4 hereof.

"GAAP" means generally accepted accounting principles as in effect from time to time in the United States of America.

"Plan Effective Date" means the "Effective Date" as defined in the Plan.

"Pledge Agreement" means, during such time as the Pledge Agreement is in effect, that certain Pledge and Security Agreement regarding this Note, dated as of _____, 2010, by and among CIRCOR International, Inc., as Pledgor, Leslie Controls, Inc. Asbestos Personal Injury Trust, as Secured Party, and Leslie Controls, Inc., as Obligor, as the same may be amended from time to time.

"Pledgor" means, during such time as the Pledge Agreement is in effect, CIRCOR International, Inc., a Delaware corporation.

"Responsible Officer" means each of the chairman and chief executive officer, the president, the chief financial officer, the treasurer, the secretary or any vice president (whether or not further described by other terms, such as, for example, senior vice president or vice president-operations) of the Obligor or of the Pledgor or, if any such office is vacant, any person performing any of the functions of such office.

"Securities Act " means the Securities Act of 1933, as amended from time to time.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Obligor has caused this Note to be executed by its duly authorized officer as of the date first written above.

Attest                                      LESLIE CONTROLS, INC.


By: _____
         Name:
         Title:


AGREED AND ACCEPTED AS OF,
_____, 2010:

Leslie Controls, Inc.
Asbestos Personal Injury Trust


By: _____
         Name:
         Title:

# EXHIBIT E

# PLEDGE AGREEMENT

# PLEDGE AND SECURITY AGREEMENT

dated as of

_____, 2010

among

CIRCOR International, Inc.

and

Leslie Controls, Inc. Asbestos Personal Injury Trust

and

Leslie Controls, Inc. as Obligor

PLEDGE AND SECURITY AGREEMENT dated as of _____, 2010 (this "Agreement") among CIRCOR International, Inc., a Delaware corporation (the "Pledgor"), and Leslie Controls, Inc. Asbestos Personal Injury Trust, a Delaware statutory trust (together with the successors and assigns thereof, the "Secured Party"), and Leslie Controls, Inc., a Delaware corporation, as Obligor.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Pledgor has agreed to pledge and grant a security interest in the Collateral (as defined below) as security for the Obligations (as defined below).

Accordingly, the parties herein agree as follows:

Section 1.    Definitions.

(a)    As used in this Agreement, the terms defined in the preamble hereto have the meanings ascribed therein and the following terms have the meanings ascribed below:

"*Collateral*" has the meaning assigned to such term in Section 3.

"*Initial Pledged Interests*" means all authorized, issued and outstanding equity interests of the Obligor as of the date hereof, comprised of 100% of the common stock of Leslie Controls, Inc., together with all certificates evidencing the same.

"*Note*" means that certain Secured Promissory Note executed and delivered by the Obligor to the Secured Party, dated as of _____, 2010, in the original principal amount of $1,000,000.00, as amended or modified from time to time, together with any Note executed and delivered in exchange, substitution or transfer thereof.

"*Obligations*" means any and all principal and other amounts now or hereafter from time to time owing by the Obligor to the Holder pursuant to the Note.

"*Obligor*" means Leslie Controls, Inc., a Delaware corporation, together with any successor or assignee.

"*Pledged Interests*" means, together with the Initial Pledged Interests, all authorized, issued and outstanding equity interests of the Obligor from time to time issued by the Obligor and held by the Pledgor together with all certificates evidencing the same.

"*Proceeds*" has the meaning assigned to such term in the UCC.

"*UCC*" means the Uniform Commercial Code as in effect from time to time in the State of New York.

(b)    In addition, for all purposes hereof, capitalized terms used but not otherwise defined herein have the respective meanings ascribed such terms (i) in the Note and (ii) if not defined therein, in the UCC.

(c)     The foregoing definitions shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine, and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (i) any definition of or reference to any agreement, instrument, or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented, or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth herein or therein), (ii) references to any law, constitution, statute, treaty, regulation, rule, or ordinance (each a "law") shall refer to that law as amended from time to time and include any successor law, (iii) any reference herein to any person shall be construed to include such person's successors and permitted assigns, (iv) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (v) all references herein to Sections shall be construed to refer to sections of this Agreement, and (vi) the disjunctive shall include the conjunctive and vice versa.

