# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>LESLIE CONTROLS, INC.,<br><br>              Debtor. | Chapter 11<br><br>Case No. 10-12199 (CSS) |

## FIRST AMENDED DISCLOSURE STATEMENT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE WITH RESPECT TO FIRST AMENDED PLAN OF REORGANIZATION OF LESLIE CONTROLS, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Wilmington, Delaware
Dated: August 20, 2010

*The First Amended Plan of Reorganization, attached as Exhibit A, provides for an "Asbestos PI Channeling Injunction" pursuant to section 524(g) of the Bankruptcy Code. For a description of the causes of action to be enjoined and the identities of the entities that would be subject to the injunction, see Section VIII.D of this Disclosure Statement and Article XI of the Plan.*

## SUMMARY OF THE FIRST AMENDED PLAN OF REORGANIZATION AND THE ASBESTOS PI TRUST DISTRIBUTION PROCEDURES

### A.    Introduction.

Leslie Controls, Inc. ("Leslie" or the "Debtor") is soliciting votes for the acceptance of its Plan from holders of Asbestos PI Claims. *Please refer to Article I of the Plan for definitions of terms used but not defined in this Disclosure Statement.*

The Plan contemplates the establishment of a trust under section 524(g) of the Bankruptcy Code (as defined in the Plan, the "Asbestos PI Trust") and an injunction (specifically, the Asbestos PI Channeling Injunction) that will channel all current asbestos-related Claims and future asbestos-related Demands to the Asbestos PI Trust. The injunction will cover all asbestos-related personal injury and wrongful death Claims and Demands based in whole or in part on the actual or alleged conduct or products of Leslie. The injunction will also channel all current asbestos-related Claims and future asbestos-related Demands based in whole or in part upon asbestos-related personal injury and wrongful death Claims and Demands against certain parties arising from the conduct or products of Leslie, including, but not limited to, past and present affiliates of Leslie, past and present officers and directors of Leslie, predecessors in interest to Leslie, and any entity that owned a financial interest in Leslie or its affiliates or predecessors.

Specifically, the Asbestos PI Channeling Injunction will cover Asbestos PI Claims and Demands against Leslie and Reorganized Leslie, as well as Asbestos PI Claims and Demands against Leslie's parent company, CIRCOR International, Inc. ("CIRCOR"), and its affiliated entities (the "CIRCOR Protected Parties"), and Leslie's former parent company, Watts Water Technologies, Inc. ("Watts"), and its affiliated entities (the "Watts Protected Parties"), based on any purported liability arising from their ownership of or relation to Leslie, parties that have a right of indemnity against Leslie or CIRCOR, and parties that have actual or alleged liability with respect to Asbestos PI Claims or Demands in each case related to or arising from the conduct or products of Leslie that purportedly caused asbestos-related personal injury or wrongful death, including any claim based upon a theory of veil piercing, alter ego, successor liability, fraudulent conveyance or conspiracy.

The effect of "channeling" Asbestos PI Claims and Demands to the Asbestos PI Trust is that they may only be pursued through, and resolved by the Asbestos PI Trust; Asbestos PI Claims or Demands may not be asserted against Leslie, CIRCOR, Watts and the other parties listed above and described more fully in this Disclosure Statement.

The Asbestos PI Trust will be funded with (i) Cash contributions from Leslie and CIRCOR, on behalf of themselves and certain other parties; (ii) the Leslie Promissory Note executed by Leslie and secured by a pledge by CIRCOR of 100% of the outstanding voting equity interests in Reorganized Leslie; and (iii) an assignment of the Asbestos Insurance Rights and Asbestos Insurance Actions. The assets of the Asbestos PI Trust will be used to pay current and future asbestos-related personal injury and wrongful death claimants in accordance with the terms of the Asbestos PI Trust Distribution Procedures established under the Plan.

The Asbestos PI Trust's assets, which are limited, must be managed by the Asbestos PI Trustees to ensure that funds are available to pay all current claimants as well as all expected future claimants. Nevertheless, for all the reasons detailed in this Disclosure Statement, Leslie believes that there will be substantially more assets available to pay claimants under the Plan than would be the case if there were no Plan and Leslie were forced to pay Claims solely from its own assets. Specifically, Leslie estimates that only an amount between $34 million to $37 million inclusive of insurance recoveries would be available for distribution in a liquidation, compared to the $75 million, plus potential insurance recoveries estimated by Leslie at $45.6 million, that will be available under the Plan.

Substantially more assets will be available under the Plan because, among other reasons, CIRCOR is contributing substantial assets to the Asbestos PI Trust as part of the Plan on behalf of itself and the CIRCOR Protected Parties and Watts and the Watts Protected Parties, in exchange for the protections provided to these parties under the Plan, which would not be contributed otherwise. Moreover, without the settlements and distribution procedures in the Plan, there likely would be years of costly and time-consuming litigation involving creditors and other parties that could be avoided through the Plan's orderly administrative process. Absent the Plan, distributions to creditors would be delayed and, due to the costs of litigation, the funds actually available for creditors would be reduced substantially. For this and other reasons explained in detail herein, Leslie believes that each of the holders of asbestos-related personal injury and wrongful death Claims who are entitled to vote should vote to accept the Plan.

> **RECOMMENDATION:**
>
> **Leslie, the Asbestos Claimants Committee and the Future Claimants' Representative believe that the Plan provides a fair and reasonable recovery to current claimants and future Demand holders and that acceptance of the Plan is in the best interests of all claimants and Demand holders. Accordingly, Leslie, the Asbestos Claimants Committee and the Future Claimants' Representative urge you to vote to accept the Plan.**
>
> **Please note that if there is any inconsistency between the Plan and the descriptions in the Disclosure Statement, the terms of the Plan will govern.**

**B.      Contributions to Asbestos PI Trust.**

Reorganized Leslie and CIRCOR will make contributions to the Asbestos PI Trust as follows on the Effective Date.

Reorganized Leslie will contribute to the Asbestos PI Trust:

- the Leslie Promissory Note; and

- an assignment of any and all rights of Leslie:

  (i) to proceeds under existing insurance policies that provide coverage for Asbestos Personal Injury Claims, and

(ii) to $2,625,000 of the proceeds of the Insurance Settlement Agreement between Leslie and Continental Casualty Company dated April 19, 2010, plus the proceeds, if any, of any other Insurance Settlement Agreement that were received by Leslie on or after January 1, 2010.

CIRCOR, on behalf of itself, the CIRCOR Protected Parties and the Watts Protected Parties, will make the following contributions to the Asbestos PI Trust:

- the CIRCOR Cash in the amount of $74 million; and

- a pledge of 100% of the outstanding voting equity interests in Reorganized Leslie as security for the Leslie Promissory Note.

**C.      The Leslie Promissory Note and the Pledge Agreement.**

As set forth above, Reorganized Leslie and the Asbestos PI Trust will execute the Leslie Promissory Note which provides for the payment of a principal amount of $1 million, with interest, payable in equal quarterly installments over ten years.  As security for the Leslie Promissory Note, on the Effective Date CIRCOR, Reorganized Leslie, and the Asbestos PI Trust will also enter into the Pledge Agreement pursuant to which CIRCOR will grant the Asbestos PI Trust a security interest in 100% of the outstanding voting equity interests of Reorganized Leslie as security for Leslie's obligations under the Leslie Promissory Note.

**D.      How Asbestos Claimants Receive Distributions from the Asbestos PI Trust.**

**1.      The Asbestos PI Trust Distribution Procedures.**

The goal of the Asbestos PI Trust is to treat all present and future asbestos claimants similarly and equitably and in accordance with the requirements of section 524(g) of the Bankruptcy Code.  Under the Plan, to further that goal, the Asbestos PI Trust will resolve Asbestos PI Claims in accordance with the "Asbestos PI Trust Distribution Procedures," the form of which is attached to the Plan as Exhibit C and is incorporated herein by reference.  The Asbestos PI Trust will make payments to holders of valid Asbestos PI Claims pursuant to the Asbestos PI Trust Distribution Procedures while maintaining sufficient resources to pay future valid Asbestos PI Claims on a substantially equivalent basis.

(a)      Disease Categories and Scheduled and Maximum Values

The Asbestos PI Trust Distribution Procedures establish a schedule of seven asbestos-related diseases ("Disease Levels"): (i) Mesothelioma (Disease Level VII), (ii) Lung Cancer 1 (Disease Level VI), (iii) Lung Cancer 2 (Disease Level V), (iv) Other Cancer (Disease Level IV), (v) Severe Asbestosis (Disease Level III), (vi) Asbestosis/Pleural Disease (Disease Level II), and (vii) Asbestos/Pleural Disease (Disease Level I).

In addition, a claimant must specify on his or her proof of claim whether the claim is asserted to be a Leslie Powerhouse and Below-Deck Naval Station Claim or a Leslie Construction and Maintenance Claim.  The Asbestos PI Trustee will have the right to challenge any such assertion or designation.  A Leslie Powerhouse and Below-Deck Naval Station Claim means an

iii

Asbestos PI Claim alleging exposure to asbestos during the claimant's hands-on installation, removal or maintenance of Leslie valves and other control equipment or exposure to asbestos in the immediate vicinity of a worker who is performing such hands-on installation, removal or maintenance of Leslie valves and other control equipment.  Most such claims allege that Leslie manufactured, sold, and/or distributed valves and other control equipment that contained asbestos-containing materials used at powerhouse facilities and on Naval vessels.  A Leslie Construction and Maintenance Claim means an Asbestos PI Claim alleging asbestos exposure arising from the installation, maintenance, or removal of valves and/or other control equipment manufactured by Leslie installed other than as described above for Leslie Powerhouse and Below-Deck Naval Station Claims.  To the extent that any Asbestos PI Claim filed or otherwise asserted against the Asbestos PI Trust does not specifically allege asbestos exposure arising from circumstances falling within the definition of a Leslie Powerhouse and Below-Deck Naval Station Claim, such claim shall be presumed to be a Leslie Construction and Maintenance Claim unless designed as a Leslie Powerhouse and Below-Deck Naval Station Claim in the applicable proof of claim form (subject to challenge by the Trustee).

To qualify for payment, claimants must submit specific medical and exposure evidence as provided in the Asbestos PI Trust Distribution Procedures.

The Asbestos PI Claim values for each Disease Level are set forth below.[1]  The Asbestos PI Trust Distribution Procedures also provide values for "Extraordinary Claims" (as that term is defined in the Asbestos PI Trust Distribution Procedures) that exceed those set forth below.

| Leslie Powerhouse and Below-Deck Naval Station Claims: | | | | |
|---|---|---|---|---|
| Level | Disease Category | Scheduled Value | Average Value | Maximum Value |
| VII | Mesothelioma | 100,000 | 140,000 | 350,000 |
| VI | Lung Cancer 1 | 25,000 | 35,000 | 125,000 |
| V | Lung Cancer 2 | N/A | 18,000 | 22,000 |
| IV | Other Cancer | 15,000 | 17,500 | 25,500 |
| III | Severe Asbestosis | 17,500 | 20,000 | 30,000 |
| II | Asbestosis/Pleural Disease | 4,500 | 4,500 | 4,500 |
| I | Asbestos/Pleural Disease | 1,500 | 1,500 | 1,500 |

---

[1] The figures presented here represent claim values for settlement purposes only.  The parties reserve all rights with respect to actual claim values in the event the Plan is not confirmed.

| Leslie Construction and Maintenance Claims: | | | | |
|---|---|---|---|---|
| Level | Disease Category | Scheduled Value | Average Value | Maximum Value |
| VII | Mesothelioma | 25,000 | 30,000 | 125,000 |
| VI | Lung Cancer 1 | 7,500 | 10,000 | 37,500 |
| V | Lung Cancer 2 | N/A | 5,000 | 10,000 |
| IV | Other Cancer | 5,000 | 7,500 | 15,000 |
| III | Severe Asbestosis | 6,000 | 8,000 | 17,500 |
| II | Asbestosis/Pleural Disease | 1,250 | 1,250 | 1,250 |
| I | Asbestos/Pleural Disease | 500 | 500 | 500 |

        (b)        Review and Payment of Claims Under the Asbestos PI Trust Distribution Procedures

The Asbestos PI Trust Distribution Procedures provide that claims generally will be processed in "First In, First Out" ("FIFO") order so that the oldest claims will be processed first.

The Asbestos PI Trust will, except as otherwise provided below, liquidate all Asbestos PI Claims except Foreign Claims[2] that meet the Medical/Exposure Criteria of Disease Levels I - IV, VI, and VII under the Expedited Review Process. Asbestos PI Claims involving Disease Levels III, IV, VI, and VII that do not meet the Medical/Exposure Criteria for the relevant Disease Level may undergo the Asbestos PI Trust's Individual Review Process. In such a case, notwithstanding that the claim does not meet the Medical/Exposure Criteria for the relevant Disease Level, the Asbestos PI Trust may offer the claimant an amount up to the Scheduled Value of that Disease Level if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

In lieu of the Expedited Review Process, a claimant holding an Asbestos PI Claim involving Disease Level III, IV, VI, or VII may, in the alternative, seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the Individual Review Process. However, the liquidated value of an Asbestos PI Claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than the Scheduled Value for the applicable Disease Level, and, in any event, shall not exceed the Maximum Value for the relevant Disease Level unless the claim qualifies as an Extraordinary Claim, in which case its liquidated value shall not exceed the maximum extraordinary value specified for such claims. Claims involving Disease Level V (Lung Cancer 2) and all Foreign Claims may be liquidated only pursuant to the Individual Review Process.

Claimants also have the option of engaging in binding or nonbinding arbitration to establish their Asbestos PI Claims, but only after they have completed the Individual Review

---

[2] A "Foreign Claim" is an Asbestos PI Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which Leslie has alleged legal responsibility occurred outside of the United States and its Territories and Possessions and outside the Provinces and Territories of Canada.

46392/0001-6246827v15

Process as well as a mediation process, in accordance with Alternative Dispute Resolution Procedures to be adopted by the Asbestos PI Trust in accordance with the provisions of the Asbestos PI Trust Distribution Procedures. The arbitrator may return awards only in accordance with the values set forth in the Asbestos PI Trust Distribution Procedures. Only if a claimant elects nonbinding arbitration and rejects the arbitration award may the claimant then litigate in court against the Asbestos PI Trust to establish its claim. Awards in litigation will be paid as specifically provided in the Asbestos PI Trust Distribution Procedures.

As a condition to making payment to a claimant with respect to an Asbestos PI Claim, the Asbestos PI Trust will obtain, for the benefit of the Asbestos PI Trust and the Asbestos Protected Parties, a release of liability with respect to the claimant's Asbestos PI Claim.

## 2.    Maximum Annual Payment and Claims Payment Ratio.

Aggregate distributions to claimants in each year will not exceed a "Maximum Annual Payment" amount determined for that year, consisting of the income earned during that year (net of taxes payable with respect thereto) plus a portion of principal calculated such that the application of the Asbestos PI Trust's funds over the life of the Trust will correspond with the estimated initial backlog of claims and the estimated anticipated future flow of claims. If there are insufficient funds to pay Claims in any year, the unpaid Claims will be carried over for priority payment in the next year. The Maximum Annual Payment will not apply to Leslie Liquidated Asbestos PI Claims.

In each year, after the determination of the Maximum Annual Payment, a specified percentage of that amount will be available to pay Asbestos PI Claims involving malignancies and Severe Asbestos (Disease Levels III – VII), referred to as Category A, and a specified percentage will be available to pay Asbestos PI Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels I and II), referred to as Category B. This claims payment ratio expressed as a percentage is referred to as the "Claims Payment Ratio." The Claims Payment Ratio will apply to all Asbestos PI Claims except Leslie Liquidated Asbestos PI Claims.

Based upon Leslie's claims settlement history and the analysis of present and future claims, the Claims Payment Ratio as of the Effective Date has been determined to be 80% Category A to 20% Category B. In each year, after the determination of the Maximum Annual Payment, 80% of that amount will be available to pay liquidated Category A claims and 20% will be available to pay liquidated Category B claims, each in the order such claims come up for payment in the FIFO Payment Queue. In the event there are insufficient funds in any year to pay the liquidated claims in a Category, the available funds allocated to that Category will be paid to the claimants in that Category based on their place in the FIFO Payment Queue. Liquidated claims remaining unpaid in such year on account of an insufficiency of funds allocated to the Category in which such unpaid claims fall will be carried over to the next succeeding year and shall be placed at the head of such succeeding year's FIFO Payment Queue.

As provided in the Asbestos Trust PI Distribution Procedures, if there are insufficient liquidated claims in Category B to exhaust the Maximum Annual Payment amount allocated to Category B by the Claims Payment Ratio, then under certain circumstances such excess amount may be used to pay liquidated Category A claims entitled to payment in respect of which there are

insufficient funds to pay such liquidated Category A claims or added back to and become part of the principal portion of the Asbestos PI Trust. In addition, the Claims Payment Ratio is subject to change as provided in the Asbestos PI Trust Distribution Procedures.

###    3.    Application of the Payment Percentage.

In making any change to the Initial Payment Percentage, the Asbestos PI Trustee, the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative shall take into account the fact that the holders of Asbestos PI Trust Claims who voted on the Plan relied on the findings of experts that the Initial Payment Percentage represented a reasonably reliable estimate of the Asbestos PI Trust's total assets and liabilities over the trust's life based on the best information available at the time, and shall therefore give due consideration to the expectations of such claim holders that the Initial Payment Percentage would be applied to their Asbestos PI Trust Claims.

All Asbestos PI Claims paid by the Asbestos PI Trust are subject to the Payment Percentage. The Payment Percentage is the percentage of the full liquidated value of a claim that claimants will receive from the Asbestos PI Trust. The claimant will receive a payment equal to the Payment Percentage multiplied by the liquidated value of the claim. The Payment Percentage has been set in the Asbestos PI Trust Distribution Procedures at 40%. The Payment Percentage is subject to change as provided in the Asbestos PI Trust Distribution Procedures.

###    4.    Analysis of Current and Future Claims.

As of the date of this Disclosure Statement, Leslie believes there are approximately 1340 Asbestos PI Claims pending against Leslie.

The methodology for projecting future Asbestos PI Claims consists of several steps. First, the population of individuals occupationally exposed to asbestos fiber distributed by Leslie, a product containing asbestos fiber distributed by Leslie, or any asbestos-containing product distributed by Leslie, is determined. In general, this information is derived from statistics kept by the U.S. Department of Labor and other data gathered by experts from other sources, such as union records. Second, the incidence of asbestos-related malignant disease in the exposed population is calculated based on the intensity and duration of occupational exposure and generally accepted epidemiological studies.[3] These calculations result in the annual expected incidence of asbestos-related malignant disease in the population. Third, the types of claims that have been asserted against Leslie in the past are evaluated, including the source of claims, the industries and occupations of the claimants, and their diseases. This information is compared to the population projected to contract each asbestos-related malignant disease to determine a "rate of claiming" (*i.e.*, the percentage, within any given occupational group, of individuals that historically have asserted claims against Leslie). Fourth, future Asbestos PI Claims for non-malignant conditions are predicted based on their historical filing rate in comparison to malignancy Asbestos PI Claims (because there is no epidemiological formula to predict the

---

[3] In general, the incidence of mesothelioma can be checked periodically against actual data. The incidence of lung cancer is based on a determination of "excess" cancer, *i.e.*, incidence in excess of expected underlying lung cancer rates.

46392/0001-6246827v15

incidence of non-malignant conditions).  Experts may also adjust ratios to account for developments in tort law or the litigation environment.  Thus, the estimated number of future Asbestos PI Claims likely to be asserted against Leslie is based on historical filing rates and the projected future incidence of disease in the underlying population.

E.      **Summary of Classification and Treatment under the Plan.**

As contemplated by the Bankruptcy Code, Administrative Claims, the DIP Claim and Priority Tax Claims are not classified under the Plan.  Unless such holders consent to different treatment, Allowed Administrative Claims are to be paid in full on the Distribution Date, or, for ordinary course Administrative Claims, when such claims become due.  See Section VI.A.1 for a summary of the treatment proposed under the Plan for the DIP Claim, Administrative Claims and Priority Tax Claims.

The Plan classifies Claims against and Interests in Leslie for all purposes, including voting, Plan confirmation, and Claims distribution, as set forth below.  The following table is only a summary of the classification and treatment under the Plan of Claims and Interests, and reference should be made to the entire Disclosure Statement and the Plan for a complete description of each classification and treatment.

| Description of Claims or Interests | Summary of Treatment | Entitlement to Vote | Estimated Aggregate Amount of Claims | Estimated Recovery |
|---|---|---|---|---|
| **Class 1 - Priority Claims**<br><br>Class 1 consists of all Priority Claims against any Debtor. | **Class 1 is Unimpaired by the Plan.**<br><br>Except to the extent a holder of an Allowed Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Claim will receive in full satisfaction, settlement and discharge of and in exchange for such Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Priority Claim on or before the later of: (a) the Effective Date; and (b) the date the Priority Claim becomes an Allowed Priority Claim, or as soon thereafter as practicable.  All Allowed Priority Claims not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof. | Class 1 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | $93,000 | 100% |
| **Class 2 – Secured Claims** | **Class 2 is Unimpaired by the Plan.**<br><br>Except to the extent a holder of a Secured Claim agrees to different treatment of that Claim, each holder of an Allowed Secured Claim will have such Claim reinstated pursuant to section 1124(2) of the Bankruptcy | Class 2 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | $14.5 million | 100% |

| Description of Claims or Interests | Summary of Treatment | Entitlement to Vote | Estimated Aggregate Amount of Claims | Estimated Recovery |
|---|---|---|---|---|
| | Code such that the Claim is rendered Unimpaired. The failure of Leslie or any other party in interest to file an objection, prior to the Effective Date, with respect to any Secured Claim that is reinstated hereunder will be without prejudice to the rights of Reorganized Leslie or any other party in interest to contest or otherwise defend against such Secured Claim in an appropriate forum when and if such Secured Claim is sought to be enforced. Any amount that Leslie may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed Secured Claim will be paid in full, in Cash, on, or as soon as practicable after, the later of (a) the Effective Date; (b) the date on which such Secured Claim becomes an Allowed Secured Claim; (c) the date such Secured Claim becomes due and payable according to its terms; or (d) such other date as mutually may be agreed to by and among the holder of such Secured Claim and Leslie or Reorganized Leslie. For the avoidance of doubt, Class 2 – Secured Claims includes the CIRCOR Secured Claim. | | | |
| Class 3 – General Unsecured Claims | Class 3 is Unimpaired by the Plan.<br><br>Except to the extent a holder of an Allowed General Unsecured Claim agrees to different treatment of that General Unsecured Claim, each holder of an Allowed General Unsecured Claim will have such General Unsecured Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code such that the General Unsecured Claim is rendered Unimpaired and, as a result, such treatment leaves unaltered the legal, equitable, and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim. The failure of Leslie or any other party in interest to file an objection, prior to the Effective Date, with respect to any General Unsecured Claim that is reinstated hereunder will be without prejudice to the rights of | Class 3 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | $1.6 million | 100% |

46392/0001-6246827v15

| Description of Claims or Interests | Summary of Treatment | Entitlement to Vote | Estimated Aggregate Amount of Claims | Estimated Recovery |
|---|---|---|---|---|
| | Reorganized Leslie or any other party in interest to contest or otherwise defend against such General Unsecured Claim in an appropriate forum when and if such General Unsecured Claim is sought to be enforced.  Any amount that Leslie may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed General Unsecured Claim will be paid in full, in Cash, on, or as soon as practicable after, the latest of: (a) the Effective Date; (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim; (c) the date such General Unsecured Claim becomes due and payable according to its terms; or (d) such other date as mutually may be agreed to by and among the holder of such General Unsecured Claim and Leslie or Reorganized Leslie. | | | |
| Class 4- Asbestos PI Claims and Asbestos PI Trust Expenses | Class 4 is Impaired by the Plan.<br><br>As of the Effective Date, liability for all Asbestos PI Claims will automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Asbestos PI Trust in accordance with, and to the extent set forth in, Articles IX and XI of the Plan, the applicable Plan Documents and the Confirmation Order.  Each Asbestos PI Claim will be resolved, after the Trust Distribution Effective Date, in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.  The Asbestos PI Trust will be funded in accordance with the provisions of Section 9.3 of the Plan. The sole recourse of the holder of an Asbestos PI Claim on account of such Asbestos PI Claim will be to the | Entitled to Vote. | Unknown | 40%[4] |

---

[4] The Payment Percentage has been set at 40% in the Asbestos PI Trust Distribution Procedures.  The payment percentage is subject to change as provided in the Asbestos PI Trust Distribution Procedures.  See pages iii-viii above for a discussion of the Asbestos PI Trust Distribution Procedures.

