# United States Bankruptcy Court
## District of Delaware

824 N. Market Street
Wilmington, DE 19801

Chambers of Christopher S. Sontchi
(302) 252-2888

September 21, 2010

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
Norman L. Pernick
Marion M. Quirk
Sanjay Bhatnagar
500 Delaware Avenue, Suite 1410
Wilmington, DE 19801

-and-

G. David Dean
300 East Lombard Street, Suite 2000
Baltimore, MD 21202

Counsel for Debtor and
Debtor in Possession

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Edwin J. Harron
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

Counsel for Future Claimants'
Representative

MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP
Natalie D. Ramsey
1105 Market Street, 15th Floor
Wilmington, DE 19801

Counsel for The Official Committee
Of Unsecured Creditors

CROWELL MORING
Mark D. Plevin
1001 Pennsylvania Avenue, NW
Washington, DC 20004-2595

Counsel for Century
Indemnity Company

STEVENS & LEE
John D. Demmy
1105 North Market Street, 7th Floor
Wilmington, DE 19801

Counsel for Fireman's Fund
Insurance Comp

RE: **<u>Leslie Controls, Inc., Case No. 10-12199</u>**

Dear Counsel:

Before the Court is a discovery dispute between (i) Century Indemnity Company and Fireman's Fund Insurance Company (collectively, the "Insurers"); and (ii) the

Debtor.[1] The question is whether privileged communications between the Debtor and its counsel that were shared pre-petition with an ad hoc committee of asbestos plaintiffs (the "Ad Hoc Committee") and the Debtor's proposed future claimants' representative (the "Pre-Petition FCR") remain protected from discovery under the "common interest doctrine."

There are 26 documents at issue. The main document in question is a memorandum that was prepared by insurance coverage counsel for the Debtor providing advice with respect to the effect of the Insurers' likely position on insurance recoveries under various bankruptcy scenarios. Other documents contain information or analysis obtained from the memorandum.

In late 2009, the Debtor determined that a bankruptcy filing was necessary to deal with its mounting liabilities arising from asbestos personal injury lawsuits. In early 2010, the Debtor began negotiations with the Ad Hoc Committee and the Pre-Petition FCR in hopes of developing a consensual plan of reorganization. Those negotiations were ultimately successful.[2]

During the negotiations, the Debtor shared the memorandum with counsel to the Ad Hoc Committee and the Pre-Petition FCR. Subsequently, the Debtor, the Ad Hoc Committee and the Pre-Petition FCR exchanged a number of emails in which the email and/or the attachment referenced the privileged material in the memorandum. A number of those exchanges (but not all) occurred prior to the parties reaching agreement on the terms of the plan. All of the exchanges occurred pre-petition. The memorandum, the emails and the attachments constitute the documents at issue.

***1) The Common Interest Doctrine***

The common interest doctrine "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others."[3] It expands the reach of the attorney-client privilege and work product doctrine by providing that, under certain circumstance, the sharing of privileged communications with third parties does not constitute a waiver of the privilege. Thus, the doctrine is only applicable if an underlying privilege has been established.[4]

The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter

---

[1] The Official Committee of Unsecured Creditors and the Future Claimants' Representative support the Debtor's position.

[2] A confirmation hearing is scheduled to occur shortly. The Insurers object to the plan of reorganization currently before the Court.

[3] *In re Teleglobe Communications Corp.*, 493 F.3d 345, 364 (3d. Cir. 2007).

[4] *Louisiana Municipal Police Employees Retirement System v. Sealed Air Corp., et al.*, 253 F.R.D. 300, 309 (D. N.J. 2008).

of common interest, (2) the communication was designed to further that effort, and (3) the privilege has not otherwise been waived.[5]

Although the common interest doctrine has its origin in the joint defense privilege, it has completely replaced that privilege for information sharing among clients with different attorneys.[6] Thus, the doctrine is not limited to communications among co-defendants to ongoing litigation. Indeed, "[p]ending litigation is not necessary to invoke the common interest [doctrine]: '[it] is irrespective of litigation begun or contemplated.'"[7] Rather, the common interest doctrine "applies whenever the communication is made in order to facilitate the rendition of legal services to each of the clients involved in the conference."[8]

The common interest of the parties must be "at least a substantially similar legal interest."[9] Nonetheless, the parties need not be in complete accord:

> The common interest privilege does not require a complete unity of interests among the participants. The privilege applies where the interests of the parties are not identical, and it applies even where the parties' interests are adverse in substantial respects. The privilege applies even where a lawsuit is foreseeable in the future between the co-defendants.[10]

When the interests of the parties diverge to some extent the common interest doctrine applies "only insofar as their interests [are] in fact identical; communications relating to matters as to which they [hold] opposing interests . . . lose any privilege."[11]

As mentioned above, the second prong of the common interest doctrine requires the party invoking the doctrine to establish that the communication was designed to further the common interest. "[I]t is not sufficient for the party seeking the protection of the common interest doctrine merely to show that a unified legal interest theoretically existed. Rather, it must also demonstrate that the parties demonstrated cooperation in developing a common legal strategy." [12]

---

[5] *In re Mortgage & Realty Trust*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997).