Section 2.     <u>Representations and Warranties</u>. The Pledgor represents and warrants to the Secured Party that:

(a)     *Collateral*. The Pledgor is the sole beneficial owner of the Collateral, and no lien exists upon such Collateral other than the liens created hereby.

(b)     *Creation, Perfection and Priority*. The security interest created hereby constitutes a valid and perfected security interest in the Collateral, and such perfected security interest in such Collateral is subject to no equal or higher priority lien.

(c)     *Pledgor Information; Location*. As of date hereof, the exact name, the location of the chief executive office, the jurisdiction of organization, and the IRS tax identification number of the Pledgor are as follows:

| Name | Chief Executive Office | Jurisdiction of Formation | I.D. No. |
|---|---|---|---|
| CIRCOR International, Inc. | Burlington, MA | Delaware | |

(d)     *Pledged Interests*.

(i)     The Initial Pledged Interests and all Pledged Interests acquired after the date hereof by the Pledgor and in which a security interest is created hereunder will be, duly authorized, validly issued, fully paid, and nonassessable.

(ii)     The Initial Pledged Interests constitute 100% of the issued and outstanding voting common stock in the Obligor on the date hereof (whether or not registered in the name of the Pledgor), whether such Initial

Pledge and Security Agreement

Pledged Interests are certificated or uncertificated, and the respective class of the shares constituting such Initial Pledged Interests.

(e)    The Pledgor is duly organized, validly existing, and in good standing under the laws of the jurisdiction of its incorporation and has full organizational power to execute, deliver, and perform this Agreement.

(f)    The execution, delivery, and performance of this Agreement by the Pledgor have been, and remain, duly authorized by all necessary action on the part of the Pledgor and do not result in a contravention by the Pledgor of any provision of law or of the Pledgor's organizational documents or any material contractual restriction binding on the Pledgor or its assets.

(g)    All consents, authorizations, and approvals of, and registrations and declarations with, any governmental authority necessary for the due execution, delivery, and performance of this Agreement by the Pledgor have been obtained or will, substantially simultaneously with the Plan Effective Date, be obtained and will remain in full force and effect and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any governmental authority is required to be made or obtained by the Pledgor in connection with the execution, delivery, or performance of this Agreement by the Pledgor.

(h)    This Agreement constitutes the legal, valid, and binding obligation of the Pledgor enforceable against the Pledgor in accordance with its terms, subject as to enforcement, to bankruptcy, insolvency, reorganization and other laws of general applicability relating to or affecting creditors' rights, and to general equity principles.

Section 3.    <u>Grant of Security Interest</u>. As collateral security for the prompt payment in full when due (whether at stated maturity, by acceleration, or otherwise) of the Obligations, whether now existing or hereafter from time to time arising, the Pledgor hereby grants to the Secured Party a security interest in all of the Pledgor's right and title to, and interest in, the Pledged Interests, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence (such property described in this Section 3 being collectively referred to herein as the "Collateral").

Section 4.    <u>Further Assurances; Remedies</u>. In furtherance of the pledge and grant of security interest pursuant to Section 3, the Pledgor agrees with the Secured Party as follows:

4.01    <u>Delivery and Other Perfection</u>. The Pledgor shall:

(a)    deliver to the Secured Party all certificated Pledged Interests that constitute Collateral, endorsed and/or accompanied by such properly executed instruments of assignment and transfer in such form and substance as the Secured Party may reasonably request, including, without limitation, one or more duly executed stock powers;

(b)    give, execute, deliver, file, record, authorize, or obtain all such financing statements, notices, instructions, memoranda, acknowledgements, instruments, agreements, consents, or other documents as may be necessary in the reasonable judgment of the Secured Party to create, preserve, perfect, or validate the security interest granted pursuant hereto or to

Pledge and Security Agreement

enable the Secured Party to exercise and enforce its rights hereunder or under the UCC or other applicable law with respect to such security interest, including (after the occurrence of a Collateral Event) causing any or all of the Pledged Interests that constitute Collateral to be transferred of record into the name of the Secured Party or its nominee; and

(c)     take such other action as the Secured Party shall reasonably deem necessary to acquire a first priority, perfected lien on the Collateral under the UCC. The Pledgor shall not permit any other liens on the Collateral.