46392/0001-6246827v15

| Description of Claims or Interests | Summary of Treatment | Entitlement to Vote | Estimated Aggregate Amount of Claims | Estimated Recovery |
|---|---|---|---|---|
| | Asbestos PI Trust and each such holder will have no right whatsoever at any time to assert its Asbestos PI Claim against any Asbestos Protected Party.<br><br>As of the Effective Date, liability for all Asbestos Trust Expenses will automatically, and without further act, deed or court order, be assumed by the Asbestos PI Trust and resolved in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement. | | | |
| **Class 5 – Intercompany Claims** | **Class 5 is Unimpaired by the Plan**.<br><br>On or as soon as practicable after the Effective Date, all Intercompany Claims will either be reinstated to the extent determined to be appropriate by Leslie or Reorganized Leslie or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court. | Class 5 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote. | $1 million | 100% |
| **Class 6 – Equity Interests in Leslie** | Class 6 is Unimpaired by the Plan.<br><br>On the Effective Date, the holders of Equity Interests in CIRCOR will retain their Equity Interests which will become Reorganized Leslie Common Stock as of the Effective Date. The Reorganized Leslie Common Stock will be pledged to the Asbestos PI Trust and held by the Asbestos PI Trust until such time as the Leslie Promissory Note is paid in full. | Class 6 is conclusively presumed to have accepted the Plan, and therefore, not entitled to vote | N/A | 100% |

Pursuant to Section 12.1 of the Plan, it is a condition to confirmation of the Plan that at least seventy-five (75%) in number and two-thirds (2/3) in amount of the holders of Asbestos PI Claims who actually vote on the Plan must vote to accept the Plan. The conditions to confirmation also require that the Confirmation Order contain findings consistent with those required by section 524(g) of the Bankruptcy Code, which sets forth the statutory requirements for issuance of a "channeling injunction" of the type provided for under the Plan. For the Plan to be effective, the Confirmation Order must have been entered by the Bankruptcy Court and accepted and affirmed by the District Court or entered by the District Court. Additional conditions

46392/0001-6246827v15

precedent to the Effective Date, and a description of the ability of certain parties to consent to the waiver thereof, are set forth in Sections 12.2 and 12.3 of the Plan, respectively.

**F.      Summary of Treatment of Asbestos Liability Insurance Under the Plan.**

Under the Plan, Leslie will assign to the Asbestos PI Trust the Asbestos Insurance Rights and the Asbestos Insurance Actions, including $2,625,000 of the proceeds of the Insurance Settlement Agreement between Leslie and Continental Casualty Company dated April 19, 2010, plus the proceeds, if any, of any other Insurance Settlement Agreement that were received by Leslie on or after January 1, 2010. As described more fully in Article VIII.D. below, the rights of insurers shall be determined under the Asbestos Insurance Contracts and Insurance Settlement Agreements, as applicable.

**G.      Voting on the Plan.**

Not every claimant is entitled to vote on the Plan. Under the Bankruptcy Code, only those classes of Claims or Interests that are "impaired" and are entitled to receive a distribution of (or retain) property under a plan of reorganization are entitled to vote to accept or reject the plan. Under Leslie's Plan, only Class 4 holders of Asbestos PI Claims are Impaired and are entitled to receive a distribution, *i.e.*, entitled to vote.

Leslie is seeking acceptance of the Plan by holders of Asbestos PI Claims in Class 4. This Disclosure Statement and a Master Ballot are being sent to each lead law firm of record for holders of Asbestos PI Claims.

Holders of Claims in Class 4 may vote on the Plan only if they are holders as of **August 19, 2010 (the "Voting Record Date")**.

With respect to holders of Asbestos PI Claims in Class 4, the Bankruptcy Code provides that in connection with confirmation of a plan seeking an injunction under section 524(g), such as the Asbestos PI Channeling Injunction, the Bankruptcy Court may issue such an injunction only if: (a) the holders of the Asbestos PI Claims to be channeled under the injunction are classified separately under the plan; and (b) seventy-five percent (75%) in number of the holders of the Asbestos PI Claims in that class who actually vote on the plan vote to accept the plan. For a more complete description of the requirements for acceptance of the Plan, see Section IX below.

**1.      . Voting Procedures, Ballots and Voting Deadline.**

Because Leslie does not have readily accessible accurate records of the addresses of the overwhelming majority of individual holders of Asbestos PI Claims in Class 4, Leslie has proposed special procedures for voting by counsel on behalf of holders of Asbestos PI Claims (if, as, and to the extent such counsel are authorized to do so) or else by the individual holders of Asbestos PI Claims. Accordingly, this Disclosure Statement and a form of Master Ballot are being sent to each lead law firm of record for holders of Asbestos PI Claims. This Disclosure Statement and an Individual Ballot will be sent to holders of Asbestos PI Claims who have not granted their counsel permission to vote on the Plan on their behalf or those individual claimants who have contacted the Debtor or the Claims and Balloting Agent directly for solicitation materials. Please review the voting procedures accompanying the Ballot for detailed instructions

regarding how to vote with respect to Asbestos PI Claims. If you did not receive a Ballot, it is because Leslie believes that you are (i) not entitled to vote on the Plan or (ii) an individual holder of an Asbestos PI Claim who is represented by counsel to whom a Master Ballot has been sent.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot. You should complete and sign your original Ballot (copies will not be accepted) and return it according to the instructions enclosed with the Ballot.

Each Ballot reflects the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the Ballot(s) sent to you with this Disclosure Statement.

All votes to accept or reject the Plan must be cast by using the Ballot enclosed with the Disclosure Statement. PLEASE READ AND CAREFULLY FOLLOW THE VOTING INSTRUCTIONS BEFORE COMPLETING YOUR BALLOT. IN ORDER FOR YOUR VOTE TO BE COUNTED, COMPLETE, SIGN AND DATE YOUR BALLOT AND RETURN IT TO EPIQ SO AS TO BE <u>ACTUALLY</u> <u>RECEIVED</u> BY **SEPTEMBER 27, 2010 AT 5:00 P.M. PREVAILING EASTERN TIME (THE "VOTING DEADLINE").** CLAIMANTS AND THEIR COUNSEL WILL BE GIVEN APPROXIMATELY 32 DAYS FROM THE MAILING OF THE DISCLOSURE STATEMENT TO VOTE. BALLOTS MAY BE SUBMITTED AS FOLLOWS:

| *If by hand delivery or overnight courier:* | *If by first class mail:* |
|---|---|
| Epiq Bankruptcy Solutions, LLC | Epiq Bankruptcy Solutions, LLC |
| 757 Third Avenue, 3rd FLOOR | FDR Station, P.O. Box 5015 |
| New York, NY 10017 | New York, NY 10150-5014 |
| Telephone: (646) 282-2400 | Telephone: (646) 282-2400 |
| Attention: Leslie Control Ballot Processing Center | Attention: Leslie Control Ballot Processing Center |

BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED.

If you have any questions about (a) the procedure for voting on your Class 4 Claim, (b) the packet of materials that you have received, or (c) the amount of your Claim, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or exhibits to such documents, please contact Leslie's balloting and solicitation agent, Epiq Bankruptcy Solutions, LLC ("Epiq" or the "Claims and Balloting Agent") at:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Telephone: (646) 282-2400
Attention: Leslie Control Ballot Processing Center

For further information and general instructions on voting to accept or to reject the Plan, see Section XII of this Disclosure Statement and the instructions accompanying your Ballot.

46392/0001-6246827v15

Only actual votes will be counted. Failure to return a Ballot will not be counted as either a vote for or against the Plan. Any improperly completed or late Ballot will not be counted. Any Ballot that indicates both an acceptance and rejection of the Plan will not be counted. If the holder of a Class 4 Claim casts more than one Ballot voting the same Claim before the Voting Deadline, the latest dated Ballot received before the Voting Deadline will be deemed to reflect the voter's intent and thus to supersede any prior Ballots. Claimants must vote all of their Claims either to accept or reject the Plan and may not split their votes; thus, a Ballot (or a group of Ballots) received from a single creditor that partially rejects and partially accepts the Plan will not be counted.

Once an order confirming the Plan is issued by the Bankruptcy Court and affirmed by the District Court, or issued by the District Court, the Plan will bind all holders of Claims against and Interests in Leslie, whether or not they are entitled to vote or did vote on the Plan and whether or not they receive (or retain) any distributions or property under the Plan. Thus, you are encouraged to read this Disclosure Statement carefully. In particular, holders of Asbestos PI Claims against Leslie who are entitled to vote on the Plan are encouraged to read the Plan Documents in their entirety before voting to accept or to reject the Plan.

**H.      Disclosure Statement Enclosures.**

Accompanying this Disclosure Statement are copies of: (i) the Plan (Appendix A); (ii) Leslie's historical financial information (Appendix B); (iii) Reorganized Leslie's financial projections (Appendix C); (iv) Leslie's liquidation analysis (Appendix D); and (v) Leslie's Chapter 11 recovery analysis (Appendix E). Other documents relevant to your consideration of the Plan are attached as Schedules and Exhibits to the Plan. Moreover, additional Plan Documents may be filed with the Bankruptcy Court before the expiration of the Voting Deadline.

In addition, a Ballot for accepting or rejecting the Plan is enclosed with this Disclosure Statement if you (or your clients, if you are counsel to asbestos-related personal injury or wrongful death claimants) are entitled to vote to accept or reject the Plan.

**I.      Disclaimers.**

**This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents related to the Plan, certain anticipated events in the case and certain financial information. Although Leslie believes that the Disclosure Statement, and related document summaries, are fair and accurate, they are qualified to the extent they do not set forth the entire text of the Plan, such documents or any statutory provisions. The terms of the Plan govern in the event of any inconsistency with this Disclosure Statement. All exhibits, appendices and/or schedules to the Disclosure Statement are incorporated into and are a part of this Disclosure Statement as if set forth in full herein. The statements contained in this Disclosure Statement are made as of the date hereof, unless otherwise specified, and Leslie disclaims any obligation to update any such statements after the hearing on approval of the Disclosure Statement.**

**Safe Harbor Statement under the Private Securities Litigation Reform Act of 1995: All forward-looking statements contained herein or otherwise made by Leslie involve**

material risks and uncertainties and are subject to change based on numerous factors, including factors that are beyond Leslie's control.  Accordingly, Leslie's future performance and financial results may differ materially from those expressed or implied in any such forward-looking statements.  Such factors include, but are not limited to, those described in this Disclosure Statement.  <u>See</u> Section X, "Certain Risk Factors To Be Considered" of this Disclosure Statement.  Leslie does not undertake to publicly update or revise its forward-looking statements even if experience or future changes make it clear that any projected results expressed or implied therein will not be realized.

Except as otherwise specifically noted, the financial information contained herein has not been audited by a certified public accountant and has not necessarily been prepared in accordance with Generally Accepted Accounting Principles.

In connection with Leslie's solicitation of acceptances of the Plan pursuant to section 1126(b) of the Bankruptcy Code, Leslie is furnishing a solicitation package, consisting of the Disclosure Statement, the enclosures hereto, and a Master Ballot to each lead law firm of record for holders of Claims eligible to vote as of the Voting Record Date.  This Disclosure Statement is to be used by each such eligible holder solely in connection with its evaluation of the Plan; use of this Disclosure Statement for any other purpose is not authorized.

The information contained in this Disclosure Statement, including the information regarding the history, business, and operations of the Debtor and the historical financial information regarding the Debtor is included for purposes of soliciting acceptances of the Plan but, as to contested matters and adversary proceedings, is not to be construed as an admission or a stipulation but rather as a statement made in settlement negotiations.

This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Rule 3016(c) of the Federal Rules of Bankruptcy Procedure, and not necessarily in accordance with federal or state securities laws or other non-bankruptcy law.  This Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against Leslie to make informed judgments about the Plan.

This Disclosure Statement does not constitute legal, business, financial or tax advice.  Any persons desiring any such advice should consult with their own advisors.

Except as otherwise expressly set forth herein, all information contained herein has been provided by the Debtor.  Moreover, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, waiver or statement against interest but rather should be construed as a statement made in settlement negotiations related to contested matters, adversary proceedings, and other pending or threatened litigation or actions.  This Disclosure Statement will not be admissible in any non-bankruptcy proceeding nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of claims against, or interests in, the Debtor.  The Debtor makes the statements and provide the financial information contained herein as of the date hereof unless otherwise specified.

xv

# TABLE OF CONTENTS

**Page**

A.  Introduction. .............................................................................. i
B.  Contributions to Asbestos PI Trust. .......................................... ii
C.  The Leslie Promissory Note and the Pledge Agreement. ...................... iii
D.  How Asbestos Claimants Receive Distributions from the Asbestos PI Trust. ........................................................................... iii
E.  Summary of Classification and Treatment under the Plan. ................ viii
F.  Summary of Treatment of Asbestos Liability Insurance Under the Plan ............ xii
G.  Voting on the Plan. ...................................................................... xii
H.  Disclosure Statement Enclosures. ............................................... xiv
I.  Disclaimers. .................................................................................. xiv

I. INTRODUCTION ............................................................................. 1

II. OVERVIEW OF THE DEBTOR'S BUSINESS ................................... 1
A.  Description and History of Leslie's Business. ............................... 1
B.  Asbestos-Related Personal Injury and Wrongful Death Claims against Leslie. ............................................................................ 5
C.  Asbestos-Related Personal Injury and Wrongful Death Claims against Entities Other than Leslie ...................................................... 6
D.  Insurance Coverage. ..................................................................... 7

III. PREPETITION SETTLEMENT NEGOTIATIONS ............................ 9
A.  Leslie and CIRCOR's Prepetition Discussions with Representatives of Current Holders of Asbestos PI Claims and with the Pre-Petition Future Claimants' Representative. ............................................................. 9

IV. SOLICITATION OF HOLDERS OF ASBESTOS PI CLAIMS;  CONFIRMATION HEARING. ...................................................................................... 12
A.  Solicitation of Holders of Asbestos PI Claims. ............................ 12
B.  Confirmation of the Plan. ............................................................. 14

V. EVENTS DURING THE CHAPTER 11 CASE ................................... 15
A.  First Day Motions/Applications Filed. ........................................ 15
B.  Debtor in Possession Financing. .................................................. 18
C.  Additional Motions and Applications Filed. ................................ 19
D.  Appointment of Asbestos Claimants Committee and Retention of Counsel. ........ 20
E.  Motion for Authority to Pay Prepetition Claims of Certain Creditors in the Ordinary Course of Business. ........................................................ 21
F.  Solicitation Procedures Motion. ................................................. 21

VI. TREATMENT OF HOLDERS OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN .................................................................................... 21
A.  Classification and Treatment Of Claims And Interests. ................ 22

VII. DESCRIPTION OF THE ASBESTOS PI TRUST AND  CONTRIBUTIONS BY
    LESLIE AND CIRCOR ................................................................................27
    A.     The Asbestos PI Trust. ...............................................................27
    B.     Description of the Consideration Contributed to the Asbestos PI Trust...............31
    C.     Estimation of Asbestos PI Claims. ...........................................32

VIII. OTHER ASPECTS OF THE PLAN ..............................................................33
    A.     Distributions Other than on Account of Asbestos PI Claims. ...............33
    B.     Means for Implementation of the Plan. ......................................36
    C.     Treatment of Executory Contracts and Unexpired Leases. .................37
    D.     Effect of Confirmation. .............................................................39
    E.     Releases, Injunctions and Waivers of Claims. ............................42
    F.     Miscellaneous Provisions. .........................................................47

IX. CONFIRMATION OF THE PLAN ..................................................................48
    A.     Acceptance Of The Plan. ..........................................................48
    B.     Confirmation Hearing. ..............................................................48
    C.     General Requirements of Section 1129. .....................................48
    D.     Feasibility Of The Plan. .............................................................50
    E.     Best Interests Test. ...................................................................51
    F.     Liquidation Analysis. ...............................................................52
    G.     Application of the "Best Interests" of Creditors Test To The Liquidation
             Analysis. ...................................................................................52

X. CERTAIN RISK FACTORS TO BE CONSIDERED ........................................53
    A.     Certain Bankruptcy Considerations. ........................................53
    B.     Risk Factors. ...........................................................................53

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
    PLAN ............................................................................................................57
    A.     Liquidation Under Chapter 7 or Chapter 11. .............................57
    B.     Alternative Plan(s) of Reorganization. ......................................58

XII. VOTING PROCEDURES AND RESULTS......................................................58
    A.     Parties in Interest Entitled to Vote. ...........................................58
    B.     Vote Required for Acceptance by a Class. .................................59
    C.     Classes Deemed to Accept. .......................................................59
    D.     Voting. ......................................................................................59

XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...................60
    A.     Treatment of the Asbestos PI Trust. .........................................61
    B.     Consequences to Holders of Asbestos PI Claims. .....................62
    C.     Information Reporting and Withholding. ....................................62

XIV. VOTING PROCEDURES ............................................................................62
    A.     Waivers of Plan Defaults, Irregularities, Etc. ............................62
    B.     Withdrawal of Ballots; Revocation. ..........................................63

2

C.    Further Information; Additional Copies. ...............................................63

XV. CONCLUSION AND RECOMMENDATION .................................................64

## TABLE OF APPENDICES

| APPENDIX A | Plan of Reorganization of Leslie Controls, Inc. |
|------------|------------------------------------------------|
| APPENDIX B | Historical Financial Information for Leslie |
| APPENDIX C | Reorganized Leslie's Projections |
| APPENDIX D | Leslie's Liquidation Analysis |
| APPENDIX E | Leslie's Chapter 11 Recovery Analysis |

3

# I. INTRODUCTION

This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, the need to seek Chapter 11 protection, significant events that are expected to occur during the Chapter 11 Case, and the anticipated organization, operations, and liquidity of the Debtor upon successful emergence from Chapter 11 (the "Reorganized Debtor"). This Disclosure Statement also describes terms and provisions of the Plan, specifically including the creation of an Asbestos PI Trust pursuant to section 524(g) of the Bankruptcy Code to which all asbestos-related personal injury and wrongful death Claims will be channeled, pursuant to the injunction established for the benefit of Leslie, CIRCOR and certain other parties. The Disclosure Statement also describes certain alternatives to the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan and under the Asbestos PI Trust. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted. FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, THE PLAN DOCUMENTS AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.

Although Leslie believes that the descriptions and summaries contained in this Disclosure Statement are fair and accurate in all material respects, they are qualified in their entirety to the extent that they do not set forth the entire text of the documents and statutory provisions discussed. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by Leslie's management or a review of historical corporate accounts.

*For a description of the Plan and its provisions, please see Sections VI, VII, and VIII hereof. For a discussion of certain factors to be considered prior to voting, please see Section X hereof.*

# II. OVERVIEW OF THE DEBTOR'S BUSINESS

**A.    Description and History of Leslie's Business.**

      **1.    Leslie's Origins.**

In 1905, John Leslie established the Leslie Company and built a foundry, machine shop, and high pressure steam test plant in Lyndhurst, New Jersey. Its primary business was the manufacture of steam pressure valves and regulators for use in military and commercial marine service products.

In 1926, S. Inglis Leslie, the son of the founder, purchased the business from his father and re-incorporated under the name Leslie Co. From that time until 1968, Leslie's company headquarters remained in Lyndhurst. In 1968, Leslie relocated its corporate headquarters to a new facility in Parsippany, New Jersey. In 1982, John S. Leslie sold the Leslie Company to the

Executive Operating Board, which four years later, in 1986, moved the operation to Tampa, Florida, and renamed it Leslie Controls, Inc.

In 1989, the stock of Leslie was purchased by Watts and Leslie became a wholly-owned subsidiary of Watts. In 1999, Watts spun off a number of subsidiary companies formerly included in its industrial, oil, and gas division, including Leslie Controls, Inc., as subsidiaries of a newly-created company, CIRCOR. In connection with the spin-off, a Distribution Agreement between Watts and CIRCOR provided in part that "[o]n and after the Distribution Date, Circor shall indemnify . . . each member of the Watts Group . . . (the 'Watts Indemnitees') from and against any and all damage, loss, liability and expense . . . incurred or suffered by any of the Watts Indemnitees and arising out of . . . any of the Circor Liabilities, whether before or after the Distribution Date." Since the time of the spin-off, Leslie has been a wholly-owned subsidiary of CIRCOR. In 2009, Leslie reincorporated as a Delaware corporation.

### 2.    Leslie's Historical Distribution of Products Giving Rise to Asbestos Lawsuits.

Until the mid to late 1980s (and, for certain products covered by military specifications, until the early 1990s), some valves, regulators, whistles, strainers, and heaters sold by Leslie included internal component parts (such as gaskets and packing) that were manufactured by others and contained small amounts of encapsulated asbestos. Leslie also sold gaskets and packing, manufactured by others, as replacement parts for these products. Leslie believes that the use of these products could not and did not give rise to material exposure to airborne asbestos.

Leslie also made and sold valves that did not contain asbestos, but that purchasers in some cases subsequently covered with asbestos insulation manufactured by others. Leslie believes that it is not legally responsible for any injuries allegedly caused by asbestos that Leslie did not supply.

### 3.    Leslie's Current Business, Officers and Directors.

As of the Commencement Date, Leslie's main operating center and headquarters are located in an owned facility in Tampa, Florida. In addition, Leslie has a leased service center in Chesapeake, Virginia.

Leslie's President and the Chairman of its Board of Directors is Thomas Warner, who has served in such positions since January 2010. The additional members of the Board of Directors are Frederic Burditt and A. William Higgins, each of whom is a Leslie Vice President. The additional officers of Leslie include the following: Richard Broughton, Vice President; Alan Glass, Vice President and Secretary; Jack Kober, Vice President, Assistant Treasurer and Assistant Secretary; Susan McCuaig, Vice President; Nick Turco, Vice President; and Glenn Purcell, Vice President.

In January 2010, Leslie determined that it should retain a Chief Restructuring Officer ("CRO") in connection with the Debtor's restructuring efforts, including a possible restructuring of Leslie's liabilities under the Bankruptcy Code. Accordingly, on February 9, 2010, Leslie entered into an agreement with Day Seckler LLP for G. Wayne Day to act as Leslie's CRO. The

2

CRO is an officer of Leslie and reports directly to Leslie's Board of Directors.  Mr. Day has no interest in or affiliation with Leslie's owners, members, or affiliates and serves as an independent representative of Leslie in all of its restructuring efforts.

Mr. Day's duties include:  (i) reporting to and being responsible directly to Leslie's Board of Directors; (ii) having authority as generally vested in a Chief Restructuring Officer in matters pertaining to the bankruptcy process (operational matters will continue to be the responsibility of Tom Warner); (iii) assisting Leslie's legal counsel and other advisors in planning and preparing for the bankruptcy filing; (iv) advising Leslie's management team, as requested, with respect to communications with customers, vendors, employees, creditors and other parties in interest during the bankruptcy process; (v) coordinating Leslie's activities to obtain appropriate funding for the bankruptcy, including sourcing, negotiating, analyzing forms of funding  and making recommendations to the Board of Directors as to the appropriate funding; (vi) assessing working capital requirements and sources of working capital; (vii) assisting in the preparation of bankruptcy schedules and financial information to be provided to the Bankruptcy Court and any debtor-in-possession lender(s); (viii) working with Leslie's management in preparing/reviewing the reporting requirements of the Chapter 11 process, including communicating with creditor representatives, legal counsel, and other parties in interest; (ix) preparing a liquidation analysis and financial projections for the Disclosure Statement; and (x) performing any other such restructuring services as requested by Leslie's Board of Directors.

**4.      Leslie's Existing Capital Structure.**

The Debtor's principal capital structure consists of  the Secured Note, the Guaranty of the CIRCOR Unsecured Credit Facility and equity.  As of the Commencement Date, the Debtor had approximately $14.5 million of secured debt.  The Debtor's principal indebtedness is comprised of: (a) the Secured Note; and (b) the Guaranty of the CIRCOR Unsecured Credit Facility (all as defined below).