[6] *Teleglobe*, 493 F.3d at 364 n. 20. As such, cases applying the joint defense privilege -- such as *In re Bevill, Bresler & Schulman Asset Management Corp*., et al., 805 F.2d 120 (3d Cir. 1986) – are of limited utility.

[7] *Mortgage & Realty Trust*, 212 B.R. at 653 (quoting *Continental Oil Co. v. United States,* 330 F.2d 347, 350 (9th Cir. 1964)).

[8] *Id.*

[9] *Teleglobe*, 493 F.3d at 365. That said, "[t]he fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest." *Duplan Corp. v. Deering Milliken, Inc.,* 397 F. Supp. 1146, 1172 (D. S.C. 1974)

[10] *Mortgage & Realty Trust*, 212 B.R. at 653 (internal citations omitted).

[11] *In re Rivastigmine Patent Litigation*, 2005 WL 2319005, * 4 (S.D.N.Y. Sept. 22, 2005).

[12] *Id*. at *2

### 2) *Application In This Case*

#### *a) The Attorney-Client Privilege And The Attorney Work Product Doctrine*

As a necessary, preliminary matter, the Court must find that the documents are protected under the attorney-client privilege and/or the attorney work product doctrine. The Debtor has produced a privilege log and submitted the documents to the Court *in camera*. Based upon a review of the documents in question, the Court finds that the documents reflect insurance coverage counsel's legal analysis and mental impressions concerning insurance issues and strategies in anticipation of possible litigation with the Insurers in a bankruptcy proceeding and/or subsequent coverage litigation. Thus, the information contained in the documents is, indeed, privileged. The nub of the dispute, however, is whether the Debtor waived that privilege by sharing the information with the Ad Hoc Committee and the Pre-Petition FCR.

#### *b) The Common Interest Doctrine*

The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege has not otherwise been waived.[13] The Insurers argue that the Debtor has failed to meet that burden for two reasons.

The common interest of the parties must be "at least a substantially similar *legal* interest."[14] Quoting the Debtor's statement in its letter brief that the Debtor, the Ad Hoc Committee and the Pre-Petition FCR shared a common interest in "preserv[ing] and maximiz[ing] the insurance available to pay asbestos claims," the Insurers argue that, at most, *the parties shared a common commercial interest - not a legal interest*.

In addition, the Insurers argue that the Debtor, the Ad Hoc Committee and the Pre-Petition FCR do not share a *common* interest in connection with the insurance proceeds. Rather, they are adversaries on this issue since the information was shared pre-petition and prior to the parties reaching an agreement on the terms of a plan of reorganization.

#### *c) Commercial Interest vs. Legal Interest*

The Insurers argue that the parties shared, at most, a common commercial interest as opposed to a legal interest. They cite to a number of cases in support of that argument.[15] All of those cases, however, either support the Debtor's position or are readily distinguishable.

---

[13] *Mortgage & Realty Trust*, 212 B.R. at 653.

[14] *Teleglobe*, 493 F.3d at 365 (emphasis added).

[15] *In re Rivastigmine Patent Litigation*, supra; *Shamis v. Ambassador Factors Corp.*, 34 F.Supp.2d 879 (S.D.N.Y. 1999); and *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466 (S.D.N.Y. 2003).