4.02     Financing Statements. The Pledgor hereby authorizes the Secured Party to file one or more financing statements in respect of the Pledgor as debtor in such filing offices in such jurisdictions with which such a filing is (a) required to perfect the security interest granted hereunder by the Pledgor or (b) reasonably desirable (in the Secured Party's sole discretion) to give notice of the security interest granted hereunder by the Pledgor.

4.03     Other Financing Statements and Control. Without the prior written consent of the Secured Party, the Pledgor shall not (a) authorize the filing in any jurisdiction of any financing statement or like instrument with respect to the Collateral in which the Secured Party is not named as the sole secured party or (b) cause or permit any person other than the Pledgor or the Secured Party to acquire "control" (as defined in Section 8-106 of the UCC or as otherwise construed for purposes of Article 8 or 9 of the UCC) over the Collateral.

4.04     Special Provisions Relating to Pledged Interests.

(a)     Without limiting or otherwise affecting the security interest granted under Section 3, the Pledgor will, at all times, cause such security interest to be a perfected first-priority security interest on no less than 100% of the total number of voting shares of common stock of the Obligor then outstanding on a fully diluted basis.

(b)     So long as no Collateral Event shall have occurred and be continuing, the Pledgor shall have the right to exercise all voting, consensual, and other powers of ownership pertaining to the Pledged Interests, and the Secured Party shall execute and deliver to the Pledgor or cause to be executed and delivered to the Pledgor all such proxies, powers of attorney, dividend and other orders, and all such instruments, without recourse, as the Pledgor may reasonably request for the purpose of enabling the Pledgor to exercise the rights and powers that it is entitled to exercise pursuant to this Section 4.04(b). From and after the occurrence of any Collateral Event, the Secured Party shall have the right to exercise all voting, consensual and other powers of ownership pertaining to the Pledged Interests.

(c)     Unless and until a Collateral Event has occurred, the Pledgor shall be entitled to receive and retain any and all dividends and distributions on the Pledged Interests.

(d)     If any Collateral Event shall have occurred, (i) all dividends and other distributions on the Pledged Interests shall be paid or distributed directly to the Secured Party, (ii) if the Secured Party shall so request in writing, the Pledgor agrees to execute and deliver to the Secured Party appropriate additional dividend, distribution and other orders and documents to that end, and (iii) if any dividends or other distributions on the Pledged Interests shall be paid or distributed to, or otherwise received by, Pledgor, Pledgor shall hold such dividends or

distributions in trust for the benefit of Secured Party and shall pay over any such dividends or distributions to Secured Party within one (1) Business Day after receipt thereof by Pledgor.

     4.05   <u>Collateral Events</u>.  If at any time a Collateral Event shall have occurred and be continuing:

     (a)   the Secured Party shall have all of the rights and remedies with respect to the Collateral of a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where the rights and remedies are asserted) and such additional rights and remedies to which a secured party is entitled under the laws in effect in any jurisdiction where any rights and remedies hereunder may be asserted, including the right, to the fullest extent permitted by applicable law, to exercise all voting, consensual, and other powers of ownership pertaining to the Collateral as if the Secured Party was the sole and absolute owner thereof (and the Pledgor agrees to take all such action as may be appropriate to give effect to such right); and

     (b)   the Secured Party may, upon at least ten (10) Business Days prior written notice to the Pledgor of the time and place, with respect to the Collateral or any part thereof that shall then be or shall thereafter come into the possession, custody or control of the Secured Party, sell, assign or otherwise dispose of all or any part of such Collateral at such place or places as the Secured Party deems best and for cash or for credit or for future delivery (without thereby assuming any credit risk), at public or private sale, without demand of performance or notice of intention to effect any such disposition or of the time or place thereof (except such notice as is required above or by applicable statute and cannot be waived), and the Secured Party or anyone else may be the purchaser, assignee or recipient of any or all of the Collateral so disposed of at any public sale  (or, to the extent permitted by law, at any private sale) and thereafter hold the same absolutely free from any claim or right of whatsoever kind, including any right or equity of redemption (statutory or otherwise) of the Pledgor, any such demand, notice and right or equity being hereby expressly waived and released.  The Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for the sale, and such sale may be made at any time or place in which the sale may be so adjourned.