(a)      The Secured Note

On or about July 29, 2009, Leslie (the "Borrower") entered into a Secured Promissory Note (the "Secured Note") with CIRCOR.  The Secured Note provides for an aggregate commitment of $30,000,000 with an initial advance of $222,998.18.  CIRCOR has a first priority lien on substantially all of the assets of the Borrower.  The proceeds of the Secured Note were used to cover payment of settlements, defense costs and other liabilities.

As of the Commencement Date, there was $14,142,114 in outstanding principal and $334,726 in outstanding interest under the Secured Note.

(b)      The Guaranty of the CIRCOR Unsecured Credit Facility

On or about July 29, 2009, CIRCOR, as borrower, entered into a Credit Agreement (the "CIRCOR Unsecured Credit Facility") with KeyBank National Association, Suntrust Bank, Sovereign Bank, Royal Bank of Canada and Bank of America, N.A.  Pursuant to the CIRCOR Unsecured Credit Facility, the lenders agreed to extend up to $190,000,000 of credit to CIRCOR to refinance certain of CIRCOR's then existing indebtedness and to provide working capital and

3

funds for other general corporate purposes. Each of CIRCOR's U.S. subsidiaries, including Leslie, jointly and severally, irrevocably and unconditionally guaranteed CIRCOR's obligations under the CIRCOR Unsecured Credit Facility.

As of the Commencement Date, CIRCOR owed approximately $532,000, consisting of $500,000 in outstanding principal, plus $32,000 in accrued unpaid interest, under the CIRCOR Unsecured Facility.

(c)    Equity

Leslie is authorized to issue 100 shares of common stock, par value $0.01 per share. CIRCOR, a non-Debtor entity, owns 100% of the outstanding common stock of Leslie. There is no public market for the equity securities of Leslie.

**5.    Selected Financial Data.**

Set forth in Appendix B is certain financial data for Leslie for each of the last four fiscal years ended December 31, 2009 as well as for the period from January 1, 2010 to December 31, 2014.

**Leslie's financial information and Projections, including those attached hereto as Appendix B and Appendix C have been prepared on a going concern basis. Leslie's historical financial information presented as Appendix B has been derived from Leslie's historical financial statements. Continuing as a going concern contemplates continuity of operations, realization of assets, and payment of liabilities in the ordinary course of business. The accompanying financial information does not reflect adjustments that might result if Leslie is unable to continue as a going concern.**

**Leslie's unaudited interim consolidated financial statements do not include all of the disclosures required by accounting principles generally accepted in the United States of America for annual financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation of the interim period results have been included.**

**6.    The Pension Plan.**

CIRCOR International, Inc. ("CIRCOR") is the contributing sponsor of the Circor International, Inc. Retirement Plan (the "Pension Plan"). The Pension Plan is covered by Title IV of the Employment Retirement Income Security Act of 1974, as amended ("ERISA") (29 U.S.C. § 1310 *et seq.*). The Debtor, a wholly-owned subsidiary of CIRCOR, is a member of the contributing sponsor's controlled group. *See* 29 U.S.C. §1362(a), (b); 29 U.S.C. §1301(a)(14); 29 C.F.R. § 4001.3; *see also* 26 U.S.C. §§414(b) and (c); Treas. Reg. §§1.414(b)-1 and (c)-2.

In 2006, the Pension Plan was frozen. Once frozen, Pension Plan participants no longer accrue future benefits and new hires are not eligible for participation. CIRCOR continues to fund all obligations owed as the Pension Plan's sponsor in accordance with Title IV of ERISA. If the frozen Pension Plan is terminated, however, the Debtor, as a member of the Pension Plan's

4

controlled group, would be jointly and severally liable for obligations owed to the Pension Benefit Guaranty Corporation and the Pension Plan.

The Pension Plan may be terminated only if the statutory requirements of either ERISA section 4041, 29 U.S.C. § 1341, or ERISA section 4042, 29 U.S.C. § 1342, are met. If the Pension Plan were to be terminated, CIRCOR and all members of its controlled group would be jointly and severally liable for: (i) the unfunded benefit liabilities of the Pension Plan (*see* 29 U.S.C. § 1362(a)); (ii) contributions necessary to satisfy the minimum funding standards (*see* 26 U.S.C. § 412(c)(11), 29 U.S.C. § 1082(c)(11)); (iii) unpaid premium obligations that may be owed from the Pension Plan (*see* 29 U.S.C. § 1307); and (iv) shortfall and waiver amortization charges (*see* 29 U.S.C § 1362(c)).

No provision contained herein, the Plan, the Order Confirming the Plan of Reorganization, or section 1141 of the Bankruptcy Code, shall be construed as discharging, releasing or relieving any party, in any capacity, from any liability with respect to the Pension Plan under any law, government policy or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability against any party as a result of the Plan's provisions for satisfaction, release and discharge of claims.

## B.    Asbestos-Related Personal Injury and Wrongful Death Claims against Leslie.

At the time of Watts' acquisition of Leslie's stock in 1989, Leslie was involved as a defendant or third party defendant in six actions involving claims for damages arising from plaintiffs' exposure to asbestos. Leslie settled one claim in 1989 for $500.

From July 1990 through December 1995, Leslie was sued as a third-party defendant in some 215 maritime asbestos actions in the U.S. District Court for the Northern District of Ohio. The underlying claims were filed by present or former employees of various shipping companies against certain ship-owners, who in turn filed third-party actions against some thirty different contractors, subcontractors, and suppliers, including Leslie. The claims against Leslie asserted that the gaskets in metal valves supplied by Leslie contained asbestos that contributed to the asbestos exposure of the plaintiffs who worked on the defendants' ships. One claim involving Leslie and numerous other defendants was settled in 1995 for a total sum of which Leslie paid $2,000.

From June 1996 through to the Watts' spinoff of CIRCOR in October 1999, Leslie received two third-party claims brought in the Superior Court of California, San Francisco County, but those two third-party claims were later dismissed without payment. No new ship-owner claims were filed against Leslie during this period, and the third-party claims that had previously been filed against Leslie were effectively stayed by court ordered moratoriums on answers and motion practice. In addition, during the period from October 1999 through the third quarter of 2001, Leslie received no new asbestos claims and its third-party maritime asbestos cases remained essentially inactive.

In the last quarter of 2001, however, Leslie was named in one case brought in Mississippi on behalf of 122 plaintiffs against over 250 defendants. In 2002, that case was followed by 25

5

additional Mississippi cases brought on behalf of more than 1,500 claimants, as well as some 10 claims in California Superior Court in San Francisco, two third-party claims in Michigan, and a single claim in New York. In subsequent years, increasing numbers of Asbestos PI Claims, including mesothelioma claims, were filed against Leslie. As a result, Leslie has incurred increasingly large costs for the defense and, where appropriate, settlement of Asbestos PI Claims. During 2007, Leslie for the first time suffered adverse verdicts. In November 2009, the California Court of Appeal issued a ruling reversing one of the two judgments against Leslie, but that appellate decision is pending further appeal. On June 3, 2010, the California Court of Appeal issued a ruling that conditionally affirmed the other verdict if the plaintiffs agreed to accept a suggested remittitur, and after the plaintiffs agreed to do so that ruling resulted in a new final verdict against Leslie.

As of the date of this Disclosure Statement, Leslie has approximately 1340 pending Asbestos PI Claims.

Leslie's gross expenditures for the costs of defending Asbestos PI Claims were some $2.2 million in 2005, $5.8 million in 2006, $8.9 million in 2007, $10.2 million in 2008, and $12.3 million in 2009. Leslie's gross indemnity (settlement) payments for Asbestos PI Claims were some $1.1 million in 2005, $2.3 million in 2006, $4.3 million in 2007, $4.1 million in 2008, and $6.3 million in 2009 and $2.1 million in 2010. In addition, CIRCOR has agreed to offer to make additional payments totaling up to $1.3 million, in exchange for the assignment to CIRCOR of the above-referenced judgment and of up to nineteen additional claims that were settled by Leslie on various dates between January 28, 2008 and June 9, 2010, but were unpaid as of the Commencement Date.

C.    **Asbestos-Related Personal Injury and Wrongful Death Claims against Entities Other than Leslie.**

In addition to the asbestos-related personal injury and wrongful death Claims asserted against Leslie, certain plaintiffs have also alleged derivative or successor asbestos-related personal injury and wrongful death Claims arising out of the conduct or products of Leslie against other parties related to Leslie, including CIRCOR, the CIRCOR Protected Parties, Watts, and the Watts Protected Parties (as such Claims are more specifically defined in the Plan, the "Derivative Liability Asbestos PI Claims").

Asbestos PI Claims asserted against CIRCOR and Watts, as well as all other Asbestos Protected Parties, will be channeled to the Asbestos PI Trust under the Plan to the extent such Claims are based on allegations that such parties are somehow directly or indirectly liable for the conduct of, Claims against, or Demands on Leslie.

No judgment has ever been entered against CIRCOR or Watts in any of these cases, nor has CIRCOR or Watts ever paid any money on behalf of itself to plaintiffs in settlement of any of these cases. Where CIRCOR has settled an asbestos-related personal injury or wrongful death case in which CIRCOR was a party, settling plaintiffs have released all alleged asbestos-related personal injury and wrongful death claims against CIRCOR (as well as Leslie) that were alleged to be derivative of, based on, or related to, products containing asbestos distributed by Leslie.

46392/0001-6246827v15

In exchange for the CIRCOR Asbestos PI Trust Contribution, all Derivative Liability Asbestos PI Claims against the CIRCOR Related Parties and the Watts Related Parties are being released and discharged to the fullest extent under applicable law and enjoined.

## D.    Insurance Coverage.

### 1.    Insurance Coverage Generally.

Beginning at least as early as 1967, Leslie maintained primary comprehensive general liability insurance coverage applicable to Asbestos PI Claims.  That primary coverage was issued at least by Continental Casualty Co. ("Continental") from 1967 to 1974, New Jersey Manufacturers Insurance Co. from 1974 to 1982, Zurich Insurance Co. from 1982 to 1983, Integrity Insurance Co. from 1983 to 1984, The Central National Insurance Co. of Omaha ("Central National") from 1984 to 1985, and National Union Fire Insurance Co. of Pittsburgh, Pa. ("National Union") from 1985 to 1986.  Leslie also maintained excess liability coverage applicable to Asbestos PI Claims from various insurers from at least 1967 through 1985.

The comprehensive general liability insurance policies purchased by Leslie at least until August 25, 1986, are "occurrence-based" policies, which, subject to other policy terms, generally insure against "occurrences" that result in bodily injury or property damage that trigger the applicable policy period, even if the injury or damage does not manifest itself until after the policy period.  Leslie's pre-1986 "occurrence" policies provide insurance coverage for asbestos and other "long-tail" claims, which are commonly asserted years or decades after the underlying injuries are alleged to have occurred.  Beginning in approximately November 1, 1985, Leslie's excess insurance policies may arguably contain policy exclusions generally barring coverage for liabilities resulting from asbestos-related injuries or damage.  Such alleged asbestos exclusions may be included in the primary policies Leslie purchased after August 25, 1986.

In total, from 1967 to 1985, Leslie purchased primary, umbrella, and/or excess comprehensive general liability policies with undisputed combined limits of more than $136 million.  Each policy appears to contain per-occurrence and annual aggregate limits of liability and may only cover claims to the extent any applicable lower level insurance for the covered period is or becomes exhausted.  As a general matter, primary policies respond to claims first, then umbrella or first-layer excess policies, followed in particular years by second-layer excess policies.

Leslie's primary comprehensive general liability policies include a duty on the part of the insurers to defend claims that are potentially covered under their policies and in addition a duty to indemnify Leslie with respect to claims up to properly specified applicable limits of liability. Some of the primary comprehensive general liability policies purchased by Leslie between 1967 and 1985 reportedly have been exhausted, and others may be significantly impaired, through the payment of asbestos-related liabilities.  Additionally, Leslie and Continental, one of its primary insurers, executed an insurance settlement agreement to resolve certain disputed years of coverage.  As a result of that settlement, Leslie has released its rights under insurance policies issued by Continental.

7

Moreover, of the approximately $118 million in excess coverage purchased by Leslie, more than $74 million was issued by domestic and foreign carriers that appear to be insolvent. Accordingly, as of June 17, 2010, and excluding any insurance proceeds that are available pursuant to an Insurance Settlement Agreement, there appears to remain nearly $48 million of solvent primary and excess comprehensive general liability coverage available to pay Asbestos PI Claims between at least 1967 and 1985, depending on how those policies are interpreted.

## 2. Factors that May Reduce Available Insurance Coverage.

There are several factors that may reduce the amount of insurance coverage potentially available to Leslie on account of Asbestos PI Claims asserted against it.

### (a) Insurance Coverage Litigation

Although no insurance coverage litigation is pending at this time between Leslie and its insurance carriers and Leslie has no reason to believe that litigation will be necessary, such litigation could arise in the future should Leslie's non-paying primary carriers or excess carriers contest or otherwise fail to honor the coverage obligations of their policies or their Insurance Settlement Agreements. Approximately $43.6 million of Leslie's nearly $48 million of remaining available and solvent insurance is excess coverage that insurers may argue has not yet been triggered by Leslie's Asbestos PI Claims. Therefore, Leslie has had limited discussions with many of its excess insurers regarding their coverage obligations for Asbestos PI Claims. Accordingly, estimating the amount of insurance recovery from those policies is inherently uncertain at this time and depends on a number of factors, including the potential for disputes over coverage and the timing and amount of Asbestos PI Claims. Accordingly, to the extent that the excess carriers issuing that coverage contest any or all of the foregoing issues, the timing and/or availability of the insurance proceeds available to the Asbestos PI Trust could be affected.

### (b) Insolvent Insurers

A second factor that likely will reduce available coverage is the insolvency of certain insurers. As noted, more than $74 million of Leslie's excess insurance coverage was issued by insurers that are in rehabilitation or liquidation proceedings, subject to an insolvent scheme of arrangement and/or have been declared insolvent. Recovery under policies issued by such insolvent insurers is subject to the uncertainties that result from each of the insolvent insurers' respective liquidation or rehabilitation proceedings or foreign scheme of arrangement. Therefore, it is not possible at this time to predict amounts, if any, that may be recovered ultimately from the allegedly insolvent insurers.

### (c) Alleged "Per Claim" Self-Insured Retentions

Finally, two of Leslie's primary insurance policies, each providing at least $1 million of coverage, allegedly contain "per-claim" self-insured retentions ("SIRs") that may reduce the coverage available to pay Leslie's Asbestos PI Claims. Specifically, the primary policies issued by Central National and National Union allegedly contain "per-claim" SIRs of $10,000 and $25,000 respectively that may obligate Leslie to pay the amount of the SIRs before the insurers are obligated to provide coverage. Given that the SIRs may apply "per-claim," insurers may argue that Leslie is required to pay the retained amount for each and every "claim" for which it

8

seeks coverage. Although both defense and liability costs apply toward the alleged SIRs, it is expected that Leslie's insurers may argue that Leslie's combined asbestos-related costs for many of its pending and future Asbestos PI Claims will not exceed those policies' alleged SIRs.

## III. PREPETITION SETTLEMENT NEGOTIATIONS

As set forth above, the cost of defending and resolving personal injury and wrongful death Claims asserted against Leslie has been and continues to be substantial. In addition, the amount of insurance coverage remaining to Leslie has continued to decline.

In light of these circumstances, Leslie determined that it may be necessary to commence a case under Chapter 11 of the Bankruptcy Code to preserve its remaining assets and to confirm a plan of reorganization that would allow Leslie to satisfy its asbestos-related Claims in accordance with the requirements of section 524(g) of the Bankruptcy Code. Section 524(g) provides for the creation of a trust to "assume the liabilities of a debtor which at the time of entry of the order for relief has been named as a defendant in personal injury, wrongful death, or property-damage actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products . . . . " 11 U.S.C. § 524(g)(2)(B)(i)(I). Section 524(g) further provides for a "channeling" injunction that directs all present and future asbestos-related "demands" to the trust for liquidation and satisfaction of allowed amounts. 11 U.S.C. 524(g)(1). This channeling injunction, however, is only valid and enforceable against future asbestos claimants if, "as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert [asbestos-related personal injury or wrongful death claims against the debtor] . . . . " 11 U.S.C. § 524(g)(4)(B)(i).

Leslie believes that it is necessary for any such channeling injunction to cover all asbestos-related personal injury or wrongful death Claims and future Demands based on the conduct or products of Leslie, against Leslie and parties related to Leslie including, but not limited to, past and present affiliates of Leslie (such as CIRCOR and Watts), past and present officers and directors of Leslie, predecessors in interest to Leslie, and any entity that owned a financial interest in Leslie or its affiliates or predecessors.

Accordingly, Leslie and CIRCOR commenced negotiations with the holders of asbestos-related personal injury and wrongful death Claims arising out of the conduct or products of Leslie (or their representatives) in order to establish a consensus on the framework for a Chapter 11 plan of reorganization that would satisfy the requirements of section 524(g) of the Bankruptcy Code and treat all present and future claimants fairly and equitably.

A.    **Leslie and CIRCOR's Prepetition Discussions with Representatives of Current Holders of Asbestos PI Claims and with the Pre-Petition Future Claimants' Representative.**

1.    **The Ad Hoc Committee Representing Current Asbestos PI Claim Holders.**

In November 2009, counsel for Leslie and CIRCOR began discussions with plaintiffs' counsel who represent numerous current holders of Asbestos PI Claims against both Leslie and

CIRCOR in order to explore the feasibility of and the potential for a prenegotiated Chapter 11 plan of reorganization that would include an Asbestos PI Trust and a channeling injunction pursuant to section 524(g) of the Bankruptcy Code. Such counsel, without the involvement of Leslie or CIRCOR, created an Ad Hoc Committee for the purpose of negotiating the terms of a possible Plan of Reorganization for Leslie. The members of the Ad Hoc Committee were: Joseph Belluck (Belluck & Fox, LLP); Alan R. Brayton (Brayton & Purcell LLP); Matthew Bergman (Bergman, Draper & Frockt); John D. Cooney (Cooney & Conway); James F. Early (Early, Ludwick, Sweeney & Strauss, LLC); Jordan Fox (Belluck & Fox, LLP); David C. Greenstone (Simon, Eddins & Greenstone, LLP); Dean Hanley (Paul Hanley, LLP); Mark H. Iola (Stanley, Mandell & Iola, LLP); Steven Kazan (Kazan, McCain, Lyons, Greenwood & Harley, PLC); Peter Kraus (Waters & Kraus, LLP); William (Bill) Levin (Levin, Simes, Kaiser & Gornick, LLP); Jeffrey Simon (Simon, Eddins & Greenstone, LLP); and Perry Weitz (Weitz & Luxeberg, P.C.). The Ad Hoc Committee, in turn, appointed a three-person Steering Committee to handle the negotiations over the terms of such a Plan. The members of the Steering Committee were: Steven Kazan, Mark Iola and John Cooney.

The Ad Hoc Committee selected the law firm of Montgomery, McCracken, Walker & Rhoads, LLP as its counsel, the firm of Frank Gecker LLP as its insurance experts, and the firm of Charter Oak Financial Consultants, LLC as its financial experts. The Ad Hoc Committee also retained Analysis Research Planning Corporation to act as his expert for the purpose of evaluating the Asbestos PI Claims against Leslie.

## 2.    The Pre-Petition Future Claimants' Representative.

In addition, to satisfy the requirements of section 524(g) of the Bankruptcy Code with regard to obtaining a channeling injunction, Leslie determined that it was necessary and appropriate to engage an independent third-party representative (the "Pre-Petition Future Claimants' Representative") for the purpose of protecting the rights of persons that might subsequently assert asbestos-related personal injury or wrongful death Claims against Leslie (or, derivatively, against CIRCOR or Watts arising out of Leslie's conduct or products).

Beginning in approximately November 2009, to further explore whether a Chapter 11 case was likely to provide the best means of quantifying and satisfying Leslie's asbestos-related liabilities, Leslie commenced a nationwide search for an individual to serve as the representative for the holders of future Demands alleging exposure to products containing asbestos distributed by Leslie. In conducting its search for possible candidates to serve as Future Claimants' Representative, Leslie focused on persons with reputations of high integrity and with recognized experience and expertise in dealing with mass torts, particularly asbestos, and who would not have any actual or perceived conflict of interest.

After that process, Leslie asked James L. Patton, Jr. whether he would be willing to serve as the Pre-Petition Future Claimants' Representative and, if appointed by the Court, as the Future Claimants' Representative, based on Mr. Patton's reputation for integrity, renown in the field of complex mass tort proceedings, and extensive experience with asbestos-related personal injury litigation. Specifically, since May 8, 2006, Mr. Patton has served as the Future Claimants' Representative in the Celotex Corporation asbestos-related bankruptcy case. In addition, Mr. Patton has represented the Future Claimants' Representatives in connection with asbestos-related

bankruptcy cases of Armstrong World Industries, Inc., Babcock & Wilcox Company, The Celotex Corporation, Federal-Mogul Global Inc., Kaiser Aluminum Corporation, Mid-Valley, Inc. (Halliburton), North American Refractories Company, Owens-Corning, Pittsburgh Corning Corporation, and USG Corporation.

Prior to assuming the role of Pre-Petition Future Claimants' Representative, Mr. Patton had no association or relationship with, or other connection to, Leslie or any affiliate of Leslie, and had never represented any plaintiff, defendant, or insurer in any asbestos-related litigation against Leslie.

Mr. Patton selected his law firm, Young Conaway Stargatt & Taylor LLP, as his counsel. Mr. Patton also retained Analysis Research Planning Corporation to act as his expert for the purpose of evaluating the Asbestos PI Claims against Leslie.

### 3.    Due Diligence and Plan Negotiations.

The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative, personally and/or through their various representatives, have conducted extensive due diligence concerning the background, nature, and scope of Leslie's liability for Asbestos PI Claims. This investigation has included, among other things, careful review of the facts concerning Leslie's historical involvement with asbestos; the nature and extent of past and pending asbestos litigation against Leslie, including the types of claims asserted and the legal issues raised; the projected value of present and future Asbestos PI Claims; and the extent to which insurance and other Leslie assets may be available to satisfy these liabilities in whole or in part. The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative have also examined the potential for recovery by claimants asserting asbestos-related Claims against CIRCOR and Watts, and their affiliates, based upon a variety of legal theories, including derivative liability theories such as alter ego, successor liability, and/or fraudulent conveyance.

That due diligence process included the review of many thousands of pages of documents and electronic files relating to Leslie, CIRCOR, and Watts. In addition, Leslie and CIRCOR provided written responses to all of the numerous information requests prepared by the Ad Hoc Committee and the Pre-Petition Future Claimants' Representative. The Ad Hoc Committee and the Pre-Petition Future Claimants' Representative have also reviewed the sworn declarations of a number of current and former Leslie and CIRCOR employees concerning the relationship between Leslie, CIRCOR, and Watts. Finally, Leslie and CIRCOR have provided detailed presentations to the Ad Hoc Committee and the Pre-Petition Future Claimants' Representative on relevant factual and legal issues.

Following the extensive due diligence process described above, representatives of Leslie, representatives of CIRCOR, the Ad Hoc Committee, and the Pre-Petition Future Claimants' Representative spent considerable time negotiating over the terms of a possible Plan of Reorganization for Leslie. These negotiations addressed all of the material provisions of the Plan, including without limitation the funding for the Trust to be established by the Plan, the contributions to be made by Leslie and CIRCOR, the terms of the Channeling Injunction, the issues relating to insurance coverage, and the indemnification provisions. Ultimately, Leslie, CIRCOR, the Ad Hoc Committee, and the Pre-Petition Future Claimants' Representative

11

reached an agreement on the terms for a proposed Plan of Reorganization for Leslie Controls. For a detailed description of those terms, please see the summary of the Plan provided at the beginning of this Disclosure Statement.