*In re Rivastigmine Patent Litigation* involved a suit for patent infringement. The purported infringers sought discovery of communications between the inventors and the pharmaceutical companies holding the relevant patent(s) (collectively, "Novartis"). In support of their argument the Insurers cite to the following:

> Whether the inventors and Novartis continued to have a common legal interest after all patent rights were assigned to Novartis is more doubtful. At that point, the patent rights of [the inventors] were extinguished, even though they continued to have rights to royalties. Such economic rights, standing alone, are generally not sufficient to support application of the common interest doctrine.[16]

The Insurers ignore, however, the bulk of the Court's decision in which it held that "even though Novartis and the inventors may have ultimately anticipated a transfer of the patent rights to Novartis exclusively, until that occurred they had a *common legal interest* in obtaining the patents in order to maximize the value of the property that would ultimately be conveyed."[17] The Court further held that the common interest was "not diminished" by the fact that the parties were negotiating the ultimate assignment of the patent to Novartis.[18]

The issue in *Shamis* was whether communications between the plaintiff in the action and BancBoston, which was *not* a party to the suit, were protected by the common interest doctrine where "[plaintiff] and BankBoston would both benefit from a judgment in favor of the plaintiff."[19] The Court held that sharing a desire to succeed in an action, in and of itself, does not create a common interest.[20] The Court went on to hold, however, that the common interest doctrine was inapplicable because there was no shared legal interest whatsoever.

> [Plaintiff] has not produced any agreement between plaintiff and his counsel and BankBoston establishing a joint prosecution of plaintiff's claims. There is no evidence of a coordinated legal strategy between [plaintiff] and BankBoston. BankBoston is not, and has never been a party to this action. BankBoston has not exercised control over the conduct of this action, nor has it contributed to plaintiff's legal expenses.[21]

*Gulf Island Lea*sing presents a somewhat similar fact pattern as to that in *Shamis*. In 2000, Gulf Island Leasing purchased from Bombardier Aerospace a fractional interest in an aircraft. In addition, Gulf Island Leasing and Bombardier Aerospace entered into

---

16 *In re Rivastigmine Patent Litigation*, *supra* at *4.

17 *Id*. at *3 (emphasis added).

18 *Id*. at *4.

19 *Shamis*, 34 F.Supp.2d at 893.

20 *Id*.

21 *Id*.

a management agreement governing the use and management of the aircraft. Gulf Island Leasing financed the purchase of the fractional share through a loan from Bombardier Capital – an affiliate of Bombardier Aerospace. The purchase agreement, management agreement, and finance agreement all contained cross-default provisions.

Ultimately, litigation arose between Gulf Island Leasing and Bombardier Aerospace. The litigation settled and Gulf Island Leasing and Bombardier Aerospace entered into a settlement agreement. Subsequently, a dispute arose over the terms of the settlement agreement and litigation arose once again. Bombardier Capital was not a party to the initial suit, the settlement agreement nor the second suit.

Gulf Island Leasing sought discovery from Bombardier Capital of communications between Bombardier Aerospace and Bombardier Capital relating to the initial lawsuit and the settlement. Bombardier Capital objected invoking the protection of the common interest doctrine.

The Court's holding in *Gulf Island Leasing* is, frankly, somewhat confusing. First, the Court mistakenly states that "communications regarding business matters - even where litigation is pending or imminent - do not qualify for protection from discovery under the common interest rule."[22] That statement is overly broad or, perhaps more accurately, imprecise. Indeed, the very cases cited by the Court stand for an entirely different proposition, i.e., that an *incidental* legal issue is insufficient to transform a commercial interest into a legal one. [23]

Second, the Court incorrectly held that an attorney-client privilege must exist between counsel to Bombardier Aerospace and Bombardier Capital for the common interest doctrine to be applicable.[24] That is incorrect. When multiple clients engage one

---

[22] *Gulf Island Leasing*, 215 F.R.D. at 471.

[23] See, e.g., *In re FTC*, 2001 WL 396522, at *5 (S.D.N.Y. Apr. 19, 2001) ("courts have recognized that a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule"); *Walsh v. Northrop Grumman Corp.*, 165 F.R.D. 16, 18 (E.D.N.Y.1996) ("[t]he doctrine does not extend to communications about a joint business strategy that happens to include a concern about litigation") (citation omitted).

*Id.* (emphasis added).

[24] *Moreover, the circumstances of the communications do not suggest that Bombardier Capital would be receiving legal advice from Bombardier Aerospace's attorney*. Bombardier Capital was not a party to the lawsuits and continued receiving payments due to it under the Loan Agreement. Each corporation had its own attorney. While Bombardier Capital certainly had an interest in the dispute between Gulf and Bombardier Capital being resolved and no default occurring, this does not suggest any need for the receipt of legal advice from Bombardier Aerospace's attorneys.