The Pledgor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933 and applicable state securities laws, the Secured Party may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  The Pledgor acknowledges that any such private sales may be at prices and on terms less favorable to the Secured Party than those obtainable through a public sale without such restrictions and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to permit the Obligor, as issuer thereof, to register it for public sale.

     4.06   <u>Deficiency</u>. If the proceeds of sale, collection or other realization of or upon the Collateral pursuant to Section 4.05 are insufficient to cover the costs and expenses of such

realization and the payment in full of the Obligations, the Pledgor shall not be liable for any deficiency in respect of the Obligations.

4.07    Notice of Change of Name or State of Incorporation. Without at least thirty (30) days prior notice to the Secured Party, the Pledgor shall not change the jurisdiction or form of its organization or its name from the following:

| Name | Jurisdiction of Formation |
|---|---|
| CIRCOR International, Inc. | Delaware |

4.08    Application of Proceeds. Upon the occurrence of a Collateral Event and during the continuance of such Collateral Event, the proceeds of any sale of, or other realization upon, all or any part of the Collateral shall be applied by the Secured Party in the following order of priorities:

(a)    to payment of the expenses of such sale or other realization, including any taxes arising from such sale or other realization and all expenses, liabilities and advances incurred or made by the Secured Party in connection therewith, and then ratably to pay any other unreimbursed expenses for which the Secured Party or any Holder is to be reimbursed pursuant to Section 7.1 of the Note;

(b)    to the ratable payment of unpaid interest on the Obligations;

(c)    to the ratable payment of unpaid principal of the Obligations;

(d)    to the ratable payment of all other Obligations, until all Obligations shall have been paid in full; and

(e)    to payment to the Pledgor or its successors or assigns, or as a court of competent jurisdiction may direct, of any surplus then remaining from such proceeds.

The Secured Party may make distributions hereunder in cash or in kind or, on a ratable basis, in any combination hereof.

4.09    Attorney-in-Fact. Without limiting any rights or powers granted by this Agreement to the Secured Party while no Collateral Event has occurred and is continuing, upon the occurrence of any Collateral Event and during the continuance of such Collateral Event, the Secured Party is hereby appointed the attorney-in-fact of the Pledgor for the purpose of carrying out the provisions of this Section 4 and taking any action and executing any instruments that the Secured Party may deem, in the Secured Party's sole discretion, necessary or reasonably advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest.  Without limiting the generality of the foregoing, so long as the Secured Party shall be entitled under this Section 4 to make collections in respect of the Collateral, the Secured Party shall have the right and power to receive, endorse and collect all checks made payable to the order of the Pledgor representing any dividend, payment or other distribution in respect of the Collateral or any part thereof and to give full discharge for the same.

Pledge and Security Agreement

4.10    No Marshalling. Upon the occurrence of any Collateral Event and during the continuance of such Collateral Event, the Secured Party shall not be required to marshal the order of its enforcement of its security interest in any part of the Collateral for the benefit of any person.

Section 5.    Miscellaneous.

5.01    Notices. All notices, responses, consents, waivers, requests, statements, and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile, as follows (or as otherwise directed in writing):

(a)    if to the Pledgor:

CIRCOR International, Inc.
c/o General Counsel
25 Corporate Drive, Suite 130
Burlington, MA 01803

with a copy (which alone will not constitute notice) to:

William R. Hanlon, Esq.
Richard M. Wyner, Esq.
Goodwin Procter LLP
901 New York Avenue, N.W.
Suite 900 East
Washington, DC 20001

(b)    if to the Secured Party:

Leslie Controls, Inc. Asbestos Personal Injury Trust

_____
_____
_____
Attention: _____
Facsimile: _____

with a copy (which alone will not constitute notice) to:

_____
_____
_____
Attention: _____
Facsimile: _____

46392/0001-6868262v1

    (c)    if to the Obligor:

Leslie Controls, Inc.
c/o President
12501 Telecom Drive
Tampa, FL 33637-0906

with a copy (which alone will not constitute notice) to:

Norman L. Pernick, Esq.
Marion M. Quirk, Esq.
Cole, Schotz, Meisel, Forman & Leonard, P.A.
500 Delaware Avenue, 1410
Wilmington, DE 19801

5.02    No Waiver. No failure on the part of the Secured Party to exercise, and no course of dealing with respect to, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise by the Secured Party of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any other right, power or remedy. The remedies herein are cumulative and are not exclusive of any remedies provided by law.