**IV. SOLICITATION OF HOLDERS OF ASBESTOS PI CLAIMS; CONFIRMATION HEARING**

**A.      Solicitation of Holders of Asbestos PI Claims.**

In soliciting votes for the Plan pursuant to this Disclosure Statement, the Debtor, through Epiq, will send a solicitation package (including either a Master Ballot or an Individual Ballot as described below, each, a "Ballot") to either (i) each lead law firm of record on behalf of a holder of an Asbestos PI Claim or (ii) directly to holders of Class 4 Asbestos PI Claims.  The solicitation will commence within five (5) business days of Court approval of this Disclosure Statement.

The Claims and Balloting Agent will send a solicitation package (the "Attorney Solicitation Package") to lead counsel (each a "Lead Law Firm") who have filed suit in the tort system on behalf of a holder of an Asbestos PI Claim.  The Attorney Solicitation Package will include:

> (a)      the Disclosure Statement (to which the Plan is annexed as an exhibit);
>
> (b)      a master ballot (the "Master Ballot");
>
> (c)      a preaddressed return envelope;
>
> (d)      a letter the Future Claimants' Representative and the Asbestos Claimants Committee urging claimants to vote to accept the Plan (the "Recommendation Letter");
>
> (e)      a cover letter describing the contents of the solicitation package (the "Cover Letter"); and
>
> (f)      a slip sheet listing all of the claimants represented by each applicable Lead Law Firm.

In addition to the Attorney Solicitation Packages, the Claims and Balloting Agent will send solicitation packages directly to the holders of Class 4 Asbestos PI Claims who either contact Leslie or the Claims and Balloting Agent directly or refuse to grant their counsel permission to vote on their behalf, (the "Individual Solicitation Package") that will include:

> **(a)**      the Disclosure Statement (to which the Plan is annexed as an exhibit);
>
> (b)      an individual ballot for voting a Class 4 Claim (the "Individual Ballot");

12

(c)    a preaddressed return envelope;

(d)    a Recommendation Letter; and

(e)    a Cover Letter.

If the holder of a Class 4 Asbestos PI Claim has not formally asserted a Leslie Asbestos PI Claim, a Derivative Liability Asbestos PI Claim or an Indirect Asbestos PI Claim in state or federal court by the Voting Record Date then any Master Ballot or Individual Ballot submitted must contain both medical and exposure evidence sufficient, in the discretion of the Debtor and the Asbestos Claimants Committee, to provide prima facie evidence of the merits of such claim; provided, however, that the Debtor and the Asbestos Claimants Committee reserve their respective rights to request additional medical and/or exposure evidence in their sole discretion after a Master Ballot or Individual Ballot is submitted.

In an additional effort to ensure that all individuals and counsel representing clients with Asbestos PI Claims are given the opportunity to request solicitation packages, Leslie will publish a notice of the solicitation in the following publications: *Wall Street Journal (National Edition); USA Today (National Edition); Mealey's Litigation Report: Asbestos; and Mealey's Litigation Report: Asbestos Bankruptcy.* Affidavits of such publication will be filed with the Court.

In a further effort to maximize notice and ensure that the solicitation process is as transparent as possible, Leslie will make the Disclosure Statement available in electronic format on a the following information website (http://dm.epiq11.com/lesliecontrols) created by Epiq as well as on Leslie's website (http://www.lesliecontrols.com/) and CIRCOR's website (http://www.circor.com/).

As clearly stated on the Individual Ballots and Master Ballots, in order to be counted, completed ballots must be received by the Claims and Balloting Agent by **September 27, 2010 at 5 p.m. prevailing Eastern time (the "Voting Deadline")**. Accordingly, claimants and their counsel will be given not less than 32 days from the mailing of the Disclosure Statement to vote.

Leslie believes that it will solicit votes on its Plan from substantially all holders of Asbestos PI Claims in Class 4 by its distribution of the Individual Solicitation Packages and Attorney Solicitation Packages. The Debtor does not believe there is need for any further solicitation of votes on the Plan.

If you are the holder of a Claim who is entitled to vote, but you did not receive a Ballot, or if your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact Epiq at:

> Epiq Bankruptcy Solutions, LLC
> FDR Station, P.O. Box 5015
> New York, NY 10150-5014
> Telephone: (646) 282-2400
> Attention: Leslie Controls Ballot Processing Center

46392/0001-6246827v15

**B.      Confirmation of the Plan.**

      **1.      Confirmation Hearing.**

      To confirm the Plan, the Bankruptcy Court must hold a hearing to determine whether the Plan meets the requirements of the Bankruptcy Code (the "Confirmation Hearing").  The Bankruptcy Court has scheduled the Confirmation Hearing for **October 12, 2010 at 11:00 a.m., prevailing Eastern time.**  The Confirmation Hearing will be held at the United States Bankruptcy Court, 844 King Street, Wilmington, DE 19801 before the Honorable Christopher S. Sontchi.  The Confirmation Hearing may be continued from time to time and day to day without further notice.  If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order.

      **2.      Objections to Confirmation.**

      Any party in interest may object to confirmation of the Plan and appear at the Confirmation Hearing.  The Bankruptcy Court has set **September 27, 2010 at 4:00 p.m. prevailing Eastern time as the deadline (the "Objection Deadline")** for filing and serving objections to the Plan.

      Any objection to confirmation of the Plan must be in writing and must be filed with the Bankruptcy Court and served on the parties below so as to be actually received by the Objection Deadline:

**Counsel for the Debtor**

      Cole, Schotz, Meisel, Forman & Leonard, P.A.
      500 Delaware Avenue, 1410
      Wilmington, DE 19801
      Attention:  Norman L. Pernick
                 Marion M. Quirk
      Telephone:  302-652-3131
      Facsimile:  302-652-3117

**Counsel for the Asbestos Claimants Committee**

      Natalie D. Ramsey, Esq.
      Montgomery, McCracken, Walker & Rhoads LLP
      1105 North Market Street
      15th Floor
      Wilmington, DE  19801

46392/0001-6246827v15

**Counsel for the Future Claimants' Representative**

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19801
Attention: Edwin J. Harron
Telephone:  302-571-6600
Facsimile:  302-571-1253

**Counsel for CIRCOR**

Goodwin Procter LLP
901 New York Avenue, NW
Washington, DC 20001
Attention:  William R. Hanlon
              Richard M. Wyner
Telephone:  (202) 346-4000
Facsimile:  (202) 346-4444

**Office of the United States Trustee**

United States Trustee
844 King Street, Room 2207
Wilmington, DE  19899-0035
Attention: David Klauder
Telephone:  302-573-6491

UNLESS AN OBJECTION IS TIMELY SERVED AND FILED, IT MAY NOT BE
CONSIDERED BY THE BANKRUPTCY COURT.

## V. EVENTS DURING THE CHAPTER 11 CASE

**A.      First Day Motions/Applications Filed.**

On the Commencement Date, the Debtor filed various motions and applications for relief
designed to minimize disruptions of business operations and to facilitate its reorganization.
These included, but are not limited to, those described below.

**1.      Preliminary Injunction Motion.**

In order to prevent asbestos claimants from pursuing Asbestos PI Claims against
CIRCOR or the CIRCOR Protected Parties or Watts or the Watts Protected Parties during the
pendency of the Chapter 11 Case that are derivative of Asbestos PI Claim against Leslie, which
would threaten the feasibility of the Plan, on the Commencement Date, Leslie commenced an
adversary proceeding by filing a complaint for declaratory and injunctive relief and filed a
motion in that adversary proceeding pursuant to sections 105(a) and 362(a) of the Bankruptcy
Code for (i) a preliminary injunction enjoining the commencement or continuation of any and all

Derivative Liability Asbestos PI Claims; and (ii) a temporary restraining order pending a hearing on the motion for a preliminary injunction.

The Bankruptcy Court entered a temporary restraining order, Docket No. 46, which enjoined asbestos related claims against the parties described above on an interim basis, and scheduled a hearing on the motion for a preliminary injunction for August 9, 2010, on notice to all relevant parties. After an evidentiary hearing on August 9, 2010, the Bankruptcy Court entered an order granting a preliminary injunction, Docket No. 138, which prevented all parties from taking any action with regard to any and all Derivative Liability Asbestos PI Claims against the parties described above for the period through the earlier of (i) thirty days after the effective date of a confirmed plan of reorganization that is no longer subject to appeal or discretionary review or (ii) 120 days after entry of the order granting the preliminary injunction, subject to the Debtor's right to request an extension.

## 2.    Motion for Authority to List Addresses of Counsel for Asbestos Claimants in the Creditor Matrix in Lieu of Creditors' Addresses.

The Debtor requested entry of an order authorizing it to list the addresses for counsel to the asbestos claimants in the creditors' matrix in lieu of the creditors' addresses. There are approximately 1340 asbestos claimants. While the Debtor knows the names of these claimants and the attorneys who represent them in pending asbestos litigation, the Debtor is not aware of the addresses for each of the asbestos claimants since this information is not readily available. The time and expense of trying to locate the correct address of the asbestos claimants or their respective representatives would be significant. In many cases, the Debtor would not be able to verify that the address it located is in fact correct for the particular asbestos claimant. Prior to the Commencement Date, the Debtor was able to determine the name and address for the attorneys representing the asbestos claimants in pending asbestos litigation by reviewing pleadings filed in each respective litigation. The Debtor sought to list the addresses for counsel to the claimants on the matrix instead of the asbestos claimants' addresses. The Order approving the requested relief can be found at Docket Number 31 in this Chapter 11 Case.

## 3.    Motion to Continue Using Existing Cash Management System.

On the Commencement Date, the Debtor sought the authority to continue using its existing cash management system, bank accounts and business forms and to follow its internal investment and deposit guidelines in accordance with its current business practices. Absent the Bankruptcy Court's authorization of the continued use of the cash management system, the Debtor's business operations would be impeded to the detriment of its estates and its creditors.

Continued use of the existing cash management system will facilitate the Debtor's smooth and orderly transition into Chapter 11, minimize the disruption of its business while in Chapter 11 and expedite its emergence from Chapter 11. As a result of set up time and expenses, requiring the Debtor to adopt and implement a new cash management system would likely increase the costs of the Chapter 11 Case. For the same reasons, requiring the Debtor to cancel its existing bank accounts and establish new accounts or requiring the Debtor to create new business forms would only frustrate the Debtor's efforts to reorganize expeditiously. The Order approving the requested relief can be found at Docket Number 40 in this Chapter 11 Case.

46392/0001-6246827v15

4.    **Motion to Approve Debtor in Possession Financing and Authorize Continued Use of Cash Collateral.**

On the Commencement Date, the Debtor also sought authority to enter into the DIP Agreement and to continue to use the cash collateral (as that term is defined in section 363(a) of the Bankruptcy Code) held by the Debtor to fund the Debtor's working capital needs for the duration of the Chapter 11 Case. A summary of the salient terms of the DIP Agreement is set forth in Section V.B. hereof. An order approving the DIP Agreement and the use of Cash Collateral on an interim basis can be found at Docket Number 41 in this Chapter 11 Case. On August 9, 2010, the Bankruptcy Court held a further hearing on the relief requested by the Debtor. An order approving the DIP Agreement and the use of Cash Collateral on a final basis can be found at Docket Number 124 in this Chapter 11 Case.

5.    **Motions for Authority to Honor Prepetition Obligations to Customers, Critical Vendors, Taxing Authorities, Shippers and Lien Claimants.**

The Debtor has pre-petition obligations to various third parties, including customers, "critical" vendors, priority claimants, taxing authorities, and shippers and other lien claimants. The Debtor believes that the continuation of its positive relationships with such parties are imperative to its continued business operations and reorganization efforts, and that payment of such obligations in the ordinary course of business are essential to preserve and enhance the value of the Debtor's estate.

Accordingly, on the Commencement Date, the Debtor requested that the Bankruptcy Court exercise its equitable powers and authorize the Debtor to pay its pre-petition obligations to certain customers, critical vendors, priority claimants, taxing authorities, and shippers and other lien claimants, subject to certain caps on these amounts and in some cases on an interim and then final basis. The Orders approving the requested relief can be found at Docket Numbers 33, 34, 41, 43, 120, and 123 in this Chapter 11 Case.

6.    **Motion for Authority to Pay Prepetition Employee Wages and Salaries and Associated Benefits.**

The Debtor believes that it has valuable assets in its work force, and that any delay in paying prepetition compensation or benefits to its employees, independent contractors and temporary workers would significantly jeopardize the Debtor's relationships with employees, independent contractors and temporary workers and irreparably harm morale at a time when the need for continued dedication, confidence, and cooperation of the Debtor's employees, independent contractors and temporary workers is most critical. Accordingly, on the Commencement Date, the Debtor sought the authority to pay compensation and benefits which were accrued but unpaid as of the Commencement Date. The Order approving the requested relief can be found at Docket Number 32 in this Chapter 11 Case.

17

**B.    Debtor in Possession Financing.**

The Debtor entered into the DIP Agreement, the principal terms of which are summarized below.[5]

| SUMMARY OF DIP FACILITY | |
|---|---|
| **Borrower** | Leslie Controls, Inc. |
| **DIP Lender** | CIRCOR |
| **DIP Agreement** | Revolving credit facility in an amount not to exceed an aggregate principal amount at any time outstanding not to exceed U.S. $10,000,000, which amount may be increased with the consent of CIRCOR and the Court.  Amounts may be borrowed, repaid and re-borrowed until the earlier to occur of: (a) the date the Plan becomes effective (the "Effective Date"); (b) November 15, 2010, which date may be extended with the written consent of CIRCOR in its sole discretion, and (c) the date of termination in whole of all of CIRCOR's commitment to lend under the Postpetition Credit Agreement. |
| **Interest** | Interest computed on the average of all daily Net Revolver Advances in a calendar month shall accrue at a rate equal the 3-month London Interbank Offered Rate (as such rate is in effect on the last business day of each calendar month) +350bps.  Interest will be paid monthly in arrears. |
| **Security and Priority** | CIRCOR will be granted a superpriority administrative expense claim in this Chapter 11 Case and a first priority lien on and security interest in substantially all of the Debtor's assets, excluding rights in insurance policies and avoidance actions and subject to the expenses described in "Carve-Out Expenses". |

---

[5] In the case of any inconsistency between this summary and the DIP Agreement, the terms of the DIP Agreement shall control.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the DIP Agreement.

46392/0001-6246827v15

| SUMMARY OF DIP FACILITY | |
|---|---|
| **Use of Proceeds** | Revolver Advances shall be used to satisfy ordinary course business expenses (including, without limitation, payment of compensation to employees), expenses for the administration and prosecution of this Chapter 11 Case (including, without limitation, payment of professional fees and expenses), and payment of any other contractual, legal or other obligations of the Debtor, all consistent with the provisions of the DIP Orders. Borrowings net of repayments may not be used, without CIRCOR's prior written consent, to pursue any action challenging CIRCOR's liens or claims arising under the DIP Agreement or seeking to increase CIRCOR's obligations under the Plan or certain other circumstances. |
| **Events of Default** | •     The Debtor shall fail to pay any amount payable within fifteen (15) business days of being due;<br><br>•     The Debtor shall fail to perform or observe any covenant, which failure remains unremedied for at least ten (10) consecutive business days after CIRCOR provides notice thereof;<br><br>•     The Debtor shall fail to adhere to the Cash Budget, inclusive of the Permitted Variance, or otherwise use proceeds of borrowings under the Revolving Credit Facility other than as described in "Use of Proceeds" above without CIRCOR's prior written consent;<br><br>•     Any representation or warranty made by the Debtor proves incomplete, false or misleading in any material respect;<br><br>•     The Debtor withdraws or modifies the Plan in any manner materially adverse to CIRCOR without CIRCOR's consent;<br><br>•     The Plan does not become confirmed by October 15, 2010 or does not become effective by November 15, 2010, provided such dates may be extended with the written consent of CIRCOR; and<br><br>•     The Debtor fails to diligently prosecute this Chapter 11 Case in any material respect. |

**C.  Additional Motions and Applications Filed.**

Shortly after the Commencement Date, the following motions and applications were filed.

19

1.     **Applications for Retention of Cole Schotz, Retention of Day Seckler LLP, Retention of Dickstein Shapiro, and Appointment of James L. Patton, Jr. as the Future Claimants' Representative.**

The Debtor sought to retain the law firm of Cole, Schotz, Meisel, Forman & Leonard, P.A. ("Cole Schotz"), as bankruptcy counsel for the Debtor, to represent the Debtor and assist the Debtor in connection with the Chapter 11 Case. Cole Schotz has been intimately involved with the negotiation and development of the Plan and preparation of the "first day" pleadings filed with the Bankruptcy Court. An order approving the Debtor's retention of Cole Schotz can be found at Docket No. 118 in this Chapter 11 Case. The Debtor also sought the employment and retention of Day Seckler LLP and certain employees thereof, including G. Wayne Day as Chief Restructuring Officer of the Debtor. Mr. Day was involved with bankruptcy planning. An order approving the Debtor's employment and retention of Day Seckler can be found at Docket No. 119 in this Chapter 11 Case. In addition, the Debtor sought to retain the law firm of Dickstein Shapiro LLP ("Dickstein"), as asbestos insurance counsel for the Debtor. Dickstein has been involved in negotiations with holders of Asbestos PI Insurance Contracts and the development of the Plan. An order approving the Debtor's retention of Dickstein can be found at Docket No. 117 in this Chapter 11 Case. The Debtor also sought to appoint James L. Patton, Jr., Esq., as the Future Claimants' Representative. Mr. Patton was closely involved with the negotiation and development of the Plan. An order approving the appointment of Mr. Patton as the Future Claimants' Representative can be found at Docket No. 130 in this Chapter 11 Case. Mr. Patton sought to retain the law firm of Young Conaway Stargatt & Taylor, LLP to represent him as the Future Claimants' Representative in connection with this Chapter 11 Case. An order approving Mr. Patton's retention of counsel can be found at Docket No. 131 in this Chapter 11 Case. Mr. Patton sought to retain Analysis, Research, and Planning Corporation ("ARPC") as the Future Claimants' Representative's claims evaluation consultants. An order approving the retention of ARPC can be found as Docket No. 132.

D.     **Appointment of Asbestos Claimants Committee and Retention of Counsel.**

On July 22, 2010, the Office of the United States Trustee appointed an Official Commitee of Unsecured Creditors (the "Asbestos Claimants Committee") consisting of the following nine members: Brayton Purcell, LLP, Belluck & Fox, LLP, Bergman Draper & Frockt, Cooney & Conway, Early Ludwick Sweeney & Strauss, Kazan, McLain, Lyons, Greenwood & Harley, PLC, Motley Rice LLC, Waters & Kraus, LLP, and Weitz & Luxenberg, P.C. The Asbestos Claimants Committee selected the law firm of Montgomery, McCracken, Walker & Rhoads, LLP ("MMWR") as its counsel and subsequently filed an application to retain MMWR. In addition, the Asbestos Claimants Committee filed applications to retain Frank/Gecker LLP as its insurance counsel and Legal Analysis Systems, Inc. ("LAS") as its consultant on the valuation of asbestos liabilities. Furthermore, the Asbestos Claimants Committee and Future Claimants' Representative filed a joint application to retain Charter Oak Financial Consultants, LLC ("Charter Oak") as their financial advisor. On or about August 16, 1010, the Bankruptcy Court approved the retention of MMWR [Docket No. 159], Frank/Gecker LLP [Docket No. 157], LAS [Docket No. 156], and Charter Oak [Docket No. 158].

**E.**    **Motion for Authority to Pay Prepetition Claims of Certain Creditors in the Ordinary Course of Business.**

On July 23, 2010, the Debtor filed a Motion for an Order Authorizing the Payment of Prepetition Claims of Certain Creditors in the Ordinary Course of Business (the "Pay All Motion") [Docket No. 74]. Pursuant to the Pay All Motion, the Debtor sought authorization to pay, in its discretion, certain Accounts Payable Claims, Shipping Claims, and Employee/Independent Contractor Claims (all as defined in the Pay All Motion) in the ordinary course of business. On August 11, 2010, the Bankruptcy Court entered an order (the "Pay All Order") [Docket No. 121] approving the Pay All Motion, subject to an aggregate cap of $556,000.

**F.**    **Solicitation Procedures Motion.**

The Debtor filed a motion requesting the entry of an order (a) approving the adequacy of this Disclosure Statement; (b) fixing a record date for voting and procedures for filing objections to the Plan and the temporary allowance of claims; (c) approving the solicitation packages and procedures for same; (d) approving the forms of Ballots and establishment of procedures for voting on the Plan; and (e) scheduling a Confirmation Hearing and approving notice and procedures for objecting to confirmation. The Order approving the Solicitation Procedures was entered as Docket Number 166 in this Chapter 11 Case.

Leslie does not anticipate a protracted Chapter 11 Case. Within five (5) days of Bankruptcy Court approval of this Disclosure Statement, the Debtor, through Epiq, will begin solicitation of the holders of Claims entitled to vote on the Plan. The Debtor anticipates that the Confirmation Hearing will be held within approximately ninety days of the Commencement Date.

## VI. TREATMENT OF HOLDERS OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, WHICH ACCOMPANIES THIS DISCLOSURE STATEMENT, AS EXHIBIT ATTACHED HERETO, AND THE PLAN SUPPLEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN WILL CONTROL THE TREATMENT OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTOR UNDER THE PLAN AND WILL, UPON THE EFFECTIVE DATE, BE BINDING

UPON HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR, THE REORGANIZED DEBTOR, AND OTHER PARTIES IN INTEREST.  IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

## A.    Classification and Treatment Of Claims And Interests.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1122 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than the DIP Claim, Administrative Claims and Priority Tax Claims, which, pursuant to section 1123(a)(1), do not need to be classified).  The Debtor also is required, under section 1122 of the Bankruptcy Code, to classify Claims against and Interests in the Debtor into Classes that contain Claims and Interests that are substantially similar to the other Claims and Interests in such Class.

The Debtor believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law, but it is possible that a holder of a Claim or Interest may challenge the Debtor's classification of Claims and Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  In that event, the Debtor intends, to the extent permitted by the Bankruptcy Code, the Plan, and the Bankruptcy Court, to make such reasonable modifications of the classifications under the Plan to permit confirmation and to use the Plan acceptances received for purposes of obtaining the approval of the reconstituted Class or Classes of which each accepting holder ultimately is deemed to be a member.  Any such reclassification could adversely affect the Class in which such holder initially was a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan.

The amount of any Impaired Claim that ultimately is allowed by the Bankruptcy Court may vary from any estimated allowed amount of such Claim and, accordingly, the total Claims ultimately allowed by the Bankruptcy Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class.  Thus, the value of the property that ultimately will be received by a particular holder of an Allowed Claim under the Plan may be adversely (or favorably) affected by the aggregate amount of Claims ultimately allowed in the applicable Class.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized below.  The Debtor believes that the consideration, if any, provided under the Plan to holders of Claims and Equity Interests reflects an appropriate resolution of their Claims and Equity Interests, taking into account the differing nature and priority (including applicable contractual and statutory subordination) of such Claims and Equity Interests and the fair value of the Debtor's assets.  Although the Debtor believes that the Plan can be confirmed under section 1129(b), there can be no assurance that the Bankruptcy Court will find that the requirements to do so have been satisfied.

22

1.    **Description and Treatment Of Unclassified Claims Under The Plan.**

(a)    DIP Claim

Except to the extent that a holder of an Allowed DIP Claim agrees to a different treatment, each Allowed DIP Claim shall be paid in full in Cash on the Effective Date.

(b)    Administrative Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a different treatment, or as otherwise provided for in the Plan, in full satisfaction, settlement and discharge of and in exchange for such Claims, Leslie or Reorganized Leslie will pay each Allowed Administrative Expense Claim in full and in Cash on, or as soon thereafter as is reasonably practicable, the latest of: (a) the Effective Date; (b) the first Business Day after the date that is thirty (30) calendar days after the date the Administrative Expense Claim becomes an Allowed Administrative Expense Claim; and (c) the date the Allowed Administrative Expense Claim becomes due and payable according to its terms; provided  however, that the Allowed Administrative Expense Claims representing liabilities incurred by the Debtor in Possession in the ordinary course of business or liabilities under loans or advances to or other obligations incurred by the Debtor in Possession may be paid by Leslie in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Reorganized Leslie, in its sole and absolute discretion, may settle Administrative Expense Claims in the ordinary course of business without further Bankruptcy Court approval. Leslie or Reorganized Leslie will have the right to object to any Administrative Expense Claim by the later of: (a) 180 days after the Effective Date, subject to such extensions as may be granted from time to time by the Bankruptcy Court; and (b) 30 days after the date such Administrative Expense Claim is filed.  Unless Leslie or Reorganized Leslie timely objects to an Administrative Expense Claim, such Claim will be deemed Allowed in the amount requested.  In the event that Leslie or Reorganized Leslie timely objects to an Administrative Expense Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Expense Claim should be Allowed and, if so, in what amount.