*In any event, the burden of showing that Bombardier Aerospace was providing Bombardier Capital with legal advice rests with Bombardier Capital.* It has failed to meet this burden and an *in camera* review of the documents does not provide any additional support for such a claim. Because Bombardier Capital has failed to carry its burden of demonstrating that

or more common attorneys to represent them on a matter of interest to all the applicable parties, the applicable privilege is the "co-client (or joint-client) privilege" and not the common interest doctrine.[25]

Ultimately, however, the *Gulf Island Leasing* Court applied the correct legal standard and held that, as in *Shamis*, there was no evidence of a common legal interest or strategy.[26] The communications between counsel for the Bombardier entities were limited to status reports and inquiries regarding the account balance under the financing – hardly a basis to assert a common legal interest.[27]

Broadly speaking, these cases stand for the proposition that the party invoking the common interest doctrine must present evidence that a legal interest is implicated. If such a legal interest is established then the common interest doctrine will apply (assuming the other elements of the test are met) even if there are separate or overlapping commercial interests.

*Rivastigmine Patent Litigation* is particularly instructive in this case.[28] There, the Court drew a distinction between legal and commercial interests. It held that the parties shared a common legal interest in the strength of the patents prior to the assignment to Novartis. Upon assignment, the inventors' sole interest was in continuing to receive royalty payments, i.e., a commercial interest. The inventors' status as "third party beneficiaries" to litigation did not, in and of itself, give rise to a legal interest.

The interest of the Debtor, the Ad Hoc Committee and the Pre-Petition FCR at the time the documents were shared was in "preserv[ing] and maximiz[ing] the insurance available to pay asbestos claims." This is an inherently legal question. It involves an analysis of the insurance documents, as well as contract, insurance and bankruptcy law. It requires the involvement of the bankruptcy court. The parties interest in the insurance in this case is virtually identical to the legal interest of Novartis and the investors in the patents in *Rivastigmine Patent Litigation*. Thus, the interest involved here is a legal one.

In short, at the time the documents were shared, the Ad Hoc Committee and Pre-Petition were not merely third party bystanders. As representatives of the ultimate beneficiaries of at least a portion of the proceeds they were directly involved in the effort to maximize insurance coverage. They were working with the Debtor to

---

> the communications at issue are "predominately of a legal character" or indeed at all legal in nature, *the attorney-client privilege does not apply and there is no need to reach the issue of whether Bombardier Capital may invoke the common interest doctrine*.

*Id*. at 472-473 (emphasis added).

[25] *Teleglobe*, 493 F.3d at 362-366.

[26] *Gulf Island Leasing*, *supra* at 472-474.

[27] *Id*. at 472.

[28] *Rivastigmine Patent Litigation*, *supra*.

maximize the size of the pie. Whether their competing interests in getting the biggest piece of pie possible prevented the application of the common interest doctrine in this case is another matter.

### *d) Did The Debtor, The Ad Hoc Committee And The Pre-Petition FCR Share A Common Interest?*

The common interest privilege does not require a complete unity of interests among the participants, but it is limited by the scope of the parties' common interest.[29] "[C]ommunications relating to matters as to which [the parties hold] opposing interests . . . lose any privilege."[30] The Insurers argue that the Debtor, the Ad Hoc Committee and the Pre-Petition FCR do not share a *common* interest in connection with the insurance proceeds. Rather, they argue, the parties are adversaries on this issue since the information was shared pre-petition and prior to the parties reaching an agreement on the terms of a plan of reorganization.

> The common interest exception does not protect information exchanged among parties simply because they are negotiating toward what they hope will be an agreement. During negotiations, adverse parties "ha[ve] no common interest, and indeed, their interests [a]re in conflict – each [party] want[s] to get the best deal from the other [ ], and to the extent that one succeed[s] in its goal, the other suffer[s]." As a result, until an agreement is actually reached, it is not "objectively reasonable for [a negotiating party] to believe that" a communication of privileged material to other negotiating parties "was confidential" and thus protected by the common interest privilege because, while negotiating parties "may all have hoped for a successful outcome, [ ] each side is representing its or their own interest, and a successful outcome was not assured."
>
> This principle has been specifically applied in the context of negotiations between prospective asbestos debtors and the claimants who are suing them. Courts recognize that the interests of such parties are "profoundly adverse to each other" because the "claimants wish to receive as much as possible" and the prospective debtors "wish to hold their payment obligations to a minimum." Courts have therefore rejected arguments that a "common interest" exists to protect information exchanged during bankruptcy negotiations between prospective debtors and asbestos claimants.
>
> Debtor . . . made the disclosures at issue here . . . in an attempt to persuade its negotiating adversaries, the Committee and [the Pre-Petition] FCR, to reach agreement with Debtor on the terms of a plan. But . . . the parties' divergent interests could not have been "common" after they had actually

---

[29] *Mortgage & Realty Trust*, 212 B.R. at 653.