5.03    Amendments. Neither this Agreement nor any provision hereof may be changed, waived, discharged or (except as provided in Section 5.09) terminated except in writing signed by the Pledgor and the Secured Party.

5.04    Successors and Assigns. This Agreement is for the benefit of the Secured Party and its successors and permitted assigns, and in the event of an assignment of the Note, the rights hereunder, to the extent applicable to the indebtedness so assigned, shall be transferred with such indebtedness. This Agreement shall be binding on the Pledgor and its successors and assigns; provided, however, that neither the Pledgor nor Obligor shall have the right to assign its rights or obligations hereunder or any interest herein without the prior written consent of the Secured Party.

5.05    Counterparts. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and any of the parties hereto may execute this Agreement by signing any such counterpart.

5.06    Governing Law; Jurisdiction.

    (a)    Governing Law. This Agreement shall be construed in accordance with and governed by the law of the State of New York.

    (b)    Submission to Jurisdiction. Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its properties, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court for the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or

46392/0001-6868262v1

enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that either party may otherwise have to bring any action or proceeding relating to this Agreement against the other party hereto or its properties in the courts of any jurisdiction.

      (c)    <u>Waiver of Venue</u>. Each of the parties hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in Section 5.06(b). Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

      (d)    <u>Service of Process</u>. Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.01. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

    5.07   <u>Captions</u>. The captions and Section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

    5.08   <u>Severability</u>. If any provision hereof is invalid and unenforceable in any jurisdiction, then, to the fullest extent permitted by law, (a) the other provisions hereof shall remain in full force and effect in such jurisdiction and shall be liberally construed in favor of the Secured Party in order to carry out the intentions of the parties hereto as nearly as may be possible and (b) the invalidity or unenforceability of any provision hereof in any jurisdiction shall not affect the validity or enforceability of such provision in any other jurisdiction.

    5.09   <u>Termination</u>. This Agreement shall terminate upon the earlier to occur of (i) payment in full of the Note, and (ii) the transfer of title to the Collateral to the Secured Party. Upon any such termination, the Secured Party will, at the expense of the Pledgor, deliver to the Pledgor all certificates and instruments representing or evidencing the Pledged Interests held by the Secured Party hereunder, and will execute and deliver to the Pledgor such documents as the Pledgor shall reasonably request to evidence the termination of this Agreement.

      (a)    The obligations of the Pledgor hereunder shall not constitute a debt or obligation of the Pledgor in any action to collect any amounts due under, or otherwise in respect of, the Note. The Pledgor shall not be liable under any theory for any amount due under this Agreement or the Note, and no Holder shall seek a deficiency or personal judgment against the Pledgor (except in the event of fraudulent action by the Pledgor), including, without limitation, for payment of the Obligations or other amounts evidenced by this Agreement or the Note. No property or assets of the Pledgor, other than the Collateral pledged pursuant to this Agreement,

46392/0001-6868262v1

shall be sold, levied upon or otherwise used to satisfy any judgment rendered in connection with any action brought against the Pledgor with respect to this Agreement.

(b)     Notwithstanding the foregoing, nothing herein shall be construed to (i) impair or limit the rights of any Holder against the Pledgor in the event of any fraudulent actions by the Pledgor, or (ii) prevent the commencement of any action, suit or proceeding against any person (or prevent the service of papers under any person) for the purpose of obtaining jurisdiction over the Pledgor.

*{Signature Page Follows}*

Pledge and Security Agreement

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

CIRCOR INTERNATIONAL, INC.

LESLIE CONTROLS, INC. ASBESTOS PERSONAL INJURY TRUST

By: _____

By: _____

Name: _____

Name: _____

Title: _____

Title: _____

LESLIE CONTROLS, INC.

By: _____

Name: _____

Title: _____

# EXHIBIT F

## SCHEDULE OF INSURANCE SETTLEMENT AGREEMENTS AND SETTLING ASBESTOS INSURANCE ENTITIES

**EXHIBIT F**

**Schedule of Insurance Settlement Agreements**
**and Settling Asbestos Insurance Entities**

1.      Confidential Settlement Agreement and Release by and between Leslie Controls, Inc. and Continental Casualty Company, executed April 2010.