All entities seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330 or 503 of the Bankruptcy Code will (a) file, on or before the deadline specified in the Confirmation Order, their respective applications for final allowance of compensation for services rendered and reimbursement of expenses incurred; and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (i) upon the later of (A) the Effective Date and (B) the first Business Day after the date that is thirty (30) calendar days after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; or (ii) upon such other terms as may be mutually agreed upon by such holder and Reorganized Leslie. Reorganized Leslie is authorized to pay compensation for Professional services rendered and

23

reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without the need for Bankruptcy Court approval.

        (c)      Priority Tax Claims

Priority Tax Claims are essentially the unsecured Claims of federal and state governmental authorities for the kinds of taxes specified in section 507(a)(8) of the Bankruptcy Code, such as certain income taxes, property taxes, excise taxes, and employment and withholding taxes. These Unsecured Claims are given a statutory priority in right of payment. Leslie estimates that, on the Effective Date, the Allowed amount of such Claims will aggregate approximately $200,000.

Except to the extent that the holder of an Allowed Priority Tax Claim has been paid by Leslie prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Tax Claim, if any, will, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, receive in full satisfaction, settlement and discharge of and in exchange for such Allowed Priority Tax Claim, either of the following, at the sole and absolute discretion of Reorganized Leslie: (a) Cash in an amount equal to the unpaid portion of such Allowed Priority Tax Claim, on the later of: (i) the Effective Date; (ii) the date such Priority Tax Claim becomes an Allowed Claim, or as soon thereafter as is practicable; and (iii) the date such Allowed Priority Tax Claim becomes due and payable under applicable non-bankruptcy law; or (b) regular installment payments in Cash (i) of a total value, as of the Effective Date, equal to the allowed amount of such Priority Tax Claim; (ii) over a period ending not later than five (5) years after the Effective Date; and (iii) in a manner not less favorable than the most favored nonpriority General Unsecured Claim provided for by the Plan (other than cash payments made to a class of creditors under section 1122(b)).

## 2.      Treatment Of Classified Claims And Equity Interests.

        (a)      Other Priority Claims (Class 1)

Other Priority Claims include Claims that are granted priority in payment under section 507(a) of the Bankruptcy Code, such as certain wage, salary and other compensation obligations to employees of Leslie (up to a statutory cap of $10,950 per employee). Leslie estimates that on the Effective Date, the Allowed amount of such Priority Claims will aggregate approximately $93,000.

Except to the extent a holder of an Allowed Priority Claim has been paid prior to the Effective Date or agrees to a different treatment, each holder of an Allowed Priority Claim will receive in full satisfaction, settlement and discharge of and in exchange for such Priority Claim, Cash in an amount equal to the unpaid portion of such Allowed Priority Claim on or before the later of: (a) the Effective Date; and (b) the date the Priority Claim becomes an Allowed Priority Claim, or as soon thereafter as practicable. All Allowed Priority Claims not due and payable on or before the Effective Date will be paid in the ordinary course of business in accordance with the terms thereof.

Class 1 is Unimpaired under the Plan. Each holder of an Other Priority Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

46392/0001-6246827v15

(b)    Secured Claims (Class 2)

Class 2 consists of Allowed Secured Claims, which would include Claims arising under agreements and obligations of Leslie to the extent of the value of any security given by Leslie therefore, and obligations secured by statutory liens. Leslie estimates that on the Effective Date, the Allowed amount of Secured Claims will aggregate approximately $14.5 million.

Except to the extent a holder of a Secured Claim agrees to different treatment of that Claim, each holder of an Allowed Secured Claim will have such Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code such that the Claim is rendered Unimpaired. The failure of Leslie or any other party in interest to file an objection, prior to the Effective Date, with respect to any Secured Claim that is reinstated hereunder will be without prejudice to the rights of Reorganized Leslie or any other party in interest to contest or otherwise defend against such Secured Claim in an appropriate forum when and if such Secured Claim is sought to be enforced. Any amount that Leslie may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Allowed Secured Claim will be paid in full, in Cash, on, or as soon as practicable after, the later of (a) the Effective Date; (b) the date on which such Secured Claim becomes an Allowed Secured Claim; (c) the date such Secured Claim becomes due and payable according to its terms; or (d) such other date as mutually may be agreed to by and among the holder of such Secured Claim and Leslie or Reorganized Leslie. For the avoidance of doubt, Class 2 – Secured Claims includes the CIRCOR Secured Claim.

Class 2 is Unimpaired under the Plan. Each holder of a Secured Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(c)    General Unsecured Claims (Class 3)

Class 3 consists of Allowed General Unsecured Claims, which generally include the Claims of trade and other business creditors for goods and services provided to Leslie prior to the Commencement Date (including Claims of Leslie's legal counsel for unpaid services and expenses incurred prior to the Commencement Date), damage Claims arising from Leslie's rejection (if any) of executory contracts and unexpired leases, and non-asbestos personal injury and wrongful death-related Claims in respect of events occurring prior to the Commencement Date. Leslie estimates that on the Effective Date, the Allowed amount of General Unsecured Claims will aggregate approximately $1.6 million.

Except to the extent a holder of an Allowed General Unsecured Claim agrees to different treatment of that General Unsecured Claim, each holder of an Allowed General Unsecured Claim will have such General Unsecured Claim reinstated pursuant to section 1124(2) of the Bankruptcy Code such that the General Unsecured Claim is rendered Unimpaired and, as a result, such treatment leaves unaltered the legal, equitable, and contractual rights to which such Allowed General Unsecured Claim entitles the holder of such Claim. The failure of Leslie or any other party in interest to file an objection, prior to the Effective Date, with respect to any General Unsecured Claim that is reinstated hereunder will be without prejudice to the rights of Reorganized Leslie or any other party in interest to contest or otherwise defend against such General Unsecured Claim in an appropriate forum when and if such General Unsecured Claim is sought to be enforced. Any amount that Leslie may be required to pay pursuant to section

1124(2) of the Bankruptcy Code on account of any such reinstated Allowed General Unsecured Claim will be paid in full, in Cash, on, or as soon as practicable after, the latest of: (a) the Effective Date; (b) the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim; (c) the date such General Unsecured Claim becomes due and payable according to its terms; or (d) such other date as mutually may be agreed to by and among the holder of such General Unsecured Claim and Leslie or Reorganized Leslie.

Class 3 is Unimpaired under the Plan. Each holder of a General Unsecured Claim is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(d)     Asbestos PI Claims and Asbestos PI Trust Expenses (Class 4)

Asbestos PI Claims means each of the following:  (i) a Leslie Asbestos PI Claim (including a Liquidated Leslie Asbestos PI Claim); (ii) an Indirect Asbestos PI Claim; and (iii) a Derivative Liability Asbestos PI Claim.

As of the Effective Date, liability for all Asbestos PI Claims will automatically, and without further act, deed or court order, be channeled exclusively to and assumed by the Asbestos PI Trust in accordance with, and to the extent set forth in, Sections VII and VIII below, the applicable Plan Documents and the Confirmation Order.  Each Asbestos PI Claim will be resolved, after the Trust Distribution Effective Date, in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.  The Asbestos PI Trust will be funded in accordance with the provisions of Section 9.3 of the Plan.  The sole recourse of the holder of an Asbestos PI Claim on account of such Asbestos PI Claim will be to the Asbestos PI Trust and each such holder will have no right whatsoever at any time to assert its Asbestos PI Claim against any Asbestos Protected Party.

As of the Effective Date, liability for all Asbestos Trust Expenses will automatically, and without further act, deed or court order, be assumed by the Asbestos PI Trust and resolved in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement.

Class 4 is Impaired under the Plan.  Each holder of an Asbestos PI Claim will be entitled to vote to accept or reject the Plan to the extent and in the manner provided in Section XIII below and the Solicitation Procedures Order.

(e)     Intercompany Claims (Class 5)

Class 5 consists of the Claims of Affiliates against Leslie and of Leslie against Affiliates.

On or as soon as practicable after the Effective Date, all Intercompany Claims will either be reinstated to the extent determined to be appropriate by Leslie or Reorganized Leslie or adjusted, continued, or capitalized, either directly or indirectly, in whole or in part.  Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

Class 5 is Unimpaired under the Plan.  Each holder of an Intercompany is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

(f)    Equity Interests (Class 6)

Class 6 consists of Equity Interests in Leslie, all of which are held by CIRCOR.

On the Effective Date, the holder of Equity Interests in Leslie will retain its Equity Interests which will become Reorganized Leslie Common Stock as of the Effective Date. The Reorganized Leslie Common Stock will be pledged to the Asbestos PI Trust by CIRCOR pursuant to the Pledge Agreement and held by the Asbestos PI Trust until such time as the Leslie Promissory Note is paid in full.

Class 6 is Unimpaired under the Plan. The holder of the Equity Interests is deemed to have accepted the Plan and is therefore not entitled to vote to accept or reject the Plan.

## VII. DESCRIPTION OF THE ASBESTOS PI TRUST AND CONTRIBUTIONS BY LESLIE AND CIRCOR

### A.    The Asbestos PI Trust.

#### 1.    Creation of the Asbestos PI Trust.

On the Effective Date, the Asbestos PI Trust will be created in accordance with the Plan Documents, the Asbestos PI Trust Documents and section 524(g) of the Bankruptcy Code. The Asbestos PI Trust is intended to constitute a "qualified settlement fund" within the meaning of section 468B of the Internal Revenue Code and the regulations issued thereunder. The purpose of the Asbestos PI Trust will be to assume, Liquidate and, after the Trust Distribution Effective Date, resolve all liabilities determined to arise from or relate to the Asbestos PI Claims (whether existing as of the Effective Date or arising at any time thereafter) and, after the Trust Distribution Effective Date, to use the Asbestos PI Trust Assets to pay holders of Asbestos PI Claims in accordance with the terms of the Asbestos PI Trust Agreement, the Asbestos PI Trust Distribution Procedures, the Plan and the Confirmation Order, and in such a way as to provide reasonable assurance that the Asbestos PI Trust will value, and be in a financial position to pay, present Asbestos PI Claims and future Demands that involve similar claims in substantially the same manner, and to otherwise comply in all respects with the requirements of section 524(g)(2)(B) of the Bankruptcy Code. The Asbestos PI Trust will have no liability for any Claim other than an allowed Asbestos PI Claim, which shall be determined and, after the Trust Distribution Effective Date, paid in accordance with the terms, provisions and procedures of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures. On the Effective Date, all right, title and interest in and to the Asbestos PI Trust Assets and any proceeds thereof will be transferred to and vested in the Asbestos PI Trust, free and clear of all Claims, Demands, Equity Interests, Encumbrances and other interests of any Entity without any further action of the Bankruptcy Court or any Entity, but subject to the remaining provisions of Section 9.3 of the Plan.

#### 2.    Appointment of Asbestos PI Trustee.

The initial Trustee of the Asbestos PI Trust will be set forth in the Plan Supplement.

3.      **Appointment of Future Claimants' Representative.**

Contingent upon approval by the Bankruptcy Court, James L. Patton, Jr. will serve as the Future Claimants' Representative.

4.      **Appointment of Asbestos PI Trust Advisory Committee Members.**

The initial members of the Asbestos PI Trust Advisory Committee will be those persons designated in the Confirmation Order.

5.      **Claims Review.**

From and after the Effective Date, the Asbestos PI Trust may retain such third-party claims reviewers as the Asbestos PI Trustee and the Future Claimants' Representative deem appropriate to review and Liquidate (but not pay until the Trust Distribution Effective Date) all Asbestos PI Claims submitted to the Asbestos PI Trust in accordance with the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.

6.      **Limitation on Incurrence of Costs Prior to Trust Distribution Effective Date.**

During the period on and after the Effective Date but prior to the Trust Distribution Effective Date, the Asbestos PI Trust shall not incur costs (defined broadly to include all obligations, including salaries, disbursements, expenses, and all other costs) in an aggregate total amount greater than $500,000.

7.      **Payment of Asbestos PI Claims.**

Prior to the Trust Distribution Effective Date, the Asbestos PI Trust will not pay any Asbestos PI Claims. After the Trust Distribution Effective Date, the Asbestos PI Trust will pay Asbestos PI Claims that have been determined to be payable pursuant to the provisions governing the Asbestos PI Trust.

8.      **Contributions to the Asbestos PI Trust.**

As described more fully below, on the Effective Date, Reorganized Leslie and CIRCOR will make the Leslie Contribution and the CIRCOR Asbestos PI Trust Contribution, respectively, to the Asbestos PI Trust.

9.      **Leslie Promissory Note.**

On the Effective Date, as part of the Leslie Contribution, Reorganized Leslie will execute and deliver to the Asbestos PI Trust the Leslie Promissory Note. As security for the Leslie Promissory Note, on the Effective Date, CIRCOR will execute and deliver to the Asbestos PI Trust the CIRCOR Pledge.

46392/0001-6246827v15

10. **Transfer of Claims and Demands to the Asbestos PI Trust.**

On the Effective Date, all liabilities, obligations, and responsibilities relating to all Asbestos PI Claims and Demands will be transferred and channeled to the Asbestos PI Trust and will be satisfied solely by the assets held by the Asbestos PI Trust. For more information about the Asbestos PI Channeling Injunction, see Article VIII.E.7 below. The Asbestos PI Trust will have no liability for any Claims other than Asbestos PI Claims and no Claims other than Asbestos PI Claims will be transferred and channeled to the Asbestos PI Trust.

11. **Discharge of Liabilities to Holders of Asbestos PI Claims.**

The transfer to, vesting in, and assumption by the Asbestos PI Trust of the Asbestos PI Trust Assets, on or after the Effective Date, as contemplated by the Plan, and the occurrence of the Trust Distribution Effective Date will, among other things, discharge all obligations and liabilities of all Asbestos Protected Parties for and in respect of all Asbestos PI Claims as of the Trust Distribution Effective Date.

12. **Indemnification by the Asbestos PI Trust.**

As and to the extent provided in the Asbestos PI Trust Indemnification Agreement, the Asbestos PI Trust will indemnify and hold harmless each of the following Entities for any liability, or alleged liability, arising out of, or resulting from, an Asbestos PI Claim: (a) Leslie and Reorganized Leslie; (b) any CIRCOR Related Parties; (c) any Watts Related Parties; and (d) any current or former Representative of any of the above, in their capacities as such.

13. **Investment Policy.**

Prior to the Trust Distribution Effective Date, except as otherwise authorized by prior written consent of each of the Asbestos PI Trustee, the Asbestos PI Trust Advisory Committee, the Future Claimants' Representative and CIRCOR, funds will be invested in money market funds (a) the managers of which have a long term issuer rating of at least Aa3 or AA-, respectively, by Moody's Investor Services and Standard & Poor's, and (b) that invest exclusively in securities that (i) are issued by the United States Treasury or are directly and fully guaranteed or insured by the United States Government or any agency or instrumentality thereof, (ii) have maturities of not more than three (3) years from the date of acquisition, and (iii) are rated Aaa and AAA, respectively, by Moody's Investor Services and Standard & Poor's. After the Trust Distribution Effective Date, investment of monies held in the Asbestos PI Trust shall be administered in the manner consistent with the standards set forth in the Uniform Prudent Investor Act drafted by the National Conference of Commissioners on Uniform State Laws and approved by the American Bar Association on February 14, 1995, subject to such limitations and provisions as set forth in the Asbestos PI Trust Agreement.

14. **Books and Records.**

On the Effective Date, the Asbestos Records Cooperation Agreement will become effective and the Asbestos Records will be treated in accordance therewith.

### 15.    Injunction.

Notwithstanding any other provision of the Plan or the Confirmation Order that might be construed to be to the contrary, the Asbestos PI Trust is hereby prohibited and permanently enjoined from seeking to recover (on its own behalf or on behalf of its beneficiaries) from any Settling Insurer any insurance coverage provided by the Settling Insurer that has been released by Leslie or by CIRCOR pursuant to a settlement agreement, including the settlement agreements listed in Exhibit F to the Plan.

### 16.    Preservation of Insurance Claims.

The discharge, release, exculpation and indemnification of the Released Parties pursuant to the Plan will neither diminish nor impair the enforceability of any Asbestos PI Insurance Contract. The Asbestos PI Trust is, and shall be deemed to be for all purposes, including, but not limited to for purposes of insurance and indemnity, the successor to Leslie in respect of all Asbestos PI Claims. An Asbestos PI Claim determined to be payable pursuant to the provisions governing the Asbestos PI Trust will be, and will be deemed to be a judgment against the Asbestos PI Trust (as successor for all purposes to the liabilities of Leslie in respect of Asbestos PI Claims) to be liquidated by the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures.

### 17.    Failure of Trust Distribution Effective Date.

If the Confirmation Order is vacated, modified, or reversed after its affirmance or issuance by the District Court, then the Debtor, CIRCOR, Asbestos Claimants Committee and the Future Claimants' Representative will negotiate in good faith to determine if they can agree upon a modified Plan acceptable to all such parties. If the parties are unable to do so within 90 days from the date of such vacating, modification, or reversal of the Confirmation Order (which period may be extended by the agreement of the Debtor, CIRCOR, Asbestos Claimants Committee, and Future Claimants' Representative, filed with the Bankruptcy Court), then the following shall thereupon occur:

>    (a)    The Asbestos PI Trust will immediately return the Leslie Promissory Note to Leslie;

>    (b)    The Pledge Agreement will be null and void:

>    (c)    The Asbestos PI Trust will immediately transfer all of its assets to CIRCOR, except for the Leslie Promissory Note which will be returned to Leslie;

>    (d)    All rights and interests relating to insurance previously transferred by the Debtor to the Asbestos PI Trust will immediately and automatically revert to the Debtor; and

(e)     The Asbestos PI Trust will immediately thereafter be dissolved and its determinations with respect to any Asbestos PI Claims will be deemed void.

**B.      Description of the Consideration Contributed to the Asbestos PI Trust.**

Leslie and CIRCOR will contribute to the Asbestos PI Trust the following assets on the Effective Date:

**1.      The Leslie Contribution to the Asbestos PI Trust.**

Pursuant to the Plan, on or after the Effective Date, Reorganized Leslie will provide the following to the Asbestos PI Trust (the "Leslie Contribution"):

(a)     the Leslie Promissory Note; and

(b)     an assignment of any and all rights of Leslie:

(i) to proceeds under existing insurance policies that provide coverage for Asbestos Personal Injury Claims; and

(ii) to $2,625,000 of the proceeds of the Insurance Settlement Agreement between Leslie and Continental Casualty Company dated April 19, 2010, plus the proceeds, if any, of any other Insurance Settlement Agreement that were received by Leslie on or after January 1, 2010.

**2.      The CIRCOR Contribution to the Asbestos PI Trust.**

Prior to the commencement of the Chapter 11 Case, Leslie engaged in intensive negotiations with CIRCOR, the Ad Hoc Committee and the Pre-Petition Future Claimants' Representative regarding the scope, nature, and extent of the contribution to be made by CIRCOR under the Plan. Those discussions ultimately resulted in CIRCOR's agreement to, among other things, contribute, on behalf of the CIRCOR Related Parties and the Watts Related Parties, to the Asbestos PI Trust, in return for the benefits received under the Plan (the "CIRCOR Asbestos PI Trust Contribution"), the following contributions, on the Effective Date:

(a)     the CIRCOR Cash in the amount of $74 million; and

(b)     the CIRCOR Pledge of 100% of the outstanding voting equity interests in Reorganized Leslie pursuant to the Pledge Agreement as security for the Leslie Promissory Note.

Leslie, the Ad Hoc Committee, and the Pre-Petition Future Claimants' Representative each determined that the CIRCOR Asbestos PI Trust Contribution not only is a fair compromise in exchange for the CIRCOR Related Parties and the Watts Related Parties obtaining protection and releases under Plan, including as part of the Asbestos PI Channeling Injunction, but that it also maximize the value of Leslie's available assets for the benefit of Leslie and all of its current claimants and future Demand holders.

### 3.    The Leslie Promissory Note and the Pledge Agreement.

Reorganized Leslie and the Asbestos PI Trust will execute the Leslie Promissory Note which provides for the payment of a principal amount of $1 million, with interest, payable in equal quarterly installments. As security for the Leslie Promissory Note, on the Effective Date CIRCOR, Reorganized Leslie, and the Asbestos PI Trust will also enter into the Pledge Agreement pursuant to which CIRCOR will grant the Asbestos PI Trust a security interest in 100% of the outstanding voting equity interests of Reorganized Leslie as security for Leslie's obligations under the Leslie Promissory Note.

### C.    Estimation of Asbestos PI Claims.

Leslie, the Future Claimants' Representative, and the Asbestos Claimants Committee each has hired a claims valuation expert to estimate the aggregate value of Leslie's pending and future Asbestos PI Claims. Each of these experts has been provided with claims data and related information relevant to the estimation process, including a database of all asbestos personal injury and wrongful death claims filed against and resolved by Leslie before the Commencement Date.

In order to estimate an aggregate value, each of the experts prepared a forecast that estimates the number, type, and year of filing of future asbestos-related personal injury and wrongful death claims against Leslie, along with the estimated cost of resolving those claims. To create such forecasts, each of the experts applied methodologies that he or she had employed and tested in other asbestos-related bankruptcies and other contexts, and each made certain assumptions about historical events and likely future behavior.

As the basis for their respective projections, each of the experts relied on Leslie's historical litigation experience in the tort system. As a general matter, each of the experts first estimated the underlying aggregate population of individuals occupationally exposed to asbestos in the United States, and then used epidemiological studies of mesothelioma and lung cancer to calculate the number of occupationally exposed individuals who, in the view of the expert, will likely develop a malignant disease due to asbestos exposure. Each of the experts then used Leslie's claims history to produce his or her independent estimate of what percentage of persons who develop an asbestos-related malignant disease is likely to file claims against Leslie.

Each of the experts also estimated the number of non-malignant claims likely to be filed in the future. Because there are no epidemiological studies to serve as the basis to predict the number of exposed individuals who might develop a non-malignant condition, the experts relied on Leslie's historical claims experience – and, in particular, the historical ratio of non-malignant claims to certain malignant claims – to come up with independent predictions of the number of non-malignant claims likely to be filed against Leslie in the future.

Because each of the experts conducted an independent analysis using his or her own independent assumptions concerning issues such as the particular time period used to determine claim rates and indemnity values and the rate at which claims will be paid in the future, their valuations differ substantially from one another. Leslie and CIRCOR believe that the aggregate value of Leslie's present and future liability for Asbestos PI Claims is significantly lower than

the valuations by either the Asbestos Claimants Committee or the Future Claimants' Representative. However, based on these differing valuations, and because the Trust's total assets and liabilities are difficult to estimate with any certainty, the parties have agreed that under the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures each holder of an eligible Asbestos PI Claim initially will receive only a pro rata share of the liquidated value of that claim based on the Payment Percentage.

The Initial Payment Percentage was determined by the parties after taking into account the $77,625,000 million dollars in contributions to be made by Leslie and CIRCOR to the Trust, but without regard to any potential insurance recoveries.[6] The Initial Payment Percentage is subject to change as provided in the Asbestos PI Trust Distribution Procedures. The Initial Payment Percentage has been established at forty percent (40%). It was developed by comparing the assets of the Asbestos PI Trust against its projected liability for Asbestos PI Trust Claims and Asbestos PI Trust Expenses. The Asbestos PI Trust's projected liability for Asbestos PI Trust Claims is based on a number of assumptions, including the assumption that the rate at which the Asbestos PI Trust approves claims for payment will remain consistent with the rate at which Leslie previously settled and paid asbestos personal injury claims. Should this or any other assumption from which the Initial Payment Percentage was developed prove to be materially inaccurate, the Asbestos PI Trust may have to adjust the Initial Payment Percentage upwards or downwards from time to time, pursuant to the provisions of the Asbestos PI Trust Distribution Procedures and the Asbestos PI Trust Agreement, to reflect then current estimates of the Asbestos PI Trust's assets and its liabilities.

## VIII. OTHER ASPECTS OF THE PLAN

A.    **Distributions Other than on Account of Asbestos PI Claims.**

One of the key concepts under the Bankruptcy Code is that only Claims that are "allowed" may receive distributions under a Chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" Claim simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the Claim, and the amount thereof, is in fact a valid obligation of the debtor. For an explanation of how Disputed Claims will be determined, see Section VIII.A.4. below.

1.    **Distributions.**

Other than with respect to distributions to be made to Asbestos PI Claims from the Asbestos PI Trust, Reorganized Leslie will make all Distributions required to be made under the Plan as provided under Article VI thereof. All distributions to be made on account of Asbestos PI Claims will be made in accordance with the terms of the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures, subject to the conditions for the Trust Distribution Effective Date as set forth in Section 12.3 of the Plan having been previously satisfied.

---

[6] Actual recoveries from the insurance described in detail in Article II.D above may be subject to numerous variables, including the volume and cost of claims paid by the Asbestos PI Trust and the eventual resolution of various coverage issues and disputes.

46392/0001-6246827v15

2.    **Timing and Conditions of Distributions.**

(a)    Date of Distributions.

Except as otherwise provided herein, any Distributions and deliveries to be made hereunder on account of Allowed Claims or Equity Interests (other than Asbestos PI Claims) will be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but will be deemed to have been completed as of the required date.

(b)    Fractional Cents.

Notwithstanding any other provision in the Plan to the contrary, no payment of fractional cents will be made pursuant to the Plan.  Whenever any payment of a fraction of a cent under the Plan would otherwise be required, the actual Distribution made will reflect a rounding of such fraction to the nearest whole penny (up or down), with fractions of more than half a penny being rounded up and fractions of half of a penny or less being rounded down.

3.    **Delivery of Distributions.**

Subject to Bankruptcy Rule 9010, all Distributions to any holder of an Allowed Claim or Equity Interest will be made at the address of such holder as set forth on the Schedules filed, as may be required, with the Bankruptcy Court, or on the books and records of Leslie or its agents, or in a letter of transmittal, unless Leslie has been notified in writing of a change of address.

If any holder's Distribution is returned as undeliverable, then no further Distributions to such holder will be made unless and until Reorganized Leslie is notified of such holder's then-current address, at which time all missed Distributions will be made to such holder without interest.  A Cash Distribution that is not claimed by the expiration of six (6) months from the date that such Distribution was made will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will revest in Reorganized Leslie, and the Claim of any holder to such Distributions will be discharged and forever barred.  Nothing contained in the Plan will require Leslie or Reorganized Leslie to attempt to locate any holder of an Allowed Claim.

4.    **Procedures for Resolving and Treating Disputed Claims Other Than Asbestos PI Claims.**

(a)    Disputed Claims.

All Disputed Claims against Leslie will be subject to the provisions of Article VIII of the Plan.  All Asbestos PI Claims will be resolved by the Asbestos PI Trust in accordance with Section 9.3 of the Plan, the Asbestos PI Trust Agreement and the Asbestos PI Trust Distribution Procedures.  Only the Asbestos PI Trust will have the right to object to and/or resolve Asbestos PI Claims.  All Asbestos PI Claims must be submitted solely to the Asbestos PI Trust for payment, which will be in accordance with the Asbestos PI Trust Distribution Procedures.

(b)     Objections to Claims.

Leslie or Reorganized Leslie, as the case may be, will be entitled to file objections to Claims that have been or properly should have been brought in the Bankruptcy Court (other than Asbestos PI Claims), on or before the first (1st) anniversary of the Effective Date (unless such day is not a Business Day, in which case such deadline will be the next Business Day thereafter), as the same may be extended from time to time by the Bankruptcy Court, and will be authorized to settle, compromise, withdraw or litigate to judgment such objections without further approval of the Bankruptcy Court.

(c)     Payments and Distributions with Respect to Disputed Claims.

Notwithstanding any other provision hereof, if any portion of a Claim (other than an Asbestos PI Claim) is a Disputed Claim, no payment or Distribution provided for herein will be made on account of such Claim, unless and until such Claim becomes an Allowed Claim.

(d)     Preservation of Insurance.

Subject to the terms and provisions of Section 10.4 of the Plan, as such provisions may be amended from time to time prior to the Confirmation Date, nothing in the Plan, the Plan Documents, or the Confirmation Order, including the discharge and release of Leslie and the Asbestos PI Channeling Injunction, will diminish, impair or otherwise affect the enforceability of any Asbestos PI Insurance Contract or any other insurance policy that may provide coverage for Claims or Demands against Leslie; provided, further, that all Asbestos PI Insurance Contracts and Insurance Settlement Agreements shall be assumed by the Debtor and assigned to the Reorganized Debtor as of the Effective Date and the Debtor shall assign the Asbestos Insurance Rights and the Asbestos Insurance Proceeds to the Asbestos PI Trust as part of the Leslie Contribution.

(e)     Estimation of Claims.

Leslie or Reorganized Leslie, as the case may be, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim (not including any Asbestos PI Claims) for any reason pursuant to section 502(c) of the Bankruptcy Code, regardless of whether Leslie previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate such Claim at any time, including, without limitation, during the pendency of litigation concerning any objection to any Claim or of any appeal relating thereto. Claims may be estimated and subsequently compromised, settled, withdrawn, or otherwise resolved by any mechanism approved by the Bankruptcy Court.

(f)     Preservation of Rights to Settle Claims.

In accordance with section 1123(b) of the Bankruptcy Code, Leslie and Reorganized Leslie will retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims (other than Asbestos PI Claims), rights, causes of action, suits and proceedings, whether in law or equity, whether known or unknown, that Leslie or its estate may

35

hold against any Entity, without the necessity for Bankruptcy Court approval under Bankruptcy Rule 9019.

**B.**     **Means for Implementation of the Plan.**

    **1.**     **Amended Certificate of Incorporation and By-Laws.**

        The Amended Certificate of Incorporation and Amended By-Laws will contain such provisions as are necessary to satisfy the provisions of the Plan and, to the extent necessary, to prohibit the issuance of nonvoting equity securities as required by section 1123(a)(6) of the Bankruptcy Code, subject to further amendment of the Amended Certificate of Incorporation and Amended By-Laws after the Effective Date as permitted by applicable law.  Except as otherwise provided herein, such Amended Certificate of Incorporation and Amended By-Laws will contain indemnification provisions applicable to the officers and employees of Reorganized Leslie and such other Entities as may be deemed appropriate in the discretion of Reorganized Leslie and will provide for the authorization and/or issuance of the Reorganized Leslie Common Stock as identified in the Plan Supplement.

    **2.**     **Reorganized Leslie Common Stock.**

        On the Effective Date, all of the issued and outstanding shares of common stock of Leslie shall become Reorganized Leslie Common Stock as of the Effective Date.

    **3.**     **Corporate Governance of Reorganized Leslie.**

        On or after the Effective Date (i) the current directors of Leslie will serve on the Board of Directors of Reorganized Leslie, as identified in the Disclosure Statement with any further changes set forth in the Plan Supplement and (ii) the current officers of Leslie, as identified in the Disclosure Statement with any further changes set forth in the Plan Supplement, will serve as officers of Reorganized Leslie, subject to any applicable employment agreements.

    **4.**     **Effectuating Documents; Further Transactions.**

        Any officer, member or manager of or director of Leslie or Reorganized Leslie, as the case may be, will be authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, certificates, and other agreements or documents, and take such other actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Secretary of Leslie will be authorized to certify or attest to any of the foregoing, if necessary.

        Leslie and Reorganized Leslie, and all other parties, including all holders of Claims entitled to received Distributions under the Plan, will execute any and all documents and instruments that must be executed under or in connection with the Plan in order to implement the terms of the Plan or to effectuate the Distributions under the Plan, provided, that such documents and instruments are reasonably acceptable to such party or parties.

### 5.    Treatment of each Settling Asbestos Insurance Entity.

Leslie will recommend to the Bankruptcy Court that any Settling Asbestos Insurance Entity should be entitled to treatment under section 524(g) of the Bankruptcy Code, solely with respect to the policy or policies that are the subject of the Insurance Settlement Agreement, by identifying such Asbestos Insurance Entity as a Settling Asbestos Insurance Entity and setting forth the corresponding policies on Exhibit F to the Plan, as such exhibit may be amended by Leslie from time to time prior to the Confirmation Date.

## C.    Treatment of Executory Contracts and Unexpired Leases.

### 1.    Contracts and Leases Not Expressly Rejected Are Assumed.

Subject to approval of the Bankruptcy Court, section 365 of the Bankruptcy Code allows a debtor to assume or reject its executory contracts and unexpired leases.

Leslie will assume, as of the Effective Date, all Executory Contracts to which Leslie is a party, except for: (a) the Executory Contracts specifically listed in the Schedules to the Plan Supplement, which will either be rejected or assumed and assigned, respectively, as described therein, and (b) the Executory Contracts specifically addressed in the Schedules to the Plan Supplement or pursuant to a Final Order of the Bankruptcy Court entered on or before the Effective Date. Leslie may, at any time on or before the Effective Date, amend the Schedules to the Plan Supplement to delete therefrom or add thereto any Executory Contract. Leslie will provide notice of any such amendment to the parties to the Executory Contract(s) affected thereby and to the parties on any master service list established by the Bankruptcy Court in the Chapter 11 Case. The fact that any contract or lease is listed in the Schedules to the Plan Supplement will not constitute or be construed to constitute an admission that such contract or lease is an executory contract or unexpired lease within the meaning of section 365 of the Bankruptcy Code or that Leslie or any successor in interest to Leslie (including Reorganized Leslie) has any liability thereunder.

The Confirmation Order will constitute an order of the Bankruptcy Court approving such (a) rejections, (b) assumptions, or (c) assumptions and assignments, as the case may be, as of the Effective Date, pursuant to sections 365 and 1123(b)(2) of the Bankruptcy Code.

### 2.    Cure of Defaults.

Generally, if there has been a default under an executory contract or unexpired lease (other than a default specified in section 365(b)(2) of the Bankruptcy Code), the debtor can assume the contract or lease only if the debtor cures the default.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any Executory Contract to be assumed (including any Executory Contract to be assumed and assigned) pursuant to Section 7.1 of the Plan, Reorganized Leslie will, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within thirty (30) days after the Effective Date, file and serve a pleading with the Bankruptcy Court listing the amount of the proposed Cure for each such Executory Contract. The non-Debtor party or parties to each such

37

Executory Contract will have fifteen (15) days from service of the Cure Notice to object to the proposed Cure with respect to that Executory Contract. Within thirty (30) days after service of any objection to the proposed Cure for an Executory Contract, Leslie will (i) resolve such objection, which resolution will not require approval of the Bankruptcy Court, (ii) schedule a hearing before the Bankruptcy Court to determine the proper Cure for the Executory Contract, or (iii) determine to reject the Executory Contract, and provide notice thereof to the applicable non-Debtor party or parties, which rejection will be deemed effective as of the day before the Effective Date.

### 3.     Rejection Damages Claims.

In the event that the rejection of an Executory Contract by Leslie, pursuant to the Plan or otherwise, results in damages to the non-Debtor party or parties to such Executory Contract, a Claim for such damages will be forever barred and will not be enforceable against Leslie, Reorganized Leslie, or their respective properties or interests in property as agents, successors or assigns unless a Proof of Claim with respect to such damages is filed with the Bankruptcy Court and served upon counsel for Leslie on or before (i) if such Executory Contract is rejected pursuant to Sections 7.1 and 7.2 of the Plan, the later of: (a) thirty (30) days after entry of the Confirmation Order and (b) fifteen (15) days after the non-Debtor party receives notice of the rejection of such Executory Contract pursuant to Section 7.2 of the Plan; or (ii) if such Executory Contract is rejected pursuant to a Final Order of the Bankruptcy Court granting a motion filed by Leslie to reject that Executory Contract, fifteen (15) days after entry of such order.

### 4.     Insurance Policies.

With the exception of the Asbestos PI Insurance Contracts and Insurance Settlement Agreements as described in Section 8.4 of the Plan, all of the Debtor's insurance policies and any agreements, documents, or instruments relating thereto, to the extent necessary, are treated as executory contracts under the Plan. On the Effective Date, the Debtor will be deemed to have assumed and assigned to the Reorganized Debtor all insurance policies and any agreements, documents, and instruments relating to coverage of Claims covered by those insurance policies, subject to all rights, remedies and defenses of the Debtor under any agreements, insurance policies and applicable law.

### 5.     Compensation and Benefit Plans and Treatment of Retiree and Pension Benefits.

**Except as otherwise expressly provided in the Plan or in any contract, instrument, release, indenture or other agreement or document entered into in connection with the Plan, all of the Debtor's programs, plans, agreements and arrangements relating to employee compensation and benefits, including programs, plans, agreements and arrangements subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code and including, without limitation, all savings plans, retirement plans, healthcare plans, disability plans, severance plans, incentive plans, life, accidental death and dismemberment insurance plans, workers' compensation plans, remaining benefits under the pension plan frozen in 2006 and employment, severance, salary continuation and retention agreements entered into before the Commencement Date and not since terminated, will be deemed to**

38

be, and will be treated as though they are, executory contracts that are assumed under Section 7.1 of the Plan, and the Debtor's obligations under such programs, plans, agreements and arrangements will survive confirmation of the Plan, except for executory contracts or plans that previously have been rejected, are the subject of a motion to reject or have been specifically waived by the beneficiaries of any plans or contracts.  In addition, pursuant to the requirements of section 1129(a)(13) of the Bankruptcy Code, the Plan provides for the continuation of payment by the Debtor of all "retiree benefits," as defined in section 1114(a) of the Bankruptcy Code, if any, at previously established levels.

**D.      Effect of Confirmation.**

**1.      Vesting of Reorganized Leslie's Assets.**

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, except as otherwise provided in the Plan, the Plan Documents or the Confirmation Order, the property of the Estate of Leslie (except for the Leslie Contribution) will vest in Reorganized Leslie on the Effective Date free and clear of any and all Liens, Claims, Encumbrances and other interests of any Entity.  From and after the Effective Date, Reorganized Leslie may operate its business and may use, acquire, and dispose of property free of any restrictions imposed under the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Court.  Without limiting the generality of the foregoing, Reorganized Leslie may, without application to, or approval by, the Bankruptcy Court, pay Professional fees and expenses that Reorganized Leslie incurs after the Effective Date.

**2.      Preservation of Certain Causes of Action; Defenses.**

Except as provided in Section 10.6 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, Reorganized Leslie, as successor in interest to Leslie and its Estate, will retain and may enforce any and all rights, Claims, and Causes of Action accruing to or that are property of Leslie or its Estate pursuant to the Bankruptcy Code or any statute or legal theory, including any Avoidance Action, any rights to, Claims or Causes of Action for recovery under any policies of insurance issued to or on behalf of Leslie but not including Asbestos Insurance Rights and Asbestos Insurance Actions, and any rights, Claims, and Causes of Action against third parties related to or arising out of Allowed Claims, and Reorganized Leslie shall retain and may enforce all defenses and counterclaims to all Claims asserted against Leslie or its Estate, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code. Reorganized Leslie may pursue such Claims, rights, or Causes of Action, as appropriate, in its sole and absolute discretion.  Notwithstanding anything in Section 10.2 of the Plan to the contrary, neither Leslie nor Reorganized Leslie will have any rights to pursue any Avoidance Actions or Derivative Liability Claims against any of the CIRCOR Related Parties or Watts Related Parties or any of their Representatives.  Reorganized Leslie does not intend to pursue any Avoidance Actions.

Notwithstanding anything in Section 10.2 of the Plan to the contrary, but subject to Section 9.3 of the Plan, on the Effective Date all Claims, defenses, rights and Causes of Action of Leslie and Reorganized Leslie relating to Asbestos PI Claims, Asbestos Insurance Rights and Asbestos Insurance Actions, will be transferred and assigned to the Asbestos PI Trust.  Except as

39

otherwise provided in Section 10.2 of the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Asbestos PI Trust will retain and may enforce such Claims, defenses, rights and Causes of Action and will retain and may enforce all defenses and counterclaims to all Claims or Demands asserted against the Asbestos PI Trust with respect to such Asbestos PI Claims, including, but not limited to, setoff, recoupment and any rights under section 502(d) of the Bankruptcy Code; provided, however, that no such defenses, Causes of Action, or counterclaims may be asserted against any Asbestos Protected Party. The Asbestos PI Trust will be deemed to be the appointed representative to and may pursue, litigate, compromise and settle any rights, Claims, or Causes of Action transferred to it, as appropriate, in accordance with its and its beneficiaries' best interests.

Nothing in Section 10.2 of the Plan , however, will be deemed to be a transfer by Leslie or Reorganized Leslie of any Claims, rights, Causes of Action, or defenses relating to assumed Executory Contracts or which otherwise are required by Reorganized Leslie to conduct its business in the ordinary course subsequent to the Effective Date.

### 3.     Institution and Maintenance of Legal and Other Proceedings.

From and after the Effective Date to the Trust Distribution Effective Date, the Asbestos PI Trust, will be empowered and entitled, to pursue, compromise or settle Leslie's or Reorganized Leslie's interests in any and all Asbestos Insurance Actions. From and after the Trust Distribution Effective Date, the Asbestos PI Trust will be empowered and entitled, in its sole and absolute discretion, to pursue, compromise or settle Leslie's or Reorganized Leslie's interests in any and all Asbestos Insurance Actions. The duties, obligations and liabilities of any Asbestos Insurance Entity under all insurance policies, including but not limited to the Asbestos Insurance Contracts, all Insurance Settlement Agreements, and all other settlement agreements are not enlarged or diminished, reduced or eliminated by any aspect of the Chapter 11 Case, provided, that all Asbestos PI Insurer Coverage Defenses are preserved in accordance with Section 10.4 of the Plan.

### 4.     Insurance Neutrality.

Notwithstanding anything to the contrary in the Confirmation Order or the Plan, but subject to the proviso below, nothing in the Confirmation Order or the Plan (including any other provision that purports to be preemptory or supervening) will in any way operate to impair, or have the effect of impairing, the insurers' legal, equitable or contractual rights, if any, in any respect. The rights of the insurers will be determined under the insurance contracts, applicable law or insurance settlement agreements, as applicable; provided, however, that nothing in Section 10.4 of the Plan will preclude the entry or effectiveness of the Asbestos PI Channeling Injunction or will affect or limit, or be construed as affecting or limiting, the protections afforded to the Asbestos Protected Parties under the Asbestos PI Channeling Injunction, or will affect or limit, or be construed as affecting or limiting, the releases, covenants and/or agreements in the Asbestos PI Trust Agreement (or any releases granted in connection therewith).

40

5.      **Terms of Injunction and Automatic Stay.**

All of the injunctions and/or stays in existence immediately prior to the Confirmation Date provided for in or in connection with the Chapter 11 Case, whether pursuant to section 105, 362, or any other provision of the Bankruptcy Code, the Bankruptcy Rules or other applicable law, including, but not limited to, the injunction provided for by the Preliminary Injunction Order, will remain in full force and effect until the injunction set forth in the Plan becomes effective pursuant to a Final Order, and will continue to remain in full force and effect thereafter as and to the extent provided by the Plan, the Confirmation Order, or by their own terms. In addition, on and after the Confirmation Date, Reorganized Leslie may seek such further orders as it may deem necessary or appropriate to preserve the status quo during the time between the Confirmation Date and the Effective Date.

Each of the injunctions contained in the Plan or the Confirmation Order will become effective on the Effective Date and will continue in effect at all times thereafter unless otherwise provided by the Plan or the Confirmation Order. All actions of the type or nature of those to be enjoined by such injunctions will be enjoined during the period between the Confirmation Date and the Effective Date.

6.      **No Liability for Certain Released Claims.**

Neither Leslie, Reorganized Leslie, the other Asbestos Protected Parties, nor the Asbestos PI Trust (except, as it relates to the Asbestos PI Trust, with respect to the Asbestos PI Claims) does, or will be deemed to, assume, agree to perform, pay, or indemnify creditors for any liabilities or obligations of Leslie relating to or arising out of the operations of, or assets of, Leslie whether arising prior to or resulting from actions, events, or circumstances occurring or existing at any time prior to the Effective Date. Neither Reorganized Leslie, nor the Asbestos PI Trust will be liable for any Derivative Liability Claim, except that Reorganized Leslie and the Asbestos PI Trust will assume their respective obligations specified in the Plan and the Confirmation Order.

Effective automatically on the Trust Distribution Effective Date, the Asbestos Protected Parties and their respective Representatives will unconditionally and irrevocably be fully released from any and all Derivative Liability Asbestos PI Claims.

7.      **Title to Asbestos PI Trust Assets.**

On the Effective Date, title to all of the Asbestos PI Trust Assets will vest in the Asbestos PI Trust free and clear of all Claims, Equity Interests, Encumbrances and other interests of any Entity, subject to the provisions of Sections 9.3 and 10.3 of the Plan. The Asbestos PI Trust will be empowered and entitled to process and, after the Trust Distribution Effective Date, pay Asbestos PI Claims in accordance with the Asbestos PI Trust Distribution Procedures and the Asbestos PI Trust Agreement.

8.      **Dissolution of Committees; Creation of the Asbestos PI Trust Advisory Committee; Continuation of Future Claimants' Representative.**

Effective on the Effective Date, any committee appointed in the Chapter 11 Case will be dissolved automatically, whereupon its members, Professionals, and agents will be released from any further duties and responsibilities in the Chapter 11 Case and under the Bankruptcy Code, except with respect to applications for compensation by Professionals or reimbursement of expenses incurred as a member of any committee and any motions or other actions seeking enforcement or implementation of the provisions of the Plan or the Confirmation Order or pending appeals of any other order entered in the Chapter 11 Case.

As provided in Section 9.3(d) of the Plan, the Confirmation Order will provide for the appointment of the Asbestos PI Trust Advisory Committee effective as of the Effective Date. The Confirmation Order will also provide that, from and after the Effective Date, the Future Claimants' Representative will continue to serve as provided in the Plan and the Asbestos PI Trust Agreement, to perform the functions specified and required therein. The Future Claimants' Representative also may, at his option, participate in any: (a) appeal of the Confirmation Order; (b) hearing on a Claim for compensation or reimbursement of a Professional; or (c) adversary proceeding pending on the Effective Date in which the Future Claimants' Representative is a party.

Upon termination of the Asbestos PI Trust: (a) the members of the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative will be released and discharged of and from all further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Case; and (b) the Asbestos PI Trust Advisory Committee will be deemed dissolved and the Future Claimants' Representative's employment will be deemed terminated.

All reasonable and necessary post-Effective Date fees and expenses of the professionals retained by the Asbestos PI Trust Advisory Committee and the Future Claimants' Representative will be paid exclusively by the Asbestos PI Trust in accordance with the terms of the Asbestos PI Trust Agreement, and Reorganized Leslie will not be liable for any such fees and expenses. The parties will attempt to resolve any dispute regarding the payment of such fees and expenses in good faith, and if they fail to resolve such dispute, they will submit the dispute to the Bankruptcy Court for resolution.

E.      **Releases, Injunctions and Waivers of Claims.**

1.      **Discharge of Leslie.**

**Except as specifically provided for in Sections 4.1, 4.2, 4.3 and 11.10 of the Plan, pursuant to section 1141(d)(1)(A) of the Bankruptcy Code, confirmation of the Plan will discharge Leslie and Reorganized Leslie from any and all Claims of any nature whatsoever, including, without limitation, all Claims and liabilities that arose before the Effective Date and all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, whether or not: (a) a Proof of Claim based on such Claim was filed under section 501**

42

of the Bankruptcy Code, or such Claim was listed on any Schedules of Leslie; (b) such Claim is or was allowed under section 502 of the Bankruptcy Code; or (c) the holder of such Claim has voted on or accepted the Plan.  Except as specifically provided for in Sections 4.1, 4.2, 4.3 and 11.8 of the Plan, as of the Effective Date the rights provided in the Plan will be in exchange for and in complete satisfaction, settlement and discharge of all Claims against Leslie or Reorganized Leslie or any of their respective assets and properties.

      2.      **Injunction.**

Except as specifically provided for in Sections 4.1, 4.2, 4.3 and 11.10 of the Plan, all persons or Entities who have held, hold or may hold Claims or Demands are permanently enjoined, from and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against Reorganized Leslie with respect to such Claim or Demand; (b) enforcing, attaching, collecting, or recovering by any manner or means of any judgment, award, decree, or order against Reorganized Leslie with respect to such Claim or Demand; (c) creating, perfecting, or enforcing any Encumbrance of any kind against Reorganized Leslie or against the property or interests in property of Reorganized Leslie with respect to such Claim or Demand; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due to Reorganized Leslie or against the property or interests in property of Reorganized Leslie, with respect to such Claim or Demand; and (e) pursuing any Claim or Demand released pursuant to Article XI of the Plan.

      3.      **Exculpation.**

None of the Released Parties will have or incur any liability to any holder of a Claim or Equity Interest, including, without limitation, the Asbestos PI Claims, for any act or omission in connection with, related to, or arising out of: (a) the Chapter 11 Case; (b) pursuit of confirmation of the Plan; (c) consummation of the Plan, or administration of the Plan or the property to be distributed under the Plan or the Asbestos PI Trust Distribution Procedures; (d) the Plan; or (e) the negotiation, formulation and preparation of the Plan, the Plan Documents, and any of the terms and/or settlements and compromises reflected in the Plan and the Plan Documents, except for willful misconduct or gross negligence as determined by a Final Order, and, in all respects, Leslie, Reorganized Leslie, and each of the other Released Parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan and the Plan Documents.

      4.      **Release by Debtor Released Parties of Released Parties.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, Reorganized Leslie, any other Debtor Released Party and any Entity seeking to exercise the rights of the Estate, in each case, whether individually or collectively, including, without limitation, any successor to the Debtor or any Estate representative appointed or selected pursuant to the applicable provisions of the Bankruptcy Code, will be deemed to forever release, waive and discharge the Released Parties of all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities which the Debtor, any other Debtor Released Parties

43

of the Estate are entitled to assert including, without limitation, any Derivative Liability Asbestos PI Claims and Derivative Liability Claims asserted on behalf of the Debtor, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the conduct of the Debtor's business, the Chapter 11 Case, the Plan or Reorganized Leslie (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder); provided, however, that nothing contained herein is intended to operate as a release of any potential claims based upon gross negligence or willful misconduct.  Notwithstanding anything contained in Section 11.4 of the Plan, nothing contained in the Plan will discharge or release any Claim of or Demand by any of the Released Parties, the Asbestos PI Trust or any holder of an Asbestos PI Claim against any Asbestos Insurance Entity.

5.    **Release by Non-Debtor Released Parties of Released Parties.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Non-Debtor Released Parties will be deemed to forever release, waive and discharge the Released Parties and the Asbestos PI Trust of and from all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities which the Non-Debtor Released Parties are entitled to assert, whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the conduct of the Debtor's business, the Chapter 11 Case, the Plan or Reorganized Leslie (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder); provided, however, that nothing contained herein is intended to operate as a release of any potential claims based upon gross negligence or willful misconduct.  Notwithstanding anything contained in Section 11.5 of the Plan, nothing contained in the Plan will discharge or release any Claim of or Demand by any of the Released Parties, the Asbestos PI Trust or any holder of an Asbestos PI Claim against any Asbestos Insurance Entity. Notwithstanding anything contained in Section 11.5 of the Plan, or elsewhere in the Plan (including but not limited to in Sections 9.3(j), 10.6, 11.3 and 11.7) or the Plan Documents, nothing contained in this Plan or the Plan Documents will discharge, release, impair, enjoin, or prejudice in any way any claim, rights, or demands that any of the Watts Related Parties have asserted or may assert under (1) the Distribution Agreement dated as of October 1, 1999 by and between Watts Industries, Inc. and CIRCOR or (2) any insurance policy or contract providing coverage to any or all of the Watts Related Parties.

6.    **Releases by Holders of Claims and Equity Interests.**

As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, each holder of a Claim or Demand against, or Equity Interest in, Leslie, who receives a Distribution pursuant to the Plan will be deemed to forever release,

waive, and discharge all claims, obligations, suits, judgments, remedies, damages, Demands, debts, rights, Causes of Action and liabilities whatsoever against the Released Parties whether known or unknown, liquidated or unliquidated, fixed or contingent, foreseen or unforeseen, matured or unmatured, existing or hereinafter arising, in law, equity or otherwise, based in whole or in part upon any act or omission, transaction, or occurrence taking place on or prior to the Effective Date in any way relating to the Debtor, the Estate, the conduct of the Debtor's business, the Chapter 11 Case, the Plan or Reorganized Leslie (other than the rights under the Plan, the Plan Documents, and the contracts, instruments, releases and other agreements or documents delivered or to be delivered hereunder), including, for the avoidance of doubt, any and all Causes of Action that the holder of an Asbestos PI Claim, the Asbestos PI Trust or the Future Claimants Representative did commence or could have commenced against any officer or director of Leslie (serving in such capacity) that is based upon or arising from any acts or omissions of such officer or director occurring prior to the Effective Date on account of such Asbestos PI Claim, to the fullest extent permitted under section 524(e) of the Bankruptcy Code and applicable law (as now in effect or subsequently extended); provided, however, that nothing contained herein is intended to operate as a release of (a) any potential claims based upon gross negligence or willful misconduct or (b) any claim by any federal, state or local authority under the Internal Revenue Code or other tax regulation or any applicable environmental or criminal laws.

       7.        **Asbestos PI Channeling Injunction.**

       Pursuant to the Confirmation Order and section 524(g) of the Bankruptcy Code, and subject to Section 11.8 of the Plan, the sole recourse of any holder of an Asbestos PI Claim on account of such Asbestos PI Claim will be against the Asbestos PI Trust. Each such holder will be and is enjoined from taking legal action directed against Leslie, Reorganized Leslie, any of the CIRCOR Related Parties or Watts Related Parties, or any other Asbestos Protected Party, or their respective property, for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery with respect to such Asbestos PI Claim.

       8.        **Limitations of Injunctions.**

       The releases set forth in the Plan and the injunction set forth in Section 11.7 of the Plan will not enjoin:

        (a)      the rights of Entities to the treatment accorded to them under Articles III and IV of the Plan, as applicable, including the rights of Entities with Asbestos PI Claims to assert such Claims or Demands against the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures; and

        (b)      the rights of Entities to assert any Claim, debt, obligation, or liability for payment of Asbestos PI Trust Expenses against the Asbestos PI Trust.

45

9.    **Releases and Indemnification by Leslie.**

As of the Effective Date, Leslie and Reorganized Leslie will release and will be permanently enjoined from prosecuting or attempting to prosecute any Derivative Liability Claims and any and all Causes of Action against the Released Parties that Leslie or Reorganized Leslie have, may have or claim to have, now or in the future, that are property of, assertable on behalf of, or derivative of Leslie.  Reorganized Leslie also will indemnify, release and hold harmless each of the CIRCOR Related Parties and the Watts Related Parties pursuant to the provisions of, and to the extent set forth in, the Plan.

10.    **Indemnification and Reimbursement Obligations.**

For purposes of the Plan, the obligations of Leslie to indemnify and reimburse persons who are or were directors, officers, or employees of Leslie on the Commencement Date or at any time thereafter against and for any obligations as provided in Leslie's certificate of incorporation, by-laws, applicable state law, or other agreement, or any combination of the foregoing, will survive confirmation of the Plan, remain unaffected thereby, and not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date.  Such obligations will be assumed by Reorganized Leslie on the Effective Date.  In furtherance of the foregoing, Reorganized Leslie will use its commercially reasonable efforts to maintain or procure insurance for the benefit of such directors, officers, or employees at levels satisfactory to Reorganized Leslie and the Asbestos PI Trust.

11.    **Asbestos Insurance Entity Injunction.**

Notwithstanding anything to the contrary elsewhere in the Plan, all Entities except the Asbestos PI Trust, Leslie, or Reorganized Leslie that have held or asserted, that hold or assert, or that may in the future hold or assert any Cause of Action, including but not limited to any Insurer Contribution Claim, against any Settling Insurer, based on, relating to, arising out of, or in any way connected with any Asbestos Claim, Asbestos Insurance Right, Asbestos PI Insurance Contract, or Insurance Settlement Agreement whenever or wherever arisen or asserted (including all Claims in the nature of or sounding in tort, or under contract, warranty, or any other theory of law, equity, or admiralty) will be stayed, restrained, and enjoined from taking any action for the purpose of directly or indirectly collecting, recovering, or receiving payments, satisfaction, or recovery with respect to any such Claim, Demand, or Cause of Action, including:  (a) commencing, conducting, or continuing, in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including a judicial, arbitration, administrative, or other proceeding) in any forum with respect to any such Claim, Demand, or Cause of Action against any Settling Insurer, or against the property of any Asbestos Insurance Entity, with respect to any such Cause of Action; (b) enforcing, levying, attaching, collecting, or otherwise recovering, by any means or in any manner, whether directly or indirectly, any judgment, award, decree, or other order against any Settling Insurer, or against the property of any Asbestos Insurance Entity, with respect to any such Claim, Demand, or Cause of Action; (c) creating, perfecting, or enforcing, in any manner, directly or indirectly, any Encumbrance

46

against any Asbestos Insurance Entity, or the property of any Asbestos Insurance Entity, with respect to any such Claim, Demand, or Cause of Action; and (d) asserting or accomplishing any setoff, right of subrogation, indemnity, contribution, or recoupment of any kind, directly or indirectly, against any obligation of any Settling Insurer, or against the property of any Asbestos Insurance Entity, with respect to any such Claim, Demand, or Cause of Action.  The Asbestos PI Trust will have the sole and exclusive authority at any time to terminate, reduce, or limit the scope of, the Asbestos Insurance Entity Injunction. The Asbestos Insurance Entity Injunction is issued solely for the benefit of the Asbestos PI Trust and is not issued for the benefit of any Asbestos Insurance Entity, and no Asbestos Insurance Entity is a third-party beneficiary of the Asbestos Insurance Entity Injunction.

12.    Reduction of Insurance Judgments.

Any right or Cause of Action that an Asbestos Insurance Entity may have under applicable non-bankruptcy law against any other Asbestos Insurance Entity (but for the Asbestos Insurance Entity Injunction), will be channeled to and become a right or Cause of Action solely as an offset claim against the Asbestos PI Trust and not against the other Asbestos Insurance Entity in question.  Any such right or Cause of Action to which an Asbestos Insurance Entity may be entitled, if any, will be solely a setoff against any recovery of the Asbestos PI Trust from that Asbestos Insurance Entity and under no circumstances will that Asbestos Insurance Entity receive an affirmative recovery of funds from the Asbestos PI Trust or any other Asbestos Insurance Entity for such right or Cause of Action.  Any setoff in favor of an Asbestos Insurance Entity will not constitute a classified or unclassified Claim or Demand under the Plan and will not be subject to or impaired by the Plan, except as provided in Section 11.12 of the Plan.  Instead, any such setoff will be determined, calculated, and applied solely as a matter of applicable non-bankruptcy law without regard to the Plan, (except as provided in Section 11.2 of the Plan) or any bankruptcy law or decision.

F.    Miscellaneous Provisions.

1.    Administrative Expense Claims Bar Date.

All Administrative Expense Requests must be made by application filed with the Bankruptcy Court and served on counsel for the Debtor no later than the Administrative Expense Claims Bar Date.  In the event that the Debtor or Reorganized Debtor objects to an Administrative Expense Claim, the Bankruptcy Court will determine the Allowed amount of such Administrative Expense Claim.  Notwithstanding the foregoing, (a) no application seeking payment of an Administrative Expense Claim need be filed with respect to an undisputed post-petition obligation which was paid or is payable by the Debtor in the ordinary course of business; provided, however, that in no event will a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; and (b) no application seeking payment of an Administrative

47

Expense Claim need be filed with respect to Cure owing under an executory contract or unexpired lease if the amount of Cure is fixed by order of the Bankruptcy Court.

### 2.    Other Miscellaneous Provisions.

The Plan contains provisions relating to corporate actions, delivery of distributions, manner of payment, vesting of assets, binding effect, terms of injunctions or stays, payment of statutory fees, substantial consummation, compliance with tax requirements, severability, revocation and amendment of the Plan, governing law, and timing.  For more information regarding these items, see the Plan attached hereto as Exhibit A.

# IX. CONFIRMATION OF THE PLAN

### A.    Acceptance Of The Plan.

As a condition to Confirmation, the Bankruptcy Code requires that each Class of Impaired Claims votes to accept the Plan, except under certain circumstances.

With respect to holders of Asbestos PI Claims in Class 4, the Bankruptcy Code provides that in connection with confirmation of a plan seeking an injunction under section 524(g), such as the Asbestos PI Channeling Injunction, the Bankruptcy Court may issue such an injunction only if:  (a) the holders of the Asbestos PI Claims to be channeled under the injunction are classified separately under the plan; and (b) seventy-five percent (75%) in number of the holders of the Asbestos PI Claims in that class who actually vote on the plan vote to accept the plan.

### B.    Confirmation Hearing.

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization.

### C.    General Requirements of Section 1129.

At the confirmation hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code.

2.    Leslie has complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means proscribed by law.

4.    Any payment made or promised by Leslie or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable or if such

46392/0001-6246827v15

payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.    Leslie has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer or voting Asbestos PI Trustee of Leslie, affiliates of Leslie participating in the Plan with Leslie, or successor to Leslie under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy, and Leslie has disclosed the identity of any insider that will be employed or retained by Leslie, and the nature of any compensation for such insider.

6.    With respect to each Class of Claims or Equity Interests, each holder of an Impaired Claim or Impaired Equity Interest either has accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would received or retain if Leslie were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code.  See discussion of "Best Interests Test," below.

7.    Each Class of Claims or Equity Interests has either accepted the Plan or is not Impaired under the Plan.

8.    Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims, and Other Priority Claims will be paid in full on the Effective Date and that Priority Tax Claims will receive on account of such Claims regular installments of Cash payments, over a period not exceeding five years after the date of the order for relief, of a value, as of the Effective Date, equal to the Allowed amount of such Claims, and in a manner no less favorable than the most favored nonpriority unsecured Claim provided for by the Plan.

9.    At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

10.    Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of Leslie or any successor to Leslie under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility," below.

11.    Certain current and former employees of Leslie may be entitled to retiree benefits (as defined in section 1114 of the Bankruptcy Code).  Leslie will assume any and all obligations with respect to retiree benefits owed to former employees of Leslie or employees of Leslie as of the Effective Date.

46392/0001-6246827v15

**D.    Feasibility Of The Plan.**

In connection with confirmation of the Plan, the Bankruptcy Court will be required to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that the confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

To support their belief in the feasibility of the Plan, the Debtor has relied upon the Projections, which are annexed to this Disclosure Statement as Appendix C.

The Projections indicate that the Reorganized Debtor should have sufficient cash flow to pay and service its debt obligations and to fund its operations. Accordingly, the Debtor believes that the Plan complies with the financial feasibility standard of section 1129(a)(11) of the Bankruptcy Code.

The Projections cover the operations of the Reorganized Debtor through fiscal year 2014. The Projections are based on numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms; realization of the operating strategy of the Reorganized Debtor industry performance; no material adverse changes in applicable legislation or regulations, or the administration thereof, or generally accepted accounting principles; no material adverse changes in general business and economic conditions; no material adverse changes in competition; the Reorganized Debtor's retention of key management and other key employees; adequate financing; the absence of material contingent or unliquidated litigation, indemnity, or other claims; and other matters, many of which will be beyond the control of the Reorganized Debtor and some or all of which may not materialize.

To the extent that the assumptions inherent in the Projections are based upon future business decisions and objectives, they are subject to change. In addition, although they are presented with numerical specificity and are based on assumptions considered reasonable by the Debtor, the assumptions and estimates underlying the Projections are subject to significant business, economic, and competitive uncertainties and contingencies, many of which will be beyond the control of the Reorganized Debtor. Accordingly, the Projections are only estimates and are necessarily speculative in nature. It can be expected that some or all of the assumptions in the Projections will not be realized and that actual results will vary from the Projections, which variations may be material and are likely to increase over time. In light of the foregoing, readers are cautioned not to place undue reliance on the Projections. The Projections were not prepared in accordance with standards for projections promulgated by the American Institute of Certified Public Accountants or with a view to compliance with published guidelines of the SEC regarding projections or forecasts. The Projections have not been, audited, reviewed, or compiled by the Debtor's independent public accountants. The projected financial information contained in this Disclosure Statement should not be regarded as a representation or warranty by the Debtor, the Debtor's advisors, or any other Person that the Projections can or will be achieved.

The Debtor does not intend to update or otherwise revise the Projections, including any revisions to reflect, events or circumstances existing or arising after the date of this Disclosure Statement or to reflect the occurrence of unanticipated events, even if any or all of the underlying

50

assumptions do not come to fruition. Furthermore, the Debtor does not intend to update or revise the Projections to reflect changes in, general economic or industry conditions.

The Debtor will face a number of risks with respect to their continuing business operations upon emergence from Chapter 11, including but not limited to the following:  the Debtor's ability to improve profitability and generate positive operating cash flow; the Debtor's ability to sustain sales increases in future years; the Debtor's response to the entry of new competitors into its markets; the Debtor's ability to implement effective pricing and promotional programs; potential changes in federal, state or local laws or regulations; general economic conditions in the Debtor's operating regions; increases in labor and employee benefit costs, such as health care expenses; changes in accounting standards, taxation requirements and bankruptcy laws.

The Projections should be read in conjunction with Article X. below, entitled "Certain Factors to Be Considered," and with the assumptions, qualifications and footnotes to the tables containing the Projections set forth in Appendix C to the Disclosure Statement, and the historical consolidated financial information (including the notes and schedules thereto) set forth in Appendix B to the Disclosure Statement.

**E.      Best Interests Test.**

Even if a plan is accepted by each class of claims and interests, the Bankruptcy Code requires a bankruptcy court to determine that the plan is in the best interests of all holders of claims or interests that are impaired by the plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a bankruptcy court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor were liquidated under Chapter 7, a bankruptcy court must first determine the aggregate dollar amount that would be generated from the Debtor's assets if its Chapter 11 case were converted to a Chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a Chapter 7 trustee.

The amount of liquidation value available to unsecured creditors would be reduced by, first, the claims of secured creditors to the extent of the value of their collateral and, second, by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 case and the Chapter 11 case.  Costs of liquidation under Chapter 7 of the Bankruptcy Code would include the compensation of a trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtor in its Chapter 11 case (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the Chapter 7 cases, litigation costs, and claims arising from the operations of the debtor during the pendency of the Chapter 11 case.  The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of

51

business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay general unsecured claims or to make any distribution in respect of equity security interests. The liquidation would also prompt the rejection of a large number of executory contracts and unexpired leases and thereby significantly enlarge the total pool of unsecured claims by reason of resulting rejection damages claims.

Once the bankruptcy court ascertains the recoveries in liquidation of secured creditors and priority claimants, it must determine the probable distribution to general unsecured creditors and equity security holders from the remaining available proceeds in liquidation. If such probable distribution has a value greater than the distributions to be received by such creditors and equity security holders under the plan, then the plan is not in the best interests of creditors and equity security holders.

## F.      Liquidation Analysis.

A liquidation analysis is attached as Appendix D to this Disclosure Statement. The Debtor believes that any liquidation analysis is speculative. For example, the liquidation analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims. This estimate is based solely upon the Debtor's incomplete review of the Debtor's books and records. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the liquidation analysis. The estimate of the amount of Allowed Claims set forth in the liquidation analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan.

The Debtor believes the methodology used to prepare the liquidation analysis attached hereto as Appendix D is appropriate and that the assumptions and conclusions set forth therein are fair and reasonable under the circumstances and represent a reasonable exercise of the Debtor's business judgment with respect to such matters.

## G.      Application of the "Best Interests" of Creditors Test To The Liquidation Analysis.

Notwithstanding the difficulties in quantifying recoveries to creditors with precision, the Debtor believes that taking into account the liquidation analysis, the Plan meets the "best interests" test of Bankruptcy Code section 1129(a)(7). A Chapter 11 Recovery Analysis is attached as Appendix E to this Disclosure Statement. The Chapter 11 Recovery Analysis is based upon the Plan. In either the low or high recovery analysis illustrated, confirmation of the Plan will provide creditors with a recovery that is greater than creditors would receive in a liquidation in a hypothetical Chapter 7 case. Creditors will receive a better recovery through the distributions contemplated by the Plan because the continued operation of the Debtor as a going concern rather than a forced liquidation will allow realization of more value for the Debtor's assets. Moreover, as a result of the reorganization of the Debtor, creditors such as the Debtor's employees would retain their jobs and most likely make few if any other claims against the estate. All of these factors lead to the conclusion that recoveries under the Plan would be greater than the recoveries available in a Chapter 7 liquidation.

52

## X. CERTAIN RISK FACTORS TO BE CONSIDERED

### A.    Certain Bankruptcy Considerations.

Although Leslie believes that the Plan satisfies all requirements necessary for confirmation by the Bankruptcy Court, and/or issuance or acceptance and affirmance by the District Court, there can be no assurance that the Bankruptcy Court and/or the District Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for confirmation or that such modifications will not necessitate the re-solicitation of votes. In addition, although Leslie believes that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.

For the Plan to be confirmed, at least two-thirds (2/3) in amount and seventy-five percent (75%) in number of the holders of Asbestos PI Claims who vote must vote to accept the Plan.

### B.    Risk Factors.

Holders of Claims against Leslie should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or referred to herein by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

#### 1.    Overall Risks to Recovery by Holders of Claims.

The ultimate recoveries under the Plan to holders of Claims (other than holders whose entire Distribution is paid in Cash) depend upon a number of factors. The factors below (other than the factor entitled "Certain Bankruptcy Considerations") assume that the Plan is confirmed and that the Effective Date occurs on or about November 1, 2010. Prior to voting on the Plan, each holder of a Claim should consider carefully the risk factors specified or referred to below, including the exhibits annexed hereto, as well as all of the information contained in the Plan.

#### 2.    Certain Bankruptcy Considerations.

Although Leslie believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance or guaranty that the Bankruptcy Court will reach the same conclusion, or that the Confirmation Order, if challenged on appeal, will be affirmed. There also can be no assurance that the Plan as proposed will be accepted by the requisite number of holders or amounts of Claims, that the Plan will not be modified up to and including the Confirmation Date, or that the Bankruptcy Court will enter an order confirming the Plan containing the findings of fact and conclusions of law that are conditions precedent to confirmation of the Plan. There can also be no assurance that the District Court will accept and affirm or issue the order confirming the Plan, that such acceptance and affirmance or issuance will become a Final Order and that the Asbestos PI Channeling Injunction will therefore become valid and enforceable.

46392/0001-6246827v15

If the Plan is not confirmed or the Chapter 11 Case becomes protracted, there is no assurance that CIRCOR will make any contribution; thus, Leslie believes substantially more assets would be available to pay claimants under the Plan than would be the case if there were no Plan and Leslie were forced to pay Claims solely from its own assets. In addition, if the Plan is not confirmed and consummated, there can be no assurance that the Chapter 11 Case will continue rather than be converted to a liquidation, or that any alternative plan of reorganization would be on terms as favorable to the holders of Claims and Equity Interests as the terms of the Plan. If a liquidation or protracted reorganization were to occur, there is a substantial risk that the value of Leslie's assets would be substantially eroded to the detriment of all stakeholders.

### 3.    Projected Financial Information.

The Projections are dependent upon numerous assumptions, including confirmation and consummation of the Plan in accordance with its terms, the anticipated future performance of Reorganized Leslie, general business and economic conditions, and other matters, many of which are beyond the control of Leslie. Accordingly, there can be no assurance that such assumptions will prove to be valid. In addition, unanticipated and unforeseeable events and/or circumstances occurring subsequent to the preparation of the Projections may affect the actual financial results of Reorganized Leslie. Although Leslie believes that the projections are reasonable and attainable, some or all of the estimates will vary, and variations between the actual financial results and those projected may be material.

### 4.    Appointment of a Different Asbestos PI Trustee and/or Different Members of the Asbestos PI Trust Advisory Committee for the Asbestos PI Trust.

At the Confirmation Hearing, Leslie will request that the Bankruptcy Court appoint a certain Entity as the initial Asbestos PI Trustee of the Asbestos PI Trust, and certain Entities as the initial members of the Asbestos PI Trust Advisory Committee. The Bankruptcy Court, however, may reject or otherwise decline to such proposed Asbestos PI Trustee, or one or more of the proposed members of the Asbestos PI Trust Advisory Committee. In that case, an alternate Asbestos PI Trustee and/or alternative proposed members of the Asbestos PI Trust Advisory Committee would have to be nominated, potentially resulting in significant delays in the occurrence of the Confirmation Date and Effective Date. The selection of a different Asbestos PI Trustee or different Asbestos PI Trust Advisory Committee members also could materially affect administration of the Asbestos PI Trust.

### 5.    Distributions under the Asbestos PI Trust Distribution Procedures.

Payments that will be made on Asbestos PI Claims will be determined under the Asbestos PI Trust Distribution Procedures and will be based, on the one hand, on estimates of the number, types, and amount of current and expected future Asbestos PI Claims and Demands, and on the other hand, on the value of the assets of the Asbestos PI Trust, the liquidity of the Asbestos PI Trust, the Asbestos PI Trust's expected future income and expenses, and other matters that are likely to affect the sufficiency of funds to pay all holders of Asbestos PI Claims. There can be no certainty as to the precise amounts that will be distributed by the Asbestos PI Trust in any particular time period or when Asbestos PI Claims will be paid by the Asbestos PI Trust.

46392/0001-6246827v15

6.    **Risk of Post-Consummation Default.**

Although Leslie can give no guarantees, it believes that Reorganized Leslie will generate sufficient operating cash flow to meet its business obligations and operating requirements and that such cash flow will be sufficient to make the payments required to be made by Reorganized Leslie under the Plan.  At the Confirmation Hearing, the Bankruptcy Court will be required to make a determination that the Plan is feasible (*i.e.*, not likely to be followed by the liquidation, or the need for further financial reorganization, of Reorganized Leslie) in order to confirm the Plan.

7.    **The Asbestos PI Channeling Injunction.**

The Asbestos PI Channeling Injunction, which, among other things, bars the assertion of any Asbestos PI Claims or Demands against Leslie and the other Asbestos Protected Parties, is a cornerstone of the Plan.  In 1994, the United States Congress added subsections (g) and (h) to section 524 of the Bankruptcy Code in order to confirm the authority of the Bankruptcy Court, subject to the conditions specified therein, to issue injunctions such as the Asbestos PI Channeling Injunction with respect to present and future asbestos-related personal injury, wrongful death and related Claims and demands.  Although the Plan, the Asbestos PI Trust Agreement, and the Asbestos PI Trust Distribution Procedures all have been drafted with the intention of complying with sections 524(g) and (h) of the Bankruptcy Code, and satisfaction of the conditions imposed by sections 524(g) and (h) is a condition precedent to confirmation of the Plan, there is no guarantee that the validity and enforceability of the Asbestos PI Channeling Injunction or sections 524(g) and (h) or the application of the Asbestos PI Channeling Injunction to Asbestos PI Claims will not be challenged, either before or after confirmation of the Plan.

8.    **Asbestos Liability Insurance.**

A discussion of the insurance coverage available for Asbestos PI Claims is provided in Section II.D. hereof.  Although no coverage disputes exist between Leslie and its insurers at this time, future disputes could arise and necessitate the resolution of various issues impacting the exact value of Leslie's insurance coverage, including but not limited to:  the application of the policies' limits of liability and SIRs, if any; the manner in which losses are allocated among multiple triggered policies; the determination of what constitutes injury for triggering the policies; the resolution of the number of "occurrences" issue; the principles of law which would be likely to apply in resolving coverage disputes; the timing and amount of Asbestos PI Claims which may be made in the future; the sufficiency of amounts paid by underlying insurers; the determination of each insurer's obligation to provide coverage; and various other legal and factual issues that may be raised as a defense to coverage.  Moreover, the possibility exists that one or more insurers may become insolvent in the future.

9.    **Risk of No Insurance Coverage.**

Fireman's Fund Insurance Company and possibly other related insurance companies (collectively, "FFIC") and Century Indemnity Company ("Century" and, together with FFIC, the "Insurers") have requested the inclusion of the following language quoted below.  By including this language herein, the Debtor does not necessarily agree with any or all of the language quoted.

46392/0001-6246827v15

"The Plan anticipates that certain Claims may be satisfied in whole or in part from available insurance coverage. FFIC and Century issued certain Insurance Policies for various policy periods that may provide, or may be alleged to provide, coverage for all or part of certain Claims. In connection with such Insurance Policies, the Insurers and the Debtor may have entered into various related agreements (together with the Insurance Policies, collectively, the "Insurance Agreements").

The Insurers have asserted that (i) the Insurance Agreements require the Debtor, as insured, to satisfy certain conditions in order for coverage to be provided; (ii) the Insurance Agreements are executory contracts within the meaning of section 365 of the Bankruptcy Code; and (iii) the Insurance Agreements must be assumed as a condition to the Insurers' continuing obligation to provide coverage. The Insurers believe that the Plan as stated does not presently require the Debtor and/or the Reorganized Debtor, as the case may be, to provide adequate assurance of future performance of the insured's continuing obligations under the Insurance Agreements. Moreover, the Insurers believe that the Plan attempts to assume the benefits of any coverage that may be available under the Insurance Agreements, but does not otherwise describe how the insured's continuing obligations under the Insurance Agreements will be performed. The Insurers contend that the Plan does not specifically require that the Debtor, the Reorganized Debtor and/or any other entity that may seek coverage under the Insurance Agreements to satisfy their continuing contractual obligations under the Insurance Agreements, and confirmation of the Plan may effect a discharge and/or release of those contractual obligations. As such, the Insurers believe that the Plan does not comply with section 365 of the Bankruptcy Code, or applicable non-bankruptcy law with respect to the obligations of an insured as conditions to the provision of insurance coverage and that the failure to definitively provide for performance of the insured's continuing obligations under the Insurance Agreements may result in a loss of any otherwise available coverage.

The Insurers believe that the failure of the Plan to definitively require the Debtor, the Reorganized Debtor and/or any other entity that may seek coverage under the Insurance Agreements to satisfy the continuing contractual obligations of the insured under the Insurance Agreements may void any insurance coverage under the Insurance Agreements that may be otherwise available. The Insurers also believe that the Plan seeks to provide the Debtor and/or the Reorganized Debtor with certain injunctive relief in connection with confirmation that alters the Debtor and/or the Reorganized Debtor's ongoing contractual obligations under the Insurance Agreements that could also vitiate any available insurance coverage. In particular, and not by way of limitation, the Insurers believe that the Plan violates their rights: (i) to control, participate in, and/or associate in (as applicable) the defense, investigation and/or settlement of Claims; (ii) to require the Debtor and/or the Reorganized Debtor to cooperate in the defense and investigation of otherwise covered Insured Claims including, without limitation, preservation of all books and records necessary to defend such Insured Claims; (iii) to require the Debtor's and/or the Reorganized Debtor's continuing compliance with all the terms and conditions of the Insurance Agreements; (iv) to assert certain subrogation rights available to the Insurers under the Insurance Agreements; (v) to assert any claims for setoff, indemnification, contribution, recoupment and/or similar claims otherwise available under applicable law; (vi) to deny coverage for Claims based upon any attempted assignment of the Insurance Agreements without the Insurers' prior express written consent; (vii) to require payment of any deductibles and/or self-insured retentions, if applicable, with respect to any Claims and (viii) to enforce any other

56

performance of the Debtor's and/or the Reorganized Debtor's continuing contractual obligations under the Insurance Agreements.  As such, holders of Claims that may be otherwise covered under the Insurance Agreements may not be able to receive any insurance proceeds in full or partial satisfaction of such Claims.

The Insurers contend that without further revisions to the Plan that ensure that the Debtor will effectively assume the Insurance Agreements, and provide that, notwithstanding any other terms of the Plan, the Plan Supplement and/or the Confirmation Order, the Debtor and/or the Reorganized Debtor will be bound to satisfy all continuing contractual obligations of the insureds under the Insurance Agreements, the Plan is not "insurance neutral," and the Insurers' contractual rights, claims and defenses will be impaired.  Accordingly, the Insurers have reserved all of their rights, claims and defenses under the Insurance Agreements including, but not limited to, their rights to deny coverage if, as or when any Claims are tendered under the Insurance Agreements because the Plan fails to require the Debtor, the Reorganized Debtor and/or any other entity that may seek coverage under the Insurance Agreements to satisfy the obligations of the insureds under the Insurance Agreements and otherwise prejudices the Insurers' rights, claims and defenses.  Based on the foregoing, the Insurers have indicated that they may object to confirmation of the Plan and/or seek declaratory relief in a court of competent jurisdiction that the treatment of the Insurance Agreements under the Plan relieves them of any further obligation to provide coverage thereunder."

## XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor believes that the Plan affords holders of Claims the greatest opportunity for recovery on account of their Claims and, therefore, is in the best interests of such holders.  If the Plan is not confirmed, however, the hypothetical alternatives include (a) liquidation of Debtor under Chapter 7 of the Bankruptcy Code, or (b) an alternative plan of reorganization.

### A.    Liquidation Under Chapter 7 or Chapter 11.

If no plan can be confirmed, the Chapter 11 case could be converted to a case under Chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the remaining assets of the Debtor for distribution to the creditors in accordance with the priorities established by the Bankruptcy Code.  The trustee would retain professionals and liquidate the Debtor's remaining assets, and if necessary, investigate and pursue causes of action.  The Debtor believes that the conversion of the case to Chapter 7 would increase the costs of administration, and reduce and delay the distribution to holders of Allowed Claims.  Any proceeds available to satisfy Claims would be paid in the priority established in the Bankruptcy Code – Secured Claims, Administrative Claims, Priority Claims, Priority Tax Claims, and General Unsecured Claims.  Under a Chapter 7 liquidation, the Debtor believes that any recovery to the holders of Asbestos PI Claims in a Chapter 7 case would be less than that provided for under the Plan.  For the reasons noted above, the Debtor has concluded that holders of Allowed Claims are more likely than not to receive an amount under the Plan that is more than the amount such holder would receive under a Chapter 7 liquidation.

**B.      Alternative Plan(s) of Reorganization.**

If the Plan is not confirmed, the Debtor or any other party-in-interest could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtor's business or an orderly liquidation of assets, or a combination of both.

The Debtor's business could suffer from increased costs, erosion of customer confidence and liquidity difficulties if the Debtor remained a debtor-in-possession during a lengthy Chapter 11 process while trying to negotiate a plan.  The Debtor believes that the Plan which is the result of extensive negotiations among the Debtor, CIRCOR, the Ad Hoc Committee, the Pre-Petition Future Claimants' Representative and their advisors, enables holders of Claims to realize the greatest possible value under the circumstances and that, compared to any later alternative plan of reorganization, the Plan has the greatest chance to be confirmed and consummated.

## XII. VOTING PROCEDURES AND RESULTS

**A.      Parties in Interest Entitled to Vote.**

Detailed voting instructions are provided with the Ballot accompanying this Disclosure Statement.  For purposes of the Plan, the following Classes are the only ones entitled to vote:

| Class | Description |
|-------|-------------|
| 4 | Asbestos PI Claims |

For purposes of the Plan, the following Classes are NOT entitled to vote:

| Class | Description |
|-------|-------------|
| 1 | Priority Claims |
| 2 | Secured Claims |
| 3 | General Unsecured Claims |
| 5 | Intercompany Claims |
| 6 | Equity Interests in Leslie |

If your Claim is not in Class 4, you are not entitled to vote on the Plan and you will not receive a Ballot with this Disclosure Statement.  If you are a holder of a Claim in Class 4, you should read your Ballot and follow the listed instructions carefully.  Please use only the Ballot that accompanies this Disclosure Statement.

46392/0001-6246827v15

**IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT, YOU MAY CONTACT THE CLAIMS AND BALLOTING AGENT:**

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Telephone: (646) 282-2400
Attention: Leslie Control Ballot Processing Center

**B.      Vote Required for Acceptance by a Class.**

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims is determined by calculating the number and the amount of Claims voting to accept, based on the total of Allowed Claims actually voting.  Typically, acceptance requires an affirmative vote of more than one-half (1/2) in number of the total allowed Claims voting and two-thirds (2/3) in amount of the total allowed Claims voting.  However, section 524(g)(2)(B)(ii)(IV)(bb) of the Bankruptcy Code provides that, for a debtor to establish an Asbestos PI Trust and receive the benefit of an injunction that channels liability for asbestos-related Claims to the Asbestos PI Trust, at least seventy-five percent (75%) in number of the holders of Claims that are to be addressed by the Asbestos PI Trust must vote to accept the Plan.  Accordingly, it is a condition to confirmation of the Plan that at least seventy-five percent (75%) of the holders of Asbestos PI Claims who actually vote on the Plan must have voted to accept the Plan and two-thirds (2/3) in amount of the holders of Asbestos PI Claims who actually vote on the Plan must have voted to accept the Plan.

**C.      Classes Deemed to Accept.**

Under the Bankruptcy Code, holders of Claims that are Unimpaired by the Plan are deemed to accept the Plan and solicitation of such holders is not required.  Because Claims in Class 1 (Priority Claims), Class 2 (Secured Claims), Class 3 (General Unsecured Claims), Class 5 (Intercompany Claims) and Class 6 (Equity Interests) are Unimpaired under the Plan, the holders thereof are deemed to accept the Plan, and are not entitled to vote.  For a summary of the Classes entitled to vote, see the chart in the Summary of the Plan of Reorganization and the Asbestos PI Trust Distribution Procedures.

**D.      Voting.**

In order for your vote to be counted, it must be **actually received** by the Claims and Balloting Agent at the following address before the **Voting Deadline of 5:00 p.m., prevailing Eastern time, on September 27, 2010:**

59

*If by hand delivery or overnight courier:*          *If by first class mail:*

Epiq Bankruptcy Solutions, LLC                Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd FLOOR                   FDR Station, P.O. Box 5015
New York, NY 10017                            New York, NY 10150-5014
Telephone: (646) 282-2400                     Telephone: (646) 282-2400
Attention: Leslie Control Ballot Processing Center    Attention: Leslie Control Ballot Processing Center

     If the instructions on your Ballot require you to return the Ballot to your attorneys, you must deliver your Ballot to your attorneys in sufficient time for them to process it and return it to the Claims and Balloting Agent before the Voting Deadline.  If a Ballot is damaged or lost, you may contact Leslie's Claims and Balloting Agent at the number set forth above.  Any Ballot that is executed and returned but which does not indicate an acceptance or rejection of the Plan will not be counted.

### XIII. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

     **CIRCULAR 230 NOTICE:  TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE ("IRS") CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT:  (I) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF ASBESTOS PI CLAIMS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER FEDERAL, STATE, OR LOCAL TAX LAWS, (II) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN, AND (III) HOLDERS OF ASBESTOS PI CLAIMS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

     **THE FOLLOWING DISCUSSION SUMMARIZES CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN TO HOLDERS OF ASBESTOS PI CLAIMS.  THE FOLLOWING SUMMARY DOES NOT DISCUSS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS WHOSE CLAIMS ARE ENTITLED TO PAYMENT IN FULL IN CASH OR ARE OTHERWISE UNIMPAIRED UNDER THE PLAN OR TO HOLDERS OF EQUITY INTERESTS OR INTERCOMPANY CLAIMS.**

     **THE FOLLOWING SUMMARY IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE"), TREASURY REGULATIONS PROMULGATED THEREUNDER, JUDICIAL DECISIONS AND PUBLISHED ADMINISTRATIVE RULES AND PRONOUNCEMENTS OF THE IRS AS IN EFFECT ON THE DATE HEREOF.  CHANGES IN SUCH RULES OR NEW INTERPRETATIONS THEREOF MAY HAVE RETROACTIVE EFFECT AND COULD SIGNIFICANTLY AFFECT THE FEDERAL INCOME TAX CONSEQUENCES DESCRIBED BELOW.**

46392/0001-6246827v15

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE
COMPLEX AND ARE SUBJECT TO SIGNIFICANT UNCERTAINTIES.  LESLIE
DOES NOT INTEND TO SEEK A RULING FROM THE IRS CONCERNING ANY OF
THE TAX ASPECTS OF THE PLAN.  IN ADDITION, THIS SUMMARY DOES NOT
ADDRESS FOREIGN, STATE, OR LOCAL TAX CONSEQUENCES OF THE PLAN,
NOR DOES IT PURPORT TO ADDRESS THE FEDERAL INCOME TAX
CONSEQUENCES OF THE PLAN TO SPECIAL CLASSES OF TAXPAYERS (SUCH
AS FOREIGN TAXPAYERS, BROKER-DEALERS, BANKS, MUTUAL FUNDS,
INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, THRIFTS, SMALL
BUSINESS INVESTMENT COMPANIES, REGULATED INVESTMENT COMPANIES,
REAL ESTATE INVESTMENT COMPANIES, TAX-EXEMPT ORGANIZATIONS,
TRADERS IN SECURITIES THAT ELECT TO USE A MARK-TO-MARKET METHOD
OF ACCOUNTING, AND PASS-THROUGH ENTITIES).

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL
INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND
IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED
UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN
ASBESTOS PI CLAIM.  ALL HOLDERS OF ASBESTOS PI CLAIMS ARE URGED TO
CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL,
AND OTHER TAX CONSEQUENCES APPLICABLE TO THEM UNDER THE PLAN.

A.      Treatment of the Asbestos PI Trust.

It is intended that the Asbestos PI Trust will be treated as a qualified settlement fund
within the meaning of section 468B of the Internal Revenue Code and the Treasury regulations
promulgated thereunder. The applicable Treasury regulations provide that to be treated as a
qualified settlement fund, a fund, account, or trust must be (i) established pursuant to an order of,
or be approved by, a government authority, including a court, and must be subject to the
continuing jurisdiction of that government authority; (ii) established to resolve or satisfy one or
more contested or uncontested claims that have resulted or may result from an event or a related
series of events that has occurred and that has given rise to at least one claim asserting, among
other things, liability under the Comprehensive Environmental Response, Compensation and
Liability Act of 1980, as amended, 42 U.S.C. 9601 et seq., or liability arising out of a tort, breach
of contract or violation of law; and (iii) a trust under applicable state law or have its assets
physically segregated from the other assets of the transferor and persons related to the transferor.

Provided that the Asbestos PI Trust is treated as qualified settlement fund, the Asbestos
PI Trust will generally be subject to an entity level tax at the maximum rate applicable to trusts
and estates, and, in determining the taxable income of the Asbestos PI Trust, (i) any amounts
transferred by Leslie or CIRCOR to the Asbestos PI Trust to resolve or satisfy a liability for
which the Asbestos PI Trust is established generally will be excluded from the Asbestos PI
Trust's income; (ii) any dividends, interest and payments received as compensation for delayed
transfers generally will constitute taxable income to the Asbestos PI Trust, including amounts
representing interest under the Leslie Promissory Note; (iii) any sale, exchange or distribution of
property by the Asbestos PI Trust generally will result in the recognition of gain or loss in an
amount equal to the difference between the fair market value of the property on the date of

disposition and the adjusted tax basis of such property; (iv) administrative costs (including state and local taxes) incurred by the Asbestos PI Trust generally will be deductible; and (v) trade or business expenses treated as incurred by the Asbestos PI Trust will generally not be deductible for federal income tax purposes. In general, the adjusted tax basis of property received (or treated as received for federal income tax purposes) by a qualified settlement fund from a transferor pursuant to the Plan will be the fair market value of such property at the time of receipt.

### B.    Consequences to Holders of Asbestos PI Claims.

Each Asbestos PI Claim will be liquidated and resolved by the Asbestos PI Trust in accordance with the Asbestos PI Trust Distribution Procedures. The federal income tax treatment of the receipt of payments from the Asbestos PI Trust by a holder of such an Asbestos PI Claim generally will depend upon the nature of the Asbestos PI Claim. Because the amounts received by a holder of an Asbestos PI Claim (other than an Indirect Asbestos PI Claim or an Asbestos PI Trust Expense) generally will be attributable to, and compensation for, such holder's personal physical injuries or sickness, within the meaning of section 104 of the Internal Revenue Code, any such amounts received by the holder generally should be nontaxable. However, to the extent payments from the Asbestos PI Trust to a holder of an Asbestos PI Claim are attributable to medical expense deductions allowed under section 213 of the Internal Revenue Code for a prior taxable year, such payments will be taxable as ordinary income to the recipient. To the extent that the payments from the Asbestos PI Trust to holders of Asbestos PI Claims constitute amounts received on account of claims other than personal injury or sickness, such payments generally will be includable in the gross income of such holders.

### C.    Information Reporting and Withholding.

All distributions to holders of Asbestos PI Claims under the Plan are subject to applicable information reporting and withholding. Under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then-applicable rate. Backup withholding generally applies if the holder (i) fails to furnish its social security number or other taxpayer identification number ("TIN"), (ii) furnishes an incorrect TIN, (iii) fails properly to report interest or dividends, or (iv) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent that it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

## XIV. VOTING PROCEDURES

### A.    Waivers of Plan Defaults, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots will be determined by the Claims and Balloting Agent and the Debtor, in their sole discretion, which determination will be final and binding. As indicated below under "Withdrawal of Ballots;

Revocation," effective withdrawals of ballots must be delivered to the Claims and Balloting Agent prior to the Voting Deadline. The Debtor reserves the absolute right to contest the validity of any such withdrawal. The Debtor also reserves the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtor or its counsel, be unlawful. The Debtor further reserves the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtor (or the Bankruptcy Court) determine. Neither the Debtor nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### B.    Withdrawal of Ballots; Revocation.

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Claims and Balloting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must (i) contain the description of the Claim(s) to which the Ballot relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn, and (iv) received by the Claims and Balloting Agent in a timely manner at Epiq Bankruptcy Solutions, LLC, Attention: Leslie Controls Ballot Processing Center, FDR Station, P.O. Box 5015, New York, NY 10150-5014. The Debtor intends to consult with the Claims and Balloting Agent to determine whether any withdrawals of Ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Debtor expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner by the Claims and Balloting Agent will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to the Claims and Balloting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his, her, or its vote by submitting to the Claims and Balloting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received.

### C.    Further Information; Additional Copies.

If you have any questions or require further information about the voting procedures for voting your Claim or about the packet of material you received, or if you wish to obtain an

additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d) or order of the Bankruptcy Court), please contact Epiq at:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Telephone: (646) 282-2400

## XV. CONCLUSION AND RECOMMENDATION

The Debtor believes that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will result in the greatest recoveries to holders of Claims and Interests. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.

Consequently, the Debtor urges all holders of Claims entitle to vote to ACCEPT the Plan, and to evidence their acceptance by duly completing and returning their Ballots so that they are actually received by Epiq on or before **5:00 p.m., prevailing Eastern time, on September 27, 2010.**

46392/0001-6246827v15

Dated:  August 20, 2010                         **LESLIE CONTROLS, INC.**

                                  By:  _____
                                        Name:  G. Wayne Day
                                        Title:  Chief Restructuring Officer


Dated:  August 20, 2010                         **COLE, SCHOTZ, MEISEL,**
                                                **FORMAN & LEONARD, P.A.**

                                  By:  _____
                                        Norman L. Pernick (No. 2290)
                                        Marion M. Quirk (No. 4136)
                                        Sanjay Bhatnagar (No. 4829)
                                        500 Delaware Avenue, Suite 1410
                                        Wilmington, DE  19801
                                        Telephone: (302) 652-3131
                                        Facsimile: (302) 652-3117

                                                -and-

                                        G. David Dean
                                        300 East Lombard Street, Suite 2000
                                        Baltimore, MD  21202
                                        Telephone: (410) 230-0660
                                        Facsimile: (410) 230-0667

                                        Counsel for the Debtor and
                                        Debtor in Possession