[30] *Rivastigmine Patent Litigation*, at * 4.

> reached an agreement on the Plan and its treatment of their respective rights and interests. Yet, Debtor admits that it disclosed these material to the Committee and [the Pre-Petition] FCR before there was agreement on a plan or even the structure of a plan.[31]

The Insurers argue, in effect, for establishment of a *per se* rule that parties engaged in negotiations can never share a common interest. While there are cases that support this argument,[32] they are not universal. For example, the Third Circuit has held that parties engaged in merger negotiations may share a common interest.[33] This Court believes that the imposition of a black-line rule is inappropriate. Rather, commonality must be measured on a case by case basis.

The New Jersey District Court addressed this precise issue in *Louisiana Mun. Police Employees Retirement System v. Sealed Air Corp*.[34] That case was a class action for alleged violations of the Securities Exchange Act of 1934 related to a corporate transaction between W.R. Grace & Co. ("Grace") and Sealed Air Corporation ("Sealed Air"). The primary issue in the case was whether Grace was solvent at the time of the transaction. The plaintiff in the class action sought the production of documents shared between Grace and Sealed Air relating to potential asbestos liabilities. Sealed Air objected asserting that the common interest doctrine was applicable even though, at the time the documents were shared, Grace and Sealed Air were on opposite sides of a business transaction.

The Court held that "the fact that the parties were on adverse sides of a business deal . . . does not compel the conclusion that the parties did not share a common legal interest."[35] The Court went on to hold that Sealed Air had established a sufficient commonality of interest with Grace.

> Sealed Air has shown that it had a sufficient common legal interest with Grace . . . Prior to the transaction, both Grace and Sealed Air anticipated potential litigation related to asbestos issues. They also retained a

---

[31] Insurers' Letter Brief [D.I. 217] at 2-3 (internal citations omitted, emphasis in original).

[32] See, e.g., *In re JP Morgan Chase & Co. Securities Litigation*, 2007 WL 2363311 at *5 (N.D. Ill. Aug. 13, 2007) ("The Court is not convinced that the pre-merger documents shared between JP Morgan and Bank One remains protected by the attorney-client privilege and the common interest doctrine. Fundamentally, the Court does not understand how Bank One and JP Morgan can be said to share a common legal interest prior to their signing the merger. Prior to the merger, these organizations stood on opposite sides of a business transaction. From a business standpoint and from a legal standpoint, the merger parties' interests stood opposed to each other. They had no common interest, and indeed, their interests were in conflict-each company wanted to get the best deal from the other company, and to the extent that one succeeded in its goal, the other suffered.").

[33] *Teleglobe*, 493 F.3d at 364 (The common interest doctrine "applies in civil and criminal litigation, *and even in purely transactional contexts*.") (emphasis added).

[34] *Louisiana Mun. Police Employees Retirement Systems, supra*.

[35] *Id*. at 310.

> substantially similar legal interest in defending against such claims. Plaintiff contends that there was not an identical legal strategy, but that is beside the point. All of the participants interests "need not coincide." Defendant has established that pre-transaction they anticipated the same claims and shared a common-interest in defending against those claims. Thus, Defendants have established that the common-interest privilege precludes the discovery sought.[36]

In this case, the question is, regardless of the fact that there were ongoing plan negotiations, whether the Debtor shared information with the Ad Hoc Committee and the Pre-Petition FCR that was related to the parties common legal interest against their "common enemy," the Insurers? The Court finds that they did.

The Debtor, the Ad Hoc Committee and the Pre-Petition FCR had a conflicting interest relating to the distribution of the Debtor's assets. Each of those parties clearly desired to obtain the largest share of those assets as possible. However, the parties shared a common interest in maximizing the asset pool, which would include insurance proceeds. To return to the pie analogy, the size of the pie and the size of the pieces are two separate questions. The parties are in accord as to the former and adversaries as to the latter.[37] The information contained in the documents that were shared with the Ad Hoc Committee and the Pre-Petition FCR goes to the size of the asset pool - a matter of common interest.

***3) Conclusion***

The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege has not otherwise been waived. The Debtor has met

[36] *Id*. (internal citations omitted).

[37] Think of Thanksgiving. Everyone wants the biggest turkey possible (except, perhaps, the chef) but all bets are off when it's time to wrestle over who gets a leg.

that burden. Thus, all 26 documents at issue are protected from discovery. The Debtor is instructed to submit an order under certification of counsel.

Yours very truly,

Christopher S. Sontchi
United States Bankruptcy Judge

css/